**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
| v. |
| DANEAN MACANDREW, |
| Defendant. |

Criminal Action No. 21-730 (CKK)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
(January 17, 2023)

A three-day bench trial in this criminal matter concluded on January 12, 2023.  For her actions at the insurrection of January 6, 2021, the Government charged Defendant Danean MacAndrew ("Defendant" or "MacAndrew") by Information with:  (1) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (3) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  Superseding Information, ECF No. 21.  In support of its case, the Government introduced testimony from three witnesses:  (1) Inspector Lanelle Hawa of the United States Secret Service;  (2) Captain Jessica Baboulis of the United States Capitol Police Department; and (3) Special Agent Braden Ballantyne of the Federal Bureau of Investigation.  Additionally, the Court admitted fifty exhibits into evidence in full and one exhibit into evidence with redactions.

At the close of the Government's case, Defendant moved for a judgment of acquittal as a matter of law.  That motion remains pending before the Court.  Defendant also presented evidence, calling one witness, herself.

Based on the following findings of fact and conclusions of law, Court **DENIES** Defendant's Rule 29 motion by separate order.

The Court finds Defendant Danean MacAndrew **GUILTY** on Counts 1, 2, 3, and 4, the Government having carried their burden beyond a reasonable doubt as to each element of each charge.

In reaching a decision on the following findings of fact and conclusions of law, the Court has considered the pleadings, the record, testimony, the parties' stipulations, the demeanor of the witnesses while testifying, the reasonableness of or unreasonableness of the testimony, the probability or improbability of the testimony, and all reasonable inferences to be drawn therefrom, among all other matters bearing on the credibility of the witnesses and the facts, and exhibits in evidence.  The Court credits the following testimony and evidence as undisputed and/or unrebutted.

## I.      Findings of Fact

Clad in a "MAGA" hat, wearing a red scarf, and wielding a "Trump" flag, Danean MacAndrew knew she was not permitted to be in or around the Capitol on January 6, 2021.  That knowledge, like a snowball rolling down a ski slope, accumulated that day.  Her suspicions undoubtedly started when, contrary to her testimony, she passed "Area Closed" signs affixed to strewn fencing.  If she did not know at that time her presence on Capitol grounds was unlawful, her awareness must have been stronger when she clambered over dismantled bike racks and snow fencing even closer to the Capitol building with their own "Area Closed" signs.  If, after seeing *those* signs, she did not know her presence was unlawful after *those* signs, then surely she knew she was unlawfully present when she encountered a line of armored Metropolitan Police

Department ("MPD") officers marching past Capitol Police officers guarding the Capitol

building behind bike racks affixed, again, with "Area Closed" signs.

Assuming, for sake of argument, that she *still* did not know she was not permitted on

Capitol grounds or in the Capitol building, she must have known when she arrived to the Upper

West Terrace and met four individuals she testified she knew to have been pepper sprayed.  Or,

to enter the realm of the fabulist, perhaps it was only when she entered the Capitol through a

broken door, an emergency siren blaring.  These signs, and others detailed below, undoubtedly

endowed MacAndrew with the knowledge that her presence and protest in the Capitol was

unlawful.  Nevertheless, she remained.

A.  The Certification of the Electoral College Vote and the Insurrection Generally

The Court restates a number of background facts that it has found over the course of two

prior bench trials.[1]  These facts are important context for the circumstances leading up to

Defendant's participation in the events at the Capitol on January 6, 2021 and contrast with her

experience of security screening at the Ellipse earlier in the day.

The Government's first two witnesses, Inspector Hawa and Captain Baboulis, largely

repeated the background offered in *Rivera*.  As they explained, the Capitol, guarded twenty-four

---

[1]  Specifically, the Court takes judicial notice of the trial testimony of Inspector Hawa and Captain Carneysha Mendoza in *United States v. Rivera*, Crim. A. No. 21-060 (CKK) (D.D.C.). The Court also took judicial notice of this testimony with the parties' consent in *United States v. Grider*, --- F. Supp. 3d ---, 2022 WL 17829149, at *2-3 (D.D.C. Dec. 21, 2022).  Where relevant, the Court also takes judicial notice of background information discussed in H.R. Rep. 117-663 (Dec. 22, 2022) ("Select Committee Report") as information that is unquestionably accurate and derived from a source "whose accuracy cannot reasonably be questioned."  *See Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (quoting and discussing Fed. R. Evid. 201); *see also FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 61 (D.D.C. 2022) (taking notice of Congressional committee report).   Pursuant to Fed. R. Evid. 402(e), the Court provided the parties notice that it intended to incorporate these findings and the parties did not object.  Unless otherwise stated, all facts recited in this subsection originate from *Rivera* or *Grider* or the parties' [56] Stipulations, admitted into evidence as Government's Exhibit 500.

hours a day, was open only to those with official business (along with Members and staff) from March 2020 to January 6, 2021. Had the Capitol been open to the public, all members of the public would be required to enter through the Capitol Visitor's Center. Additionally, aside from Members, anyone seeking to enter the Capitol must show identification, go through a metal detector, put their belongings through an x-ray machine, and are otherwise subject to search by United States Capitol Police ("Capitol Police") officers. Were someone to enter the Capitol without passing through security, Capitol Police would work to find and detain that person; if necessary, Capitol Police would lock down portions of the Capitol in such a way that could include stopping certain Congressional proceedings.

In preparation for Vice President Michael R. Pence's visit to preside over the counting of the votes of the Electoral College on January 6, Inspector Hawa coordinated the Vice President's visit with the Capitol Police. In partnership with the Capitol Police, the United States Secret Service ("Secret Service") set up a protective perimeter around the entire grounds of the United States Capitol. Only those with credentials or with permission from either agency were permitted beyond that point. The security perimeter is standard for visits by heads of state (in which category the Secret Service includes the Vice President) but was also implemented in light of security concerns arising from then-President Donald J. Trump's scheduled "Stop the Steal" rally near the White House. At various places, the protected area had successive lines of barriers made of snow barriers, interconnected bike racks, or mesh fencing. Most of these barriers included at regular intervals "Area Closed" signs printed in large font. *See also* Gov.'s Ex. 414.

Inspector Hawa, as the head of the Vice President's coordinating detail at the United States Capitol, arrived at the Capitol building in the morning on January 6 to coordinate the Vice President's visit that day. Vice President Pence arrived approximately at 12:30 p.m. with his

wife and daughter, and Inspector Hawa escorted the Vice President and his family to the Vice President's Ceremonial Office in the Capitol.  The Joint Session for the count of the Electoral College votes began at 1:00 p.m. with Vice President Pence presiding.  Fifteen minutes later, the two Houses of Congress retired to their respective chambers to debate the certification of the votes from the state of Arizona.

After 1:15 p.m., which was fifteen minutes after the Vice President returned to the Senate, the Secret Service learned of breaches to its protective area, i.e., the mob had made its way through barriers and onto the Capitol grounds by that time.  At that time, the Secret Service began to discuss moving the Vice President and his family to a more secure location.  At around 2:30 p.m., when the rioters first breached the Senate side of the Capitol itself, the Secret Service evacuated the Vice President and his family to a more secure location in the Capitol.  Shortly thereafter, with multiple police lines overrun and the several entrances to the Capitol breached, the Senate recessed for its own safety; the House shortly followed.

On the west side of the Capitol, the farthest edge of the security line was Peace Circle.  That line was breached at around 12:55 p.m.  The mob began to tear down fencing across the West Front of the Capitol at that same time.  At the time of these initial breaches, Captain Mendoza and other Capitol Police officers surged to support surviving police lines, mainly on the Upper and Lower Terraces on the West Front of the Capitol.  MPD officers joined Capitol Police on these lines in stages.  *See also* Gov.'s Ex. 414; 425.  Over the course of the following hour, various sections of the police line broke in the face of heavy violent resistance, including the northwestern stairway on the West Front leading from the Lower Terrace to the Upper Terrace at 2:09 p.m.  Just a few minutes later, the rioters smashed through the Senate Wing Door and its windows.  Capitol Police officers briefly reclaimed the Senate Wing Door, only for

rioters to overwhelm that line again at 2:49 p.m.  Meanwhile, another door with access to the Senate side of the Capitol, the Parliamentarian Door, was breached at 2:42 p.m.  For some period of time after 1:00 p.m. and before 2:42 p.m., MPD deployed chemical spray (pepper spray or something similar) to disperse the insurrectionists who had yet to join the portion of the riot that had captured the Upper West Terrace, ultimately to little effect.

When rioters entered the Capitol, they were met with a loud PA system urging Capitol visitors and staff to take shelter due to an incursion into the Capitol.  Although Capitol Police officers engaged in hand-to-hand combat with the rioters to maintain portions of police lines throughout Capitol grounds, Capitol Police officers were ultimately unsuccessful.  At that point, the focus of the Capitol Police shifted to convincing rioters to leave the Capitol and stemming particularly severe acts of violence.  Law enforcement and the National Guard were unable to secure the Capitol and the safety of the Vice President, Members of Congress, and staff until several hours later.  With Vice President Pence presiding, Congressional proceedings only resumed at approximately 8:00 p.m. when all of the rioters had been removed.

B. <u>MacAndrew's Participation in the Riot</u>

As noted above, the Court finds Defendant a supportive, though noncombative, member of the riot.  Defendant has long been a supporter of former President Trump.  After earning a master's degree in psychology from the University of Pittsburgh, MacAndrew returned to her family home in California.  Beginning at least in 2020, MacAndrew attended a number of pro-Trump rallies, including one rally in 2020 featuring then-President Trump himself.  After MacAndrew read then-President Trump's announcement that he would hold a rally on January 6, 2021 that "w[ould] be wild," she made plans to attend, excited to hear then-President Trump speak and to protest against the 2020 Presidential Election.

She arrived in the District of Columbia on January 4, 2021.  Two days later, she awoke early in the morning to attend the "Stop the Steal" rally at the Ellipse.  Defendant testified that she waited in line for hours to enter the rally through at least one security checkpoint.  To ensure the safety of the President and attendees at the outdoor rally, Defendant was required to leave her backpack outside the demarcated area.  At some point, MacAndrew left the rally early to retrieve ibuprofen or acetaminophen from her backpack due to, she testified, painful back spasms.  Notwithstanding her back pain, she then proceeded to march down the National Mall to the Capitol with other protestors, at times helping others carry a gargantuan "Trump" flag.

She then pierced the restricted area on its western boundary.  As stated above, Capitol Police had erected multiple lines of barriers in this area with "Area Closed" signs clearly visible.  Defendant testified that she saw individuals climbing the walls on the West Front as she worked her way northeast, towards the northern side of Capitol grounds.  Throughout this time, her "Trump" flag was unfurled as, she admitted, she demonstrated against "a stolen election."  In MacAndrew's mind, she said, only Congress could fix the abnormalities leading to the "stolen election."

Trial exhibits establish a variety of barriers, some intact and some dismantled, as she continued east.  At approximately 2:40 PM, she came upon discarded snow fencing and bike racks.  Gov.'s Ex. 426.  She looked down, where she would have seen the very same "Area Closed" signs.  *Id.*; Gov.'s Ex. 426.  In order to clamber over these bike racks and snow fencing, another demonstrator assisted her.  Gov.'s Ex. 426.  After ascending onto a pathway, she doubled back southwest, moving with a line of armored MPD officers towards the Upper West Terrace.  As she did so, she passed Capitol Police officers guarding the Capitol.  *Id.*  These officers were standing behind more bike racks, including one with another large "Area Closed" sign.  *Id.*

7

As the MPD officers continued east to attempt to reinforce police lines engaging in hand-to-hand combat with insurrections battling to enter the Capitol, Defendant turned north towards the Senate Wing Door.  *See* Gov.'s Exs. 9, 414.  There, she took multiple photos of a man who had been pepper sprayed before he left the Capitol building.  Gov.'s Exs. 10, 11, 12.  She stated that she also saw three rioters exit the door to her left, the Parliamentarian Door, also having been pepper sprayed.  Still, she continued onwards, entering the Capitol at 3:09 PM.   Gov.'s Ex. 424.  Shortly before entering, MacAndrew rolled up her "Trump" flag and covered her face with her scarf because, she admitted in her testimony, she was worried about encountering pepper spray.

MacAndrew also filmed her entry which, like the Court inferred in *Rivera*, constituted at least part of her field of vision.  *See* 2022 WL 2187851, at *3.  Her video captures the Senate Wing Door having been ripped off its hinges, nails protruding from its frame.  Gov.'s Ex. 13.  It also features a piercingly loud emergency siren blaring.  *Id.*  Upon entering, Defendant saw a line of riot police to her left, unarmored police directly in front of her, destroyed furniture, and a mob of rioters chanting, among other things, "USA! USA!"  *Id.*  A rioter directly in front of her offered at least two "fist bumps" to riot officers, which were reciprocated.  Gov.'s Ex. 424.  A third riot officer physically gestured at the same rioter to, the Court infers from its review of the video evidence, exit the Capitol.  *Id.*

After milling about for a few minutes and filming the events around her, she continued rightwards, further into the Capitol towards the Crypt.  *Id.*  Defendant did not stay for long; she was met with a cloud of chemical spray and fellow rioters warning of an incoming SWAT team.  *Id.* After turning around, she exclaimed, "They gassing us! They're gassing us!"  *Id.*  Upon returning to the area directly next to the Senate Wing Door, she continued to stand and film with

her phone.  Some footage captured other rioters exiting the building through the smashed

windows next to the Senate Wing Door.  Gov.'s Ex. 20.  Approximately three minutes later, an

unarmored Capitol Police Officer gestured at her to leave.  Gov.'s Ex. 424.  It was only at this

moment, MacAndrew insists, that she understood she was not permitted to be in the Capitol.

Even then, MacAndrew did not leave immediately.  As others passed her heading for the exit,

she remained for approximately three minutes, continuing to film while clad in her "MAGA" hat.

*Id.*  Only when armored riot police advanced with a riot shield did she finally exit the building, at

approximately 3:17 PM.  *Id.*  Defendant continued to remain directly outside the Senate Wing

Door for some time afterwards.  Gov.'s Ex. 428.

     In general, Defendant maintained in her testimony that she thought it was lawful to enter

the Capitol and its grounds and that she exited the Capitol as soon as she was instructed.  The

Court does not find this testimony credible.  As an initial matter, that assertion does not comport

with clear video evidence of a variety of circumstances placing Defendant on notice that she was

not permitted in the Capitol, not least of which included a cloud of chemical spray inside the

building, an earsplitting alarm upon entering the Capitol, and numerous "Area Closed" signs

outside of the building.  Given the numerosity of these signs and that Defendant stepped over

one, the Court does not find credible Defendant's assertion that she never saw such a sign.

     More specifically, Defendant contradicted her testimony at times in such a way as to call

much of it into doubt.  For example, Defendant testified that she did not know if it was the police

who pepper-sprayed fellow demonstrators, yet shortly after she left the Capitol she herself stated

on Twitter that it was, in fact, the police deploying chemical spray.  Gov.'s Ex. 124.  Moreover,

although on the stand she implied that those pepper sprayed were "bad" or nefarious actors, she

subsequently identified with them, calling them "Patriots."  *Id.*  Additionally, it strains credulity

to accept that an individual who just hours earlier had to pass through security to see then-President Trump speak *outside* thought it unnecessary to pass through security to enter the United States Capitol with her backpack while she believed Congress was in session.  As such, the Court does not credit Defendant's testimony regarding her mental state, although the Court does credit the remainder of her testimony as either conceded or uncontradicted by other evidence.

## II.  Conclusions of Law

A. <u>Count One</u>

To find a defendant guilty of Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1), the Court must find the following beyond a reasonable doubt: (1) the defendant entered or remained in a restricted building without lawful authority to do so; and (2) the defendant did so knowingly.  First, as in *Grider* and *Rivera*, the Court concludes again that the Capitol building and area surrounding it were "restricted" within the meaning of 18 U.S.C. § 1752 based on testimony by members of the Secret Service and Capitol Police.  Second, the overwhelming weight of evidence shows that MacAndrew knew that she was not permitted on Capitol grounds or inside the Capitol well before a Capitol Police officer instructed her to leave.

The evidence in this regard is legion and is presented in chronological order as follows:

1. Given the sheer number of barriers and signs posted on January 6, 2021, the Court can infer by circumstantial evidence that MacAndrew passed intact barriers with Area Closed signs affixed to them.

2. As MacAndrew continued further into the West Lawn, she saw, as Defendant admitted during her testimony, rioters scaling a wall in order to advance further into the Capitol.

3. MacAndrew clambered over broken fencing and, when she looked down, an "Area Closed" sign would have been visible.

4. MacAndrew continued onwards to a line of riot police, an indication that her presence was unwelcome.

5. While walking alongside that line of riot police, MacAndrew passed a group of unarmored Capitol Police officers guarding the Capitol. These officers stood behind intact bike racks, one of which had an "Area Closed" sign clearly visible to MacAndrew.

6. MacAndrew admitted in her testimony that, before entering the Capitol, she saw four rioters who, she understood, had been sprayed with some kind of chemical irritant.

7. MacAndrew took multiple photos of one of the rioters who had been pepper sprayed.

8. MacAndrew entered the Capitol through a clearly broken door.

9. When entering, MacAndrew admitted that she heard what she understood to be a piercing emergency siren.

10. After entering, she witnessed a line of police in riot gear, one of whom physically gestured the rioter directly in front of MacAndrew to leave.

11. MacAndrew also saw a pile of destroyed furniture directly after entering.

12. MacAndrew admitted during cross-examination that she covered her face with her scarf before entering because she was scared of being pepper sprayed.

13. After continuing towards the Crypt, experiencing the effects of chemical spray, MacAndrew exclaimed "They're gassing us! They're gassing us!"

14. MacAndrew filmed another rioter warning others that he believed a SWAT team was en route.

15. MacAndrew filmed at least one rioter jumping through a broken window adjoining the destroyed Senate Wing Door.

*See Rivera*, 2022 WL 2187851, at *5 (discarded barriers, signs, pepper spray, alarm, and broken door at entry put defendant on notice that his presence was unlawful).

During her testimony and closing, Defendant argued that she was unaware she was unlawfully present in the Capitol because she focused her entire attention on the four-inch screen of her phone while inside. That argument decidedly fails. As an initial matter, Defendant herself

captured numerous instances of events placing her on notice that her presence was unlawful, including her exclamation while inside the Capitol that she believed she was being teargassed. More culpably, it raises some question as to whether she willfully blinded herself to circumstances that would, she understood, have even more fully placed her on notice that her presence was unlawful.

Although not commonly invoked, "willful blindness" (sometimes termed "willful ignorance") is one method by which a factfinder may conclude that a defendant "knowingly" committed a criminal act. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) (characterizing the doctrine as "well established in criminal law"). In general, where a defendant "knows or strongly suspects that he is involved in criminal dealings but deliberately avoids learning more exact information about the nature of extent of those dealings," that defendant is said to act "knowingly." *Tantchev v. Garland*, 46 F.4th 431, 437 (6th Cir. 2022) (quoting *United States v. Tantchev*, 916 F.3d 645, 652 (7th Cir. 2019)); *see also United States v. Alston-Graves*, 435 F.3d 331, 339-41 (D.C. Cir. 2006) (discussing doctrine in dicta).[2] Much of Defendant's testimony implicates this doctrine.

For example, Defendant readily admits that she found much of the events around her "strange" and not at all akin to the prior pro-Trump events she had attended. She further testified that she thought the presence of riot police meant something "might go wrong," including due to

---

[2] Also in dicta, the Circuit suggests that this doctrine should be invoked only rarely, if at all. *Id.* To the extent that such dicta has any persuasive value, the Supreme Court explicitly called *Alston-Graves'* admonition into question in *Global-Tech*. 563 U.S. 754 at 779 n.9. The Court need not pause long on the merits of one court's dictum over another, for the Court's finding that Defendant acted knowingly rests only, and alternatively, in small part on the doctrine of "willful blindness."

her fear of "Antifa" or counter-protestors.[3]  That she could have been permitted to enter the United States Capitol without security screening and with her backpack, particularly after she witnessed other members of the crowd suffering from the effects of pepper spray, should have also struck her as "strange" when she had just been subjected to a security screening for an outdoor event.  Nevertheless, Defendant insists that she would have expected police to tell her she was not welcome.  That assertion begs the obvious question why Defendant did not stop to ask the various police officers in her vicinity throughout her progression from the West Front into the Capitol.  Failure to ask strikes the Court as a deliberate effort to avoid confirming what Defendant admits she suspected:  she was involved in criminal activity that day.  Either way, the Court concludes that Defendant was aware that her presence inside the Capitol was unlawful.

Accordingly, the evidence establishes beyond a reasonable doubt that (1) MacAndrew entered or remained in a restricted building without lawful authority to do so and (2) MacAndrew did so knowingly.  The Court therefore finds Defendant **GUILTY** on Count 1.

B. <u>Count Two</u>

To find a defendant guilty of Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2), the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building; (2) the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions; and (3) the defendant's

---

[3]  To be clear, there is no evidence that "Antifa" or any militant left-wing group was present at or around the Capitol on January 6, 2021.  Indeed, intelligence agencies concluded that such groups commanded their members to stay home that day.  Final Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol, 117th Cong. H.R. Rep. 117-663 (Dec. 22, 2022).

conduct occurred when, or so that, her conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

As this Court has held twice now, even mere presence in an unlawful mob or riot is both (1) "disorderly" in the sense that it furthers the mob's disturbance to the peace and (2) "disruptive" insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants.  Were it not, it must be said that continued presence in a mob that is being tear gassed and pepper sprayed by police, as a measure to control the rioters, is disorderly insofar as a person's continued presence clearly impedes law enforcement's efforts to regain control of a particular area.  Additionally, as Captain Mendoza explained, entering a Capitol building without authorization is necessarily "[n]ot according to order and rule," "unruly," and may "disrupt [Congressional] . . . activity" insofar as Capitol Police would seek out and detain anyone who enters a Capitol building without authorization.  Accordingly, the Court concludes that MacAndrew "engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building."

Second, having discredited Defendant's testimony regarding her mental state, the Court presumes that she intended the natural and probable consequences of her actions.  *See Grider*, 2022 WL 17829149, at *12; *United States v. Meija*, 597 F.3d 1329, 1341 (D.C. Cir. 2010). "'The probable and natural consequence of breaking into the United States Capitol is the disruption of Congressional business and proceedings.'"  *Grider*, 2022 WL 17829149, at *12 (quoting *Rivera*, 2022 WL 2187851, at *5).[4]  Even the presence of just *one* unauthorized person

---

[4] *See also* ECF No. 81 at 397, *United States v. Brock*, Crim. A. No. 21-140 (JDB) (D.D.C. Dec. 6, 2022) (transcript of bench verdict); *United States v. Brock*, Crim. A. No. 21-158 (RC) (D.D.C. Oct. 27, 2022) (same).

14

in the Capitol is reason to halt Congressional business as Capitol Police (and, in this case, many other law enforcement agencies) track down the intruder. *Id.*

The Court need not rest solely on this *Meija* axiom, however. Indeed, in advance of the rally, Defendant tweeted at then-President Trump that she too felt that "[t]raps had been set" in the "#RiggedElection" of 2020. Gov.'s Ex. 114. On January 6, she even identified with her fellow "Patriots" who had been pepper sprayed breaching the Capitol in support of former President Trump. Gov.'s Ex. 124. And at the "Stop the Steal" rally, then-President Trump eponymously exhorted his supporters to, in fact, stop the steal by marching to the Capitol. Defendant marched to the Capitol where, she testified, she understood that only Congress had the power to fix the election's outcome and that Congress was likely in session while she was around and in the Capitol. Having followed then-President Trump's instructions, which were in line with her stated desires, the Court therefore finds that Defendant intended her presence to be disruptive to Congressional business.

Third, as the Court explained in *Rivera*, even mere presence in these circumstances is in fact disruptive. 2022 WL 2187851, at *6. As noted above, even the presence of *one* unauthorized person in the Capitol is reason to suspend Capitol business. Captain Baboulis and Inspector Hawa amply explained how Defendant's presence, standing alone, was disruptive to Congress and to the Vice President's business on January 6, 2021.[5]

---

[5] For the sake of completeness, the Court repeats the metaphor presented in *Rivera*, which the Government recited at trial:

> Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption. Because MacAndrew's presence and conduct in part caused the continued interruption to

Altogether the Court finds that the evidence shows, beyond a reasonable doubt, that MacAndrew knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building that in point of fact impeded or disrupted the orderly conduct of Government business or official functions. The Court therefore finds Defendant **GUILTY** on Count 2.

  C. <u>Count Three</u>

In order for the Court to find Defendant guilty of Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D), the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings; (2) the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and (3) the defendant acted willfully and knowingly. Broadly, a person acts "willfully" when they "act with knowledge that their conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (cleaned up); *see also United States v. Moore*, 612 F.3d 698, 703 (D.C. Cir. 2010) (Kavanaugh, J., concurring). As the Court has already concluded that MacAndrew knew her presence around and in the Capitol was unauthorized, and that her continued presence was disruptive, the Court has found that MacAndrew acted willfully as well. For the other elements of the offense, for the same reasons the Court found Defendant guilty on

---

Congressional proceedings, the Court finds that she in fact impeded or disrupted government business while present in the Capitol on January 6, 2021.

*See* 2022 WL 2187851, at *6.

Counts 1 and 2, the Court finds that the Government has carried its burden beyond a reasonable doubt and finds Defendant **GUILTY** on Count 3.

    D. <u>Count Four</u>

    To find a defendant guilty of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), the Court must find the following beyond a reasonable doubt: (1) the defendant paraded, demonstrated, or picketed in any of the United States Capitol Buildings; and (2) the defendant acted willfully and knowingly.

    As the Court has explained in prior opinions, "parading" and "demonstrating" centers on participation in a "march[,] procession," or gathering "in support of some political object" or question. *Rivera*, 2022 WL 2187851, at *7 (internal quotation marks removed).  Defendant admitted that she traveled not just to the District of Columbia to demonstrate and protest, but to Capitol grounds as well.  While on Capitol grounds, she proudly flew her "Trump" banner while wearing a red "MAGA" hat.  Yet, she maintains, she did not demonstrate *in* the Capitol because she furled her banner and only recorded videos.[6]

    As an initial matter, this Court has already held that "recording" and "demonstrating" are not mutually exclusive.  *Id.*  Furthermore, even mere presence in a crowd of demonstrators suffices to protest, so long as there are some indicia that the defendant joined their fellow demonstrators' cause.  *Id.* at *7 n.16; *see also Brock* at 412-13 (finding beyond a reasonable doubt that a defendant demonstrated without examining specific actions or statements by the defendant himself).  Defendant conceded such indicia through her own testimony.  Overall, her presence was part of the floodwaters that drowned the Capitol in insurrection and destruction.  In

---

[6] Defendant admitted during her testimony that she is not a professional photographer; at most she is a hobbyist.

other words, MacAndrew was no passive observer.  Clearly, the evidence shows, beyond a reasonable doubt, that MacAndrew took part in a demonstration.

Second, for the same reasons the Court concluded that Defendant acted "willfully and knowingly" in Count 3, the Court concludes that the evidence shows, beyond a reasonable doubt, that Defendant "willfully and knowingly" "paraded [ or] demonstrated" "in any of the United States Capitol Buildings."  The Court therefore finds Defendant **GUILTY** on Count 4.

### III.     Conclusion

Beyond a reasonable doubt, Danean MacAndrew knew on January 6, 2021 that her actions at the Capitol were unlawful.  Every step of the way, from the western boundary of Capitol grounds, to the West Lawn, to the Upper West Terrace, to the interior of the Capitol itself, she saw sign after sign that her presence was unlawful.  Nevertheless, heeding the call of former President Trump, she continued onwards to "stop the steal."  For her participation in the insurrection of January 6, the Court finds Danean MacAndrew **GUILTY** on Counts 1, 2, 3, and 4.

Dated: January 17, 2023

                                                                    /s/
                                                    COLLEEN KOLLAR-KOTELLY
                                                    United States District Judge