## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-730-CKK** |
| **v.** | : | |
| | : | |
| **DANEAN MACANDREW,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Defendant Danean MacAndrew ("MacAndrew") unlawfully entered the Capitol in the midst of a deadly riot on January 6, 2021. As explained below, the government requests that this Court sentence MacAndrew to 13 months' incarceration, 12 months' supervised release, and restitution of $500.

### I.        Introduction

MacAndrew is 55 years old and is self-employed selling old-time radio shows. On January 6, 2021, MacAndrew participated in the attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.

After a bench trial, Judge Kollar-Kotelly convicted MacAndrew of violating 18 U.S.C. § 1752(a)(1): entering and remaining in a restricted building; 18 U.S.C. § 1752(a)(2): disorderly and disruptive conduct in a restricted building; 40 U.S.C. § 5104(e)(2)(D): disorderly and disruptive conduct in a Capitol building; and 40 U.S.C. § 5104(e)(2)(G): parading, picketing, and demonstrating in a Capitol building. As explained herein, a sentence of 13 months' incarceration

1

is appropriate in the instant case because: to enter restricted Capitol grounds, MacAndrew climbed over a small wall with the assistance of another rioter, passing downed barricades and fencing and an "Area Closed" sign; before entering the Capitol building, MacAndrew passed officers in rioter gear and photographed rioters in gas masks, helmets, and reeling from pepper spray; MacAndrew saw at least three rioters exit the Capitol building having been pepper sprayed, but instead of turning around she covered her face with a scarf and entered the building anyway, filming the damaged doorframe and ignoring blaring alarms; MacAndrew ignored police instructions telling rioters to leave the Capitol building and instead stayed inside the building filming the officers and other rioters; MacAndrew stayed on restricted Capitol grounds at least another 40 minutes after leaving the Capitol building, filming as an angry mob continued to harass and yell at officers; MacAndrew celebrated January 6th on social media after the fact, calling it "an amazing day" of "patriotism" and "unity"; MacAndrew provided false and misleading testimony during trial asserting that she thought it was lawful to enter the Capitol building and its grounds on January 6, 2021; and MacAndrew has shown no remorse for her actions.

The Court must also consider that MacAndrew's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol building, and disrupted the proceedings. The facts of and circumstances of MacAndrew's crimes, as described below, support a sentence of 13 months' incarceration, towards the middle of the estimated Guidelines range for Counts 1 and 2.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1 Attachment 1 (Statement of Facts), at 1-2.

*Defendant MacAndrew's Role in the January 6, 2021 Attack on the Capitol*

On January 4, 2021, MacAndrew traveled from California to Washington, D.C. to attend the Stop the Steal Rally, scheduled for January 6, 2021, at the White House Ellipse. MacAndrew came to Washington, D.C. to protest what she described as "abnormalities" in the 2020 Presidential Election. Trial Tr. (1/10/2023) at 174. MacAndrew testified that, on January 6, 2021, she waited in line for several hours and underwent security screenings to enter the White House Ellipse. *Id.* at 179. Security at the Rally required MacAndrew and other protestors to leave their backpacks with security officials before entering the White House Ellipse. Trial Tr. (1/11/23) at 209, 222. This is relevant because mere hours later, MacAndrew entered the U.S. Capitol building without undergoing any security screenings. *Id.* at 222. Given this and the surrounding circumstances, MacAndrew knew her presence was unlawful in and around the Capitol building.

MacAndrew left the Stop the Steal Rally and joined other protestors to march to the U.S. Capitol. According to MacAndrew, the protest at the Capitol was a "continuation" of the protest at the White House Ellipse. Trial Tr. (1/10/23) at 183. MacAndrew described the scene at the Capitol as "strange," *id.* at 184, 186, and as if police were prepared for "something to go wrong." *Id.* at 186. She admitted that she saw individuals scaling the walls on the West Front of the Capitol. *Id.* at 184. She believed that only Congress could fix the abnormalities leading to the "stolen election." Trial Tr. (1/11/23) at 207. She understood that Congress was likely in session while she was in and around the Capitol. *Id.* at 242. These circumstances show that MacAndrew intended her presence to disrupt Congress and stop the certification of the 2020 Presidential Election.

At 2:34 p.m., MacAndrew was on restricted Capitol grounds. She stood on the West Lawn of the Capitol with other rioters. Gov.'s Ex. 414; Image 1 (MacAndrew is highlighted by a red circle). She and the other rioters observed a long line of officers dressed in riot gear. *Id.* The rioters harassed the officers, screamed at them, and filmed them as the officers tried to position themselves to protect the Capitol. MacAndrew wore a black jacket, red cap, and jeans, and held her Trump flag as she watched the police with the other rioters. *Id.*



*Image 1: Still from Government's Exhibit 414*

At about 2:40 p.m., MacAndrew paraded across restricted Capitol grounds, her flag in hand, toward a path on the northeastern side of the Capitol. Gov.'s Ex. 425. This path led MacAndrew even closer to the Capitol building itself. MacAndrew climbed over the wall of the pathway, with assistance from a rioter, who was wearing a helmet. *Id.* By doing so, MacAndrew climbed over downed barricades and snow fencing that the police had put up earlier to demarcate the restricted grounds. Gov.'s Ex. 425; Image 2. (In Images 2, 4, and 5, MacAndrew is indicated with an orange or red arrow.) An "Area Closed" sign was affixed to one of the downed barricades MacAndrew climbed over. Gov.'s Ex. 425; Image 3 (downed barricades with "Area Closed" sign highlighted by a red box).



*Image 2: Still from Government's Exhibit 425*



*Image 3: Still from Government's Exhibit 425*

MacAndrew lingered on the northeastern pathway for a few minutes, taking photos. *Id.* A group of Metropolitan Police Department ("MPD") officers in riot gear passed through that very path moments later. She marched up that pathway and climbed the flight of stairs to the landing, shoulder to shoulder with the officers. *Id.*; Image 4 (MacAndrew highlighted by a red arrow). As she paraded toward the northwest courtyard of the Capitol, she flew her Trump flag. She marched

by more barricades with an "Area Closed" sign and with officers in riot gear positioned behind

them. Gov.'s Ex. 426; Image 5 (the "Area Closed" sign is highlighted by a yellow circle).



*Image 4: Still from Government's Exhibit 425*



*Image 5: Still from Government's Exhibit 426*

MacAndrew eventually made her way to the northwest courtyard of the Capitol. Here, she

took photos of rioters in gas masks, helmets, and even rioters suffering from the effects of pepper

spray. Gov.'s Ex. 11; Image 6 (photograph MacAndrew took of pepper-sprayed rioters leaving the

Capitol building). She testified that she also saw three rioters exit the door to her left, the

Parliamentarian Door, also having been pepper sprayed. Trial Tr. (1/11/23) at 196.



*Image 6: Screenshot of Government's Exhibit 11*

MacAndrew continued onwards and entered the Capitol building through the Senate Wing

Doors at 3:08 p.m. Shortly before entering, MacAndrew rolled up her Trump flag and covered her

face with her red scarf to protect herself from pepper spray. Trial Tr. (1/11/23) at 198, 223.

MacAndrew filmed her breach into the Capitol building. Before she even crossed the

threshold, she captured the condition of the doorframe on cell phone video—the door had been

knocked off its hinges, nails protruding from its frame. Gov.'s Ex. 424; Image 7 (screenshot of a

video MacAndrew took as she entered the Capitol building). In the video, alarms blared from

inside the Capitol building. Upon entering, MacAndrew saw a line of riot police to her left,

unarmored police directly in front of her, destroyed furniture, and a mob of rioters chanting "USA,

USA!"



*Image 7: Still from Government's Exhibit 424*

In another one of MacAndrew's videos, she talked about getting pepper sprayed, saying "They're gassing us, they're gassing us" as the rioters around her coughed. Gov.'s Ex. 424. She lingered in the area around the Senate Wing Door for several more minutes, filming members of the mob jumping in and out of broken windows. Gov.'s Ex. 424; Image 8 (screenshot from a video MacAndrew took from inside the Capitol building). She even heard a fellow rioter's warning of an imminent SWAT presence. Gov.'s Ex. 424. United States Capitol Police began trying to funnel the rioters out of the Senate Wing Door area. They corralled the rioters closer to the exit and told the rioters to leave. MacAndrew did not leave right away. She stood around, filming the officers and the rioters on her cell phone before finally exiting the Capitol building, at around 3:17 p.m. *Id.*



*Image 8: Still from Government's Exhibit 424*

Though MacAndrew left the Capitol building, she stayed on restricted grounds for at least another 40 minutes. She lingered around the northwest courtyard, filming a large group of MPD officers dressed in riot gear. Exhibit 428; Image 9 (screenshot from a video MacAndrew took on Capitol grounds). She stood around again as the angry mob continued to harass and yell at officers for doing their duty that day. *Id.*



*Image 9: Still from Government's Exhibit 428*

The government also presented evidence of MacAndrew's state of mind before and after the events of January 6, 2021. On January 5, 2021, MacAndrew tweeted, "Traps set again at another #RiggedElection."  Gov.'s Ex. 114. Additionally, on January 6, 2021, former President Donald Trump tweeted, "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful!" Former President Donald Trump authored this Tweet at 2:38 p.m., before MacAndrew entered the Capitol building. In response, at 4:23 p.m., after she exited the Capitol building, MacAndrew tweeted, "I respectfully disagree, Sir. Capitol Police were pepperspraying Patriots before the building was breached by infiltrators. Not cool." Gov.'s Ex. 124. MacAndrew's Tweets shows that she had first-hand knowledge of the conflict between the rioters and officers on January 6 and an understanding of why she was at the Capitol on January 6—a "rigged election."

Notwithstanding the violence and chaos on January 6th, MacAndrew celebrated the events of the day and continued to promote that the election was stolen on social media. On Gab, she posted, "January 6th in DC was an amazing day. I will remember it forever for the friendships made, the easy conversations, the patriotism, the brotherhood, the unity and the excitement that filled the brisk air." Gov.'s Ex. 102; Image 10 (screenshot of MacAndrew's January 17, 2021 Gab post). Finally, on July 12, 2021, MacAndrew posted a photograph of the large crowd at the Stop the Steal Rally with the following caption: "This is the real image of 1/6 that we need to hold on to. Trump won. We are the majority. Don't let anyone convince you otherwise." Gov.'s Ex. 136; Image 11 (screenshot of MacAndrew's July 12, 2021 Telegram post). These social media posts— along with everything MacAndrew did, saw, and heard on January 6—are evidence that she knew her presence at the Capitol was unlawful and that her intended presence at the Capitol was to disrupt Congress. In addition, these social media posts show that MacAndrew did not display any

remorse for the events of January 6th and continued to promote her belief that the 2020 Presidential

Election was stolen.



*Image 10: Screenshot of Government's Exhibit 102*



*Image 11: Screenshot of Government's Exhibit 136*

<u>*MacAndrew's Trial Testimony*</u>

MacAndrew testified at trial and made several false and misleading statements. She maintained that she thought it was lawful to enter the Capitol building and its grounds. But the Government proved that MacAndrew had many opportunities to observe "Area Closed" signs: she climbed over an "Area Closed" sign affixed to the down snow fencing/barricades leading to the northeastern pathway and passed "Area Closed" signs as she marched north towards the northwest courtyard. The Court noted in the findings of fact as part of the Guilty verdicts, that MacAndrew's "suspicions undoubtedly started when, *contrary to her testimony*, she passed 'Area Closed' signs affixed to strewn fencing." ECF 59, p. 2 (emphasis added).

MacAndrew also admitted seeing rioters scaling walls to advance further into the Capitol building and its grounds. Trial Tr. (1/11/23) at 220. And before she entered the Capitol building, she saw at least three people exit the Parliamentarian Door who were suffering from the effects of

pepper spray, *id.* at 196; she herself took many photos of a rioter suffering from pepper spray, Gov.'s Exs. 10, 11, 12; Trial Tr. (1/11/23) at 219. She also filmed her entry, which captured an earsplitting alarm as well as the broken door frame of the Senate Wing Door. Gov.'s Ex. 424. MacAndrew admitted that those alarms never ceased throughout her time in the Capitol building. Trial Tr. (1/11/23) at 223-24.

Conveniently, MacAndrew testified on redirect that she did not recall seeing the nails sticking out of the doorframe of the Senate Wing Door or shattered glass, Trial Trans. (1/11/23) at 229; did not recall seeing any "Area Closed" signs on Capitol grounds, *id.* at 231; did not recall seeing bike racks and snow fencing, *id.* at 231; had no recollection of the large, white umbrella that was strewn on its side on the northeast pathway, *id.*; and had no recollection of the insults and threatening language other rioters hurled toward law enforcement, *id.* She testified that she thought she was allowed to enter the Senate Wing Door, but not the Parliamentarian Door, because at least three people who had exited through the Parliamentarian Door were suffering from pepper spray. *Id.* at 233. MacAndrew rightly acknowledged that this "sound[ed] ridiculous based on their proximity to one another[.]" *Id.*

MacAndrew testified on direct examination that as she approached the Senate Wing Door, she "was not positive" that she was allowed to go in, but as soon as she saw Capitol Police inside the Senate Wing Door area, then she thought she was "for sure" permitted to enter. *Id.* at 204. On cross-examination, MacAndrew gave a contradictory answer:

> Q: You said you weren't positive that you could enter the Capitol.
> A: Yes.
> Q: Correct? But you –
> A: Correct
> Q: --entered anyway?
> A: Yes.

*Id.* at 222. Yet on redirect, when asked whether she believed she had a right to enter the Capitol building, MacAndrew answered, "I thought I was allowed." *Id.* at 234-35.

Before entering the Capitol, MacAndrew covered her face with her red scarf because, she admitted, there was a possibility she could have been pepper sprayed. Trial Tr. (1/11/23) at 223. MacAndrew admitted filming several rioters exiting and entering the Senate Wing Door area through shattered windows and acknowledged that one cannot "enter the Capitol through broken windows." *Id.* at 224-25. And she admitted passing by broken furniture strewn on the ground of the Senate Wing Door area. *Id.* at 225. Notably, MacAndrew testified to the security measures she had to undertake at the Stop the Steal Rally: standing in a security line, going through a security screening, and dropping off her bag with security. *Id.* at 209. But she acknowledged that she did not undergo any security screenings at the Capitol grounds or Capitol building, unlike the screenings she adhered to before entering the White House Ellipse. *Id.* at 222. As the Court noted in its findings, it strained "credulity to accept than an individual who just hours earlier had to pass through security to see then-President Trump speak *outside* thought it was unnecessary to pass through security to enter the United States Capitol with her backpack while she believed Congress was in session." ECF 59 at 9-10.

Finally, MacAndrew also testified at trial that she did not know whether it was the police or "counter protestors" who pepper sprayed fellow rioters. Trial Tr. (1/11/23) at 243. When asked if she saw any counter protestors, MacAndrew replied, "I couldn't tell." *Id.* Yet, on January 6, 2021, MacAndrew stated on Twitter that it was, in fact, the police deploying pepper spray. Gov.'s Ex. 124. MacAndrew also testified that those who were pepper sprayed may have been bad actors, but in the same tweet, she identified those people as "Patriots." *Id.*

14

*The Charges*

On November 12, 2021, the United States charged MacAndrew by criminal complaint with violating 18 U.S.C. § 1752(a)(1): entering and remaining in a restricted building; 18 U.S.C. § 1752(a)(2): disorderly and disruptive conduct in a restricted building; 40 U.S.C. § 5104(e)(2)(D): disorderly and disruptive conduct in a Capitol building; and 40 U.S.C. § 5104€(2)(G): parading, picketing, and demonstrating in a Capitol building. On December 1, 2021, FBI agents arrested MacAndrew at the FBI field office in Orange County, California. On March 10, 2022, the United States charged MacAndrew by a Superseding Information with the same four charges. A bench trial was held from January 10-12, 2023; and on January 17, 2023, MacAndrew was convicted of all four Counts in the Superseding Information.

### III.    Statutory Penalties

MacAndrew faces up to one year of imprisonment and a fine of up to $100,000 on each of the first two counts of the Superseding Information: 18 U.S.C. § 1752(a)(1), entering and remaining in a restricted building; and 18 U.S.C. § 1752(a)(2), disorderly and disruptive conduct in a restricted building. MacAndrew also faces an additional six months of imprisonment and a fine of up to $5,000 on each of the second two counts of the Superseding Information: 40 U.S.C. § 5104(e)(2)(D), disorderly and disruptive conduct in a Capitol building; and 40 U.S.C. § 5104(e)(2)(G) parading, picketing, and demonstrating in a Capitol building. MacAndrew may also be ordered to pay restitution as discussed further below.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated MacAndrew's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Count 1 Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Trespass at Restricted Building (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Obstructing the Administration of Justice (U.S.S.G. §3C1.1(a)) | +2 |
| **Total Adjusted offense Level** | **=8** |
| | |
| Count 2 Base Offense Level (U.S.S.G. §2A2.4) | +10 |
| Obstructing the Administration of Justice (U.S.S.G. §3C1.1(a)) | +2 |
| **Total Adjusted Offense Level** | **=12** |

*See* ECF 69, Presentence Investigation Report ("PSR") ¶¶ 40, 45-53.

The government agrees with the U.S. Probation Office that the base offense level for Count 2 is 10. There is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, so "the most analogous guideline" must be applied. U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

The government also agrees with the U.S. Probation Office's application of U.S.S.G. § 3C1.1 for MacAndrew's obstruction of justice based on MacAndrew's materially false and misleading testimony during trial.

Pursuant to U.S.S.G. § 3D1.2, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." Specifically, when counts involve the same victim and two or more acts or transactions connected by a common criminal objective, those counts should group. U.S.S.G. § 3D1.2(b). Accordingly, Counts One and Two should group here, as they involve the

16

same victim, Congress, and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. *See* PSR ¶ 43. Under U.S.S.G. § 3D1.3(a), for offenses that group pursuant to U.S.S.G. § 3D1.2(a)-(c), the combined offense level for the Group is the highest offense level of the counts in the Group, and so here the Group's offense level is 12. The government agrees with the U.S. Probation Office's calculation of MacAndrew's criminal history as a category I. *See* PSR ¶ 56. But the government disagrees with paragraph 102 of the PSR regarding the calculation of MacAndrew's statutorily authorized maximum sentence. The PSR inaccurately applies U.S.S.G. § 5G1.1(a) and states that "where the statutorily authorized maximum sentence is less than the minimum of the applicable guidelines range, the statutorily authorized maximum sentence shall be the guidelines range." *Id.* ¶ 102. The PSR states, therefore, that the applicable guidelines range is 10-12 months. *Id.*

However, U.S.S.G. § 5G1.1 does not apply to cases where there is more than one count of conviction. Since there are multiple counts of conviction here to which the Guidelines apply (the two 18 U.S.C. § 1752 counts), the Court should instead apply § 5G1.2. Furthermore, under U.S.S.G. § 5G1.2(d), where there are multiple counts of conviction, and where the Guidelines range is higher than the statutory maximum for any single count, the Court may impose consecutive or partially consecutive sentences on more than one count to get a total sentence of confinement that is within the Guidelines range, which, here, is 10-16 months. Accordingly, MacAndrew's total adjusted offense level is 12 and her corresponding Guidelines imprisonment range is 10-16 months.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged numerous persons with crimes based on the January 6 riot.

This includes hundreds of felonies and misdemeanors that will undergo Guidelines analysis. To reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 13 months' incarceration, 12 months' supervised release, and restitution of $500.

#### A.   The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing MacAndrew's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like MacAndrew, the absence of violent or destructive acts is not a mitigating factor. Had MacAndrew engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in MacAndrew's case is that she ignored numerous, clear signs that she was not welcome inside the Capitol or on its grounds and, instead of turning away, she breached the Capitol building. Moreover, she incredibly testified at trial that she thought it was lawful to enter the Capitol building and its grounds. Disturbingly, in the aftermath of January 6th, MacAndrew continued to promote on social media her belief that the 2020 Presidential Election

18

was stolen and celebrated the events of January 6th. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B. The History and Characteristics of MacAndrew

MacAndrew does not have a criminal history. MacAndrew reported to Probation that she attended Carnegie Mellon University in Pittsburgh, Pennsylvania from 1996 to 1999, where she earned her master's degree. PSR ¶ 76. At trial, MacAndrew testified that she earned her master's degree in Psychology. Trial Tr. (1/11/23) at 236. MacAndrew reported that she has been self-employed at TheRadioLady.com since November 2000. PSR ¶ 80.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

MacAndrew has taken no responsibility, nor shown any remorse, for her actions on January 6, 2021. MacAndrew openly ignored clear indicators not to approach restricted Capitol grounds or

enter the Capitol building, and she remained there for at least an hour and a half while property damage and violence were going on around her. Yet at trial, MacAndrew made several false and misleading statements by maintaining that she thought it was lawful to enter the Capitol building and its grounds. In addition, in the aftermath of January 6th, MacAndrew celebrated the events of January 6th and promoted her continued belief that the 2020 Presidential Election was stolen. MacAndrew's lack of remorse, and her false testimony about her intent and motivations, make clear that she presents a risk of repeating this conduct in the future if she faces a political outcome she does not like or support. The government's recommended term of incarceration is necessary to specifically deter MacAndrew from any such future crimes, to impress upon her the gravity of her crimes, and to promote respect for the law.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[1] This Court must sentence MacAndrew based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully

---

[1] A routinely updated table detailing the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence here would not result in an unwarranted sentencing disparity.

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity

of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations here.

In *United States v. Russel Alford*, 1:21-CR-00263 – TSC, Alford was convicted of the same four misdemeanor offenses following a jury trial. The evidence showed that Alford posted on Facebook in the days and weeks leading up to January 6, claiming that the 2020 presidential election was rigged, indicating he purposefully engaged in unlawful behavior on January 6 intending to stop the Congressional certification. Alford entered through the Upper House door, through doors and windows that had been broken open by previous rioters. Police in riot gear were nearby and an alarm blared throughout Alford's time in the building and despite MPD's attempt to remove rioters from the building, Alford continued on. Alford, like MacAndrew, celebrated his participation in the riot on social media and demonstrated a lack of candor and honesty in his trial testimony. Like MacAndrew, Alford engaged in no violence in the Capitol and was not inside the building for a long period of time. Alford was convicted of the same four charges of which MacAndrew stands convicted. The Government asked the Court to sentence Alford to 13 months' incarceration, the middle of the Guidelines range of 10 to 16 months. The Court sentenced Alford to 12 months' incarceration, followed by 12 months' supervised release.

In *United States v. Rivera*, No. 1:21-cr-0060-CKK, Rivera was convicted of four misdemeanor offenses after a bench trial. *See* Findings of Fact and Conclusions of Law, Rivera, No. 1:21-cr-0060-CKK, ECF No. 62. The evidence showed that Rivera livestreamed his presence in the Capitol and "[h]e urged his followers watching his Facebook livestream to share his livestream with their friends and followers" and proclaimed he was "about to take [his] ass to the middle of the [United] State[s] Capitol." *See* Sentencing Memorandum, Rivera, No. 1:21-cr-0060-CKK, ECF No. 69 at 5. Rivera announced to his followers that MPD officers were firing pepper spray at the rioters. *Id.* at 7. Rivera, like MacAndrew, saw rioters climbing a wall, and Rivera shouted at them, "there's an easier way up!" *Id.* Rivera, like MacAndrew, engaged in no violence in the Capitol and left after around 20 minutes. Also in *Rivera*, as in this case, the defendant did not express any remorse or contrition for his actions. Like MacAndrew's statements after the events of January 6th, Rivera told a friend a day after the riot that he "had a great time." *Id.* at 17. In contrast, Rivera did not take the stand at trial and did not otherwise qualify for the U.S.S.G. §3C1.1(a) obstruction enhancement. Rivera was convicted of the same four charges of which the defendant stands convicted. The Government recommended 9 months' incarceration – the midpoint of the 6 to 12-month Guidelines range in that case – and the court sentenced the defendant to 8 months' incarceration and 12 months of supervised release. Rivera, No. 1:21-cr-0060-CKK, ECF. 82.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," and so "different district courts may have distinct sentencing philosophies and may emphasize and weigh

the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### F.   Restitution.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because MacAndrew was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury., 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must consider the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[2]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic

---

[2] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. See 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require MacAndrew to pay $500 in restitution for her convictions on Counts One to Four. This amount fairly reflects MacAndrew's role in the offense and the damages resulting from his conduct. Moreover, when the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 13 months' incarceration, 12 months' supervised release, and restitution of $500. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:          /s/ *Julie Bessler*
Julie Bessler
PA Bar No. 328887
Assistant United States Attorney
United States Attorney's Office
601 D Street N.W.
Washington, D.C. 20530
Telephone: 202-809-1747
Julie.Bessler@usdoj.gov

Zachary Phillips
CO Bar No. 31251
Assistant United States Attorney
United States Attorney's Office, Detailee
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 720-281-1611
Zachary.phillips@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 14 day of July, 2023 a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:      /s/ *Julie Bessler*
Julie Bessler
PA Bar No. 328887
Assistant United States Attorney
United States Attorney's Office
601 D Street N.W.
Washington, D.C. 20530
Telephone: 202-809-1747
Julie.Bessler@usdoj.gov

Zachary Phillips
CO Bar No. 31251
Assistant United States Attorney
United States Attorney's Office, Detailee
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 720-281-1611
Zachary.phillips@usdoj.gov