**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| UNITED STATES OF AMERICA, | |
| :--- | :--- |
| v. | Criminal No. 21-cr-00730 (CKK) |
| DANEAN KIMBERLY MACANDREW, | |
| Defendant. | |

**DANEAN MACANDREW'S SENTENCING MEMORANDUM**

Defendant Danean Kimberly MacAndrew, by and through her counsel Deputy Federal Public Defender Lillian Chu, hereby submits defendant's sentencing memorandum for the Court's consideration.

**I.      INTRODUCTION**

Danean MacAndrew is a 55-year old cancer survivor who has spent nearly two decades taking care of her ailing parents. Her dedication to her family demanded a steep sacrifice. Rather than pursuing the fruits of her education (a master's degree she succeeded in obtaining over a decade after she was a high school dropout), Ms. MacAndrew forewent her hopes of career in psychology to spend her days caring for her elderly and ailing parents until they each passed. Even as she cared for her parents, Ms. MacAndrew fought her own health battles, including rectal cancer and Graves' Disease. The year after her last parent's death and just before the COVID-19 pandemic and lockdown, she found her brother's body after he had passed from a drug overdose days earlier. By the start of the pandemic, Ms. MacAndrew had lost almost all of her immediate family. As she weathered the pandemic alone, she found support

and normalcy in the form of Reopen California and pro-Trump rallies, which ultimately led her to Washington D.C. on January 6th.

Ms. MacAndrew's nonviolent, calm, and quiet behavior at the Capitol places her among the least offensive January 6th defendants, most of whom (if they have been sentenced already) have received noncustodial sentences. Ms. MacAndrew should also receive a noncustodial sentence for her misdemeanor convictions. The defense acknowledges that, to account for her conviction at trial rather than by plea agreement, her noncustodial sentence should be more punitive than the probation sentences that many have received. A prolonged period of custody, however, amounts to an excessive trial tax for Ms. MacAndrew in light of her strong mitigation, her actual conduct on January 6th, and the fact that she waived jury trial. The government's request of 13 months imprisonment, in particular, would be incredibly disproportionate to even sentences where defendants have gone to trial, such as the defendant in *United States v. Rivera*, D.D.C. Case No. 21-cr-060-CKK (who notably livestreamed the events to incite more support and then mocked police officers on social media afterwards).

Ms. MacAndrew's exemplary life and character, cooperation with the FBI, nonviolent conduct during the events of January, and the need to avoid sentencing disparities all justify a noncustodial sentence. As detailed below, the defense respectfully requests a sentence of six months home detention, which is sufficient, but not greater than necessary to achieve the goals of sentencing in this case.

## II.    THE SENTENCING GUIDELINES CALCULATIONS AND OBJECTIONS

### A.    Probation's Calculations

Probation calculates a base offense level of 10 under USSG § 2A2.4(a), but finds that the total offense is 12 after an additional two-level enhancement under USSG § 3C1.1. PSR at ¶¶

36-53. Probation correctly concludes Ms. MacAndrew is in criminal history category I. *Id*. at ¶ 56. With zero criminal history points, Probation finds that the applicable range is 10 to 12 months. PSR at ¶¶ 100-103.

## B. The Defense's Calculations And Sentencing Request

The defense agrees with Probation's calculation of a base offense level of 10, but objects to the two-level enhancement for obstruction of justice.[1] The defense agrees that Ms. MacAndrew is in Criminal History Category I. The defense submits that the applicable guidelines range is six to 12 months and in Zone B of the sentencing table. Under Zone B, the Guidelines Manual permits the Court to impose a noncustodial sentence of probation or home detention in lieu of imprisonment. USSG § 5C1.1(c)(3).

The defense submits that the appropriate sentence in this case is a low-end sentence of six months of home detention, which is permitted under the USSG § 5C1.1(c)(3). If, however, the Court finds that two-level enhancement for obstruction of justice is appropriate in this case, the defense submits that a below-guideline sentence of six months home detention is appropriate in this case under 18 U.S.C. § 3553(a). Ms. MacAndrew does not object to a restitution order of $500, as suggested by Probation and requested by the government. Sentencing Recommendation and PSR at 3, ECF No. 70. If the Court sentences Ms. MacAndrew to a period of incarceration, the defense requests the Court designate her to FCI Dublin, which is in California anyeah, d will allow visits with friends and family.

## C. The Defense Objects To An Enhancement For Obstruction

This Court has previously acknowledged that an enhancement under USSG § 3C1.1(a) is not applied as a matter of course in every case where a defendant takes the stand: "this

---

1 Note that the defense previously objected to Probation's calculations under USSG § 2A2.4(a). ECF No. 67. The defense does not renew that objection for sentencing.

enhancement should, perhaps, be rarely applied against a defendant who takes the stand in his own defense…"  May 23, 2023 Order at 1-2, *United States v. Grider*, D.D.C. Case No 21-22-CKK, ECF No. 177.  This Court stated in *Grider* that the enhancement may only be applied "upon a finding by clear and convincing evidence that Defendant 'gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of mistake or faulty memory.'"  *Id.* at 1 (citing *United States v. Gaviria*, 116 F.3d 1498, 1518 (D.C. Cir. 1997)).

Rather than willfully provide false testimony, Ms. MacAndrew made key admissions about her conduct at the Capitol, including but not limited to admitting:

(1) to her presence inside and outside the Capitol;

(2) she approached the Capitol because she believed the crowd there was part of a "demonstration and a protest" (Exh B. at 183: 7-15) and she wanted to "be part of the demonstration" (Exh C at 194:12-14;  *see also id.* at 205:15-20);

(3) she saw people scaling the wall (Exh B at 183:23 – 184:6);

(4) she saw "a lot of D.C. Metro officers" (*id.* at 185:19-34), that the officers were in "riot gear" (Exh C at 194:24-25), and she believed they "seemed ready for something to go wrong" (Exh B at 186:4-10);

(5) she observed individuals suffer from pepper spray (*id.* at 196:15-18);

(6) she wore her scarf over her face to avoid potential pepper spray (*id*. at 198:7-14);

(7) protestors outside the Capitol building were being "extremely rude" to officers (*id.* at 203:11-17) and were "yelling at officers" (*id*. at 215:5-7);

(8) she was not positive she could go inside the Capitol building but she went in anyway (*id*. at 222:6-8);

4

(9) alarms were blaring inside the Capitol building, but she entered anyway (*id.* at
223:30-24, 224:13-14); and

(10) she saw "people jumping in and out of the Capitol through broken windows" (*id* at
224:24-225:2).

Even if the Court believes that her testimony at trial was misleading or false, there is no
evidence suggesting that she had a willful intent to mislead the Court or to obstruct justice. To
the extent the Court made conclusions that Ms. MacAndrew was not credible in her testimony,
differences in her memory and perception of the events are likely the culprit. Not only were the
events of January 6th two years prior to her trial, but Ms. MacAndrew has reviewed extensive
videos, photos, and media coverage of the day since. Time and new information affect memory,
perception, and understanding of past events. The enhancement should not apply here.

## III.   HOME DETENTION IS APPROPRIATE PUNISHMENT UNDER § 3553(a)

### A.   Ms. MacAndrew's History And Characteristics Support A
### Noncustodial Sentence

Ms. MacAndrew's life and character extend beyond the misdemeanor offenses the Court
convicted her of and support a sentence of six month's home detention. As discussed below,
below the surface of Ms. MacAndrew's seemingly normal, middle class childhood lays a history
of drug use, sexual abuse, and a chaotic home life. Her childhood difficulties notwithstanding,
Ms. MacAndrew worked hard to educate herself and contribute to society in meaningful ways.

In addition to her most important role as a caregiver to her both of her parents for nearly
two decades, she has also acted in many ways as a caregiver to the community around her.
Letters of support submitted with the position paper detail how Ms. MacAndrew is the kind of
person "who takes the extra time to stop and have a conversation with a homeless person, to

return with a sweater or a meal" and who "give[s] up her holidays to pack and distribute holiday meals for the less fortunate." Exh A at Lttr from E. MacAndrew. When her mother was in a residential care facility towards the end of her life, Ms. MacAndrew not only provided daily care to her mother but brought "old time movies to the home, play[ed] games, and read" to others in the home who needed support. *Id.* at Ltt from R. Phillips; *see also id.* at Lttr from J. Hardwigg (Ms. MacAndrew would "reach out and help anyone she could at the Board & Care her Mom was at"). During the COVID-19 pandemic, Ms. MacAndrew came up with a way to help friends and church members who were at serious risk from COVID: "She would shop for them. Danean would collect grocery lists from several individuals, and couples. She would shop at their favorite stores for them, and then deliver the groceries to the individual homes." *Id.* at Lttr from P. and G. Haas. All of her letters of support describe Ms. MacAndrew as someone compassionate, caring, loving, and "willing[ ] to go above and beyond." *Id.* Ms. MacAndrew's life and character, as further detailed below, call for a noncustodial sentence in her case.

### 1. Ms. MacAndrew experienced significant trauma as a child

Ms. MacAndrew hailed from a middle class neighborhood and had both parents in the home, but she experienced significant trauma and difficulties before the age of 18. Her parents, particularly her accomplished father, were very strict. PSR at ¶¶ 62-63. Ms. MacAndrew's perfectionist father alienated all three of Ms. MacAndrews older brothers, all of whom "gave up" when they could not live up to their father's expectations and turned to drug use. *Id.* at ¶ 62. Her brothers, all many years older than her, struggled with mental health issues in addition to drug abuse and caused a "chaotic" home life for Ms. MacAndrew when she was a child. *Id.* at ¶¶ 62-63. She witnessed police visits to the house, a lot of yelling, and even her brothers beating her father. *Id.* Her brothers' drug use overshaded her family life growing up, and she ultimately lost

6

two brothers to overdose. *Id.* The third is alive but remains a heavy user. *Id.*

Outside of her home, Ms. MacAndrew experienced sexual abuse from age five to 12 at the hands of a group of teenage boys in the neighborhood. *Id.* at ¶ 70. Although her older brother Todd was aware of some of the abuse, he did nothing to stop it. *Id.* Ms. MacAndrew suffered in silence with the trauma from this abuse, only telling her mother when she was in her 20s and her father a few weeks before he passed. *Id.* At the end of his life, her father finally understood what Ms. MacAndrew had been carrying with her for so long and what had made her "such an angry kid." *Id.*

### 2. Ms. MacAndrew abused drugs as a teenager, but cleaned up on her own after she found God

As a teenager, Ms. MacAndrew feels like she also "gave up" under the weight of her father's perfectionism and impossible expectations, becoming a heavy drug user. *Id.* at ¶¶ 62, 72. At only 12 years old, Ms. MacAndrew began using marijuana daily. *Id.* at ¶ 72. She then tried and used multiple substances throughout her teenage years, but became addicted to methamphetamine at 17 years old. *Id.* From 17 until 19 years old, Ms. MacAndrew used methamphetamine daily. *Id.* She dropped out of high school and ended up homeless in the streets of Los Angeles. *Id.* at ¶ 75. After discovering she had a heart condition and her drug use could cause her death, Ms. MacAndrew went through detox on her own. *Id.* at ¶ 72. During her detox, she had a singular experience that directed her towards Christianity. *Id.* From that point on, she dedicated herself to church and never returned to drug use. *Id.*

### 3. Despite dropping out of high school, Ms. MacAndrew earned her GED and then went on to higher education

Ms. MacAndrew returned to classes to obtain her GED after she conquered her

methamphetamine addiction.  PSR at ¶ 75.  A few years after obtaining her GED, Ms.

MacAndrew attended a local community college and, two years later, earned her Associate of

Arts Degree.  *Id.* at ¶ 76.  Ms. MacAndrew continued with her college education, obtaining a

Bachelor of Arts from the University of California, Davis.  *Id.*  Ms. MacAndrew went on to

higher education in the field of psychology and obtained a Masters of Science from Carnegie

Mellon University.  *Id.* at ¶ 76.  Just a little over a decade after Ms. MacAndrew was struggling

with drug addiction and homelessness, she had completely turned her life around and was about

to embark on a career in psychology.

> **4.     After working for over a decade on her education, Ms. MacAndrew**
> **sacrificed her career to take care of her aging parents even while she**
> **fought her own health battles**

Ms. MacAndrew graduated in 1999 with a master's degree, but as she completed her

schooling, her father began treatment for prostate cancer.  He was already suffering from COPD

and emphysema at this point.  Ms. MacAndrew's mother broke her hip shortly after Ms.

MacAndrew graduated.  Putting her career goals on hold, Ms. MacAndrew returned to her

parents' home after graduation, started her own business TheRadioLady.com in November 2000,

and took on the role of caregiver for both of her parents.

In 2009, Ms. MacAndrew started suffering her own health issues when she was

diagnosed with rectal cancer.  PSR at ¶ 67.  That year, Ms. MacAndrew began chemotherapy,

radiation, and had surgery to treat the cancer.  *Id.*  The following year, in 2010, she had her gall

bladder removed.  *Id.*  A few years later, Ms. MacAndrew was diagnosed with Graves' Disease

and, in 2013, Ms. MacAndrew underwent eye surgery to address ophthalmologic issues

associated with her conditions.  *Id.*

Throughout her health struggles, Ms. MacAndrew continued caring for her parents. *See* Exh A (Lttrs from E. MacAndrew and K. MacAndrew). As Ms. MacAndrew fought cancer, her father's COPD progressed and he began to have trouble breathing and with daily activities. Her mother had to have both hips replaced in 2009, the same year Ms. MacAndrew underwent cancer treatment. Ms. MacAndrew's mother also began to show signs of dementia and a diagnosis soon followed. By 2012, Ms. MacAndrew's mother's dementia became pronounced. By this point, Ms. MacAndrew had taken over all daily living tasks for her parents.

In 2015, Ms. MacAndrew's father passed away at 87 years old from COPD. PSR at ¶ 62. In the years leading up to his death, Ms. MacAndrew was solely responsible for his daily care. Ms. MacAndrew's mother's dementia meant that her mother did not comprehend that her husband was sick and dying. After his death, Ms. MacAndrew's mother declined further. When she could no longer keep her safe, Ms. MacAndrew moved her mother to a memory care facility but visited and helped with her care at the facility daily. Ms. MacAndrew's mother was eventually diagnosed with lung cancer. Ms. MacAndrew provided her mother's daily end of life care herself and her mother passed away in 2018.

Ms. MacAndrew's dedication to her family extended beyond her parents. Over the years, she provided love and support to her nieces, both of whom submitted letters of support for Ms. MacAndrew. *See* Exh A. In 2019, when Ms. MacAndrew's brother Todd MacAndrew passed from a likely drug overdose, his body was left alone in a hot house for days. *See* PSR at ¶ 69. In line with her natural tendency to care about and support others, Ms. MacAndrew went to check on her brother after not hearing from him. Ms. MacAndrew discovered his body, which was a traumatic event for her. *Id.*

Ms. MacAndrew sacrificed her 30's and 40's to care for her aging and dying parents. By

9

the end of 2019, Ms. MacAndrew's life had undergone fundamental, painful changes.  Ms.

MacAndrew (the youngest in the family) suddenly had only one brother left from her family of

five.  Her last brother resides in San Diego but, due to his drug use, they have little contact.

### B.    The Circumstances Of The Offense Support A Noncustodial Sentence

Although the Court is aware of details of the offense through trial, additional background

on the circumstances of the offense are relevant to sentencing and illustrate why a downward

variance from the guidelines range is warranted.

### 1.    In 2020, Ms. MacAndrew began attending Reopen California rallies and these shaped her expectations going into January 6

As Ms. MacAndrew was still coping with the loss of her mother and her brother, the

COVID-19 pandemic began.  Like many, Ms. MacAndrew was forced to shelter in place at home

and could not attend church or see much of her community.  It affected her mental health and the

mental health of many of her friends.  PSR at ¶ 71.  Ms. MacAndrew tried to stay busy by

grocery shopping and running errands for elderly or medically compromised friends to keep

them from being exposed to COVID.  *Id.* at ¶ 71.  But, as she and others struggled with the

isolation rules, Ms. MacAndrew passionately believed churches needed to reopen to provide

support to the community.  Eventually, Ms. MacAndrew began attending Reopen California

rallies to demonstrate her support for reopening.

After weeks of isolation, at her first Reopen California rally, Ms. MacAndrew saw people

socializing, hugging, and generally engaging in positive interactions.  She found herself drawn to

the normalcy at these rallies.  She experienced them as positive, upbeat, and peaceful events.

Although Ms. MacAndrew never considered herself a supporter of former President Trump and

personally did not like him very much, through these rallies, Ms. MacAndrew began to

reconsider her opinion. The rallies she attended were often filled with Trump supporters, and

eventually she began going to rallies specifically aimed at supporting the former president.

By the time Ms. MacAndrew flew to Washington D.C. to attend the January 6th Trump

rally, she had been attending Reopen California and Pro-Trump rallies for many months. For

Ms. MacAndrew, these rallies were a valuable social experience: "It felt like going somewhere

with a bunch of -- like to a giant party with a bunch of friends you hadn't met yet. It was just

really easy to -- easy to talk to people, you know." Exh. B at 176: 10-13. These positive rally

experiences formed the backdrop to her participation in the events on January 6th. Ms.

MacAndrew flew to Washington D.C. to attend former President Trump's rally believing it

would be another upbeat and peaceful experience similar to those in the past. Indeed, Ms.

MacAndrew testified that she went to Washington D.C. with the expectation that it would be

"peaceful, like all other pro-Trump events I had been to." *Id.* at 177:11-14.

### 2. Ms. MacAndrew's own conduct at the Capitol was nonviolent

Prior to and at trial Ms. MacAndrew admitted that she approached, walked around, and

ultimately entered the Capitol building. Ms. MacAndrew did not premeditate her presence at the

Capitol building that day (*id.* at 177:15-17) and, as the Court determined, was a "noncombative"

participant. Findings of Fact and Conclusions of Law, ECF No. 59 at 6.

Ms. MacAndrew walked into the Capitol building through the Senate Wing Door after

the Second Breach of that door. *See* Exh B. at 73:14-15 (second breach was around 2:47 or 2:48

p.m.); 123:2-3 (she entered at 3:09 p.m.). By the time she approached the Senate Wing Door, the

crowd was already streaming in through the door and the path in was unobstructed. *Id.* at 74:16-

22. Ms. MacAndrew entered into a hallway adjacent to the Senate Wing Door and walked

around with her phone. *Id.* at 150:17-23; 160:21-161:8. She never left the area of that hallway.

*Id.* at 160:21-161:8; Govt's Exh. 424.  Ms. MacAndrew spent approximately eight minutes in the

Capitol building total.  Exh B at 136:2-3 (she exited at 3:17 p.m.).  She did not shout, break

anything, incite others, or engage in any violence.  Govt's Exh. 424.  She did not even speak to

anyone in the building.  *Id.*  Importantly, when Ms. MacAndrew was asked to leave, she exited

the building, the only delay being the crowd of people in the doorway.  Exh. C at 225:19-226:4.

Similarly, during her time on Capitol grounds, Ms. MacAndrew was nonviolent.  She

never yelled at police officers.  Exh B. at 164: 21-22; 165:22-23.  She never chanted.  *Id.* at

164:23-24; 165:18-21. She did not push anything out of the way.  *Id.* at 165: 24-25.  She did not

throw anything.  *Id.* at 166:1-4.  She mostly stood and walked around.  *Id.* at 164:25-165: 1.  She

took photos, but she did not engage with the crowd.  *Id.* at 165:4-5.  She was calm and she stuck

to herself.  *Id.* at 166:5-8.  Considering the spectrum of conduct of January 6th participants, Ms.

MacAndrew's conduct that day was at the least offensive end of the spectrum.

### 3.     Ms. MacAndrew cooperated with the FBI

Irrespective of Ms. MacAndrew asserting her right to trial, Ms. MacAndrew cooperated

with the FBI by interviewing with agents, including admitting her participation in the events of

January 6th.  Additionally, the government seized her cell phone and made a forensic copy of it,

but later approached Ms. MacAndrew through counsel and asked her to consent to have the

phone data searched for evidence related to January 6th.  The government represented to defense

counsel that there was an error in the search warrant.  Ms. MacAndrew spared the government

the time and effort of obtaining another search warrant and consented to the search.

Notably, during the search, the agents had difficulty locating the relevant data in their

forensic copy of the phone's contents and declared that the search was fulfilled, even when they

did not obtain all the data.  Rather than leave with her phone at this point, and after conferring

12

with counsel, Ms. MacAndrew helped the agents locate photos and videos on her actual phone.

She spent significant time pulling up each relevant photo and video for the agents to view.  Ms.

MacAndrew then helped the agents get around technical issues they had in their forensic copy of

the phone by producing the requested data through defense counsel.  Ms. MacAndrew's

cooperation in her own prosecution, and also in providing to the government relevant evidence

of the events of January 6th, should be considered at sentencing.

> **C.     The Need To Avoid Unwarranted Sentencing Disparities Calls For A
>          Noncustodial Sentence**

With hundreds of January 6th defendants sentenced to a broad range of punishment, the

need to avoid unwarranted sentences disparities remains paramount, even as it grows more

challenging.  As a noncombative participant who did not incite, yell, touch anything, or venture

out of the hallway area of the Senate Wing door, Ms. MacAndrew's conduct places her in the

least offensive group of defendants and she should be sentenced accordingly.

> **1.      Ms. MacAndrew's conduct on January 6th is similar to individuals
>           who have received noncustodial sentences from this Court**

This Court has sentenced individuals with conduct most similar to Ms. MacAndrew to

noncustodial sentences.  For example, in *United States v. Kelly*, this Court imposed a sentence of

twelve months of probation, to include sixty days of home detention. *See* Judgment at 2, D.D.C.

Case No. 21-cr-331-CKK-1, ECF No. 45 (Feb. 7, 2022).  On January 6, Kelly walked into the

Capitol building, penetrating the building much deeper that Ms. MacAndrew by walking toward

the Crypt before turning around and exiting the building.  Gov't Sentencing Position at 9-10, *id.*,

ECF No. 36.  While Ms. MacAndrew avoided violence, Kelly sent texts saying he "broke in" and

bragged about causing senators to "hid[e] under their [sic] desks" and "force[] [Congress] into

recess."  *Id*. at 10.

In *United States v. Orangias*, this Court imposed a sentence of thirty-six months of probation, to include ninety days of home monitoring.  *See* Judgment at 2, D.D.C. Case No. 21-cr-265-CKK, ECF No. 43 (Mar. 18, 2022).  On January 6, like Ms. MacAndrew, Orangias entered the Capitol building through the Senate Wing Door and took photos.  *See* Gov't Sentencing Position at 3-5, *Orangias*, No. 21-cr-265-CKK, ECF No. 36.  In conduct more serious than Ms. MacAndrew, Mr. Orangias participated in chants with other rioters and exited the building via a broken window.  *Id.*  In the days following January 6, Orangias participated in a podcast in which he denied seeing those same broken windows, denied entering the capitol building at all, and stated that in the coming days, "shit's going to blow up."  *Id*. at 5-6.  During follow-up interviews with the FBI, Orangias made inconsistent statements, including at times claiming that he never entered the Capitol building.  *Id*. at 6-7.  In their sentencing papers in the *Orangias*, the government noted that he failed to express remorse for his actions.  *Id*. at 12.

Recently, this Court sentenced a family of three defendants to 36 months of probation each in *United States v. Rutledge et al. See* Judgments at 2, D.D.C. Case No. 21-cr-643-CKK, ECF Nos. 103, 105, 108 (Mar. 9 and Mar. 31, 2023).  In that case, all three defendants scaled the scaffolding set up for President Biden's inauguration and entered the Capitol building to take photos despite seeing and hearing flash bangs, broken windows, and tear gas.  Gov't Sentencing Position as to Meghan Rutledge at 4, 6, 8, *Rutledge et al.*, No. 21-cr-643-CKK, ECF No. 100. After the rally, the family maintained that they were "set up," blamed the riot on Antifa, and claimed to friends that the media "bastardized" the events at the Capitol.  *Id.* at 7, 10; Gov't Sentencing Position as to Karegan Bostic at 9, *id.*, ECF No. 95.  On January 9, 2021, Mr. Bostic suggested that Trump supporters should storm the Capitol again. Gov't Sentencing Position as to

Willard Bostic at 10, *id.*, ECF No. 94. While one of the defendants ultimately cooperated with the FBI, two completely refused to interview with law enforcement. *Id*; Gov't Sentencing Position as to Meghan Rutledge at 11, *id.*, ECF No. 100; Gov't Sentencing Position as to Karegan Bostic at 9, *id.*, ECF No. 95.

Compared with the defendants above, Ms. MacAndrew's conduct during the events of January 6th is similar or less serious. Unlike the Rutledge-Bostic family, Ms. MacAndrew did not climb through broken windows or scale the scaffolding put in place for the upcoming inauguration ceremony. Instead, she entered through an open door with the flow of the crowd while police officers stood to the side. Exh C at 197:1-16. Additionally, Ms. MacAndrew remained inside the building for a similar amount of time to the defendants in *Kelly* and *Orangias*. *Compare supra with* Findings of Fact and Conclusions of Law, ECF No. 59 at 8-9. And, while Ms. MacAndrew did post to social media in the days following her entry into the Capitol building, her words did not evince force or violence like those of the defendant in *Kelly*. *Compare supra with* Gov't Exh. List at 3-6, Exhs. 102-24, ECF No. 62. She also did not suggest storming the Capitol again like the defendant in *Bostic*. *Compare supra with* Gov't Exh. List at 3-6, Exhs. 102-24, ECF No. 62.

The only significant different between Ms. MacAndrew and these defendants is that she proceeded to a bench trial. Six months of home detention is a higher sentence than the sentences of probation or two months of home detention ordered by this Court for these similar defendants. The defense's proposed sentence accounts for Ms. MacAndrew going to trial and having higher exposure at sentencing.

**2.    Defendants with more egregious conduct have received lesser**

**sentences than the recommendations in this case**

Several defendants who contributed to destruction of property, entered private Senate

offices or the Senate gallery, verbally abused police officers, or incited violence were sentenced

by this Court to a shorter term of incarceration than the ten-month prison term recommended by

Probation for Ms. MacAndrew.  For example, in *United States v. Sarko*, the defendant remained

inside the Capitol building for approximately twenty minutes.  *See* Gov't Sent'g Position at 9,

*United States v. Sarko*, D.D.C. No. 21-cr-591, ECF No. 31 (Mar. 18, 2022).  While inside and

during his walk back from the riot, Mr. Sarko live broadcasted the events on Snapchat,

encouraging viewers to support him and other rioters.  *Id.* at 3, 11-12.  Sarko's Snapchat records

him saying, "Bring out Pelosi!" and "We're actually breaking in right now" as he walked

through the Capitol building and entered a Senator's private office.  *Id.* at 6-8, 11.  Sarko also

had significant criminal history.  *See id.* at 16.  This Court sentenced him to 30 days in prison

with 36 months supervision.  *See* Judgment at 2, *id.*, ECF No. 39 (May 23, 2022).

In *United States v. Ashcraft*, the defendant climbed the scaffolding outside the Capitol

building, encouraged others to do the same, and used a knife to destroy part of the sheathing in

order to "create an area for rioters to hang flags."  *See* Gov't Sentencing Position at 5-6, D.D.C.

No. 22-cr-295-CKK, ECF No. 20.  After entering the building, Ashcraft remained inside for 41

minutes, during which time he stole a flag and flagpole, banged on the floor with the pole, kicked

a door, stole water, and posed for photographs.  *Id.* at 2, 6-10.  In the weeks following January

6th, Ashcraft attempted to join the Oath Keepers, burned the stolen flag, and tried to dispose of

other evidence.  *Id.* at 12-13.  This Court sentenced Ashcraft to 80 days in prison followed by 12

months of supervised release.  *See* Judgment at 2-3, *id.*, ECF No. 24 (Apr. 3, 2023).

The defendant in *United States v. Spencer* exhibited much more egregious conduct that

16

Ms. MacAndrew during the events of January 6th, but received only three months in custody. *See* Judgment at 2, D.D.C. Case No. 21-cr-147-CKK., ECF No. 72 (D.D.C. Jan. 21, 2022). Spencer walked to the Capitol with the Proud Boys and participated in a confrontation with a counter-protestor that required physical intervention by D.C. Metropolitan Police. *See* Gov't Sentencing Position at 4-5, *id.*, ECF No 55.  Spencer then entered the Capitol building a mere six minutes after the initial breach of the building, walked through the Crypt, and surged with a group past Capitol Police into the Small House Rotunda. *Id.* at 5-8.  Spencer next proceeded to the Speaker's office suite, which she entered briefly before attempting to breach the doors of the House Chamber, where members of Congress were sheltering. *Id.* at 8-10.  Spencer smoked a cigarette inside the Capitol building prior and left after over thirty minutes inside. *Id.* at 10.

Another relevant comparison arises in *United States v. Sandoval*, where the defendant encouraged others to join her in the days leading up to January 6th, warned that there would be violence, and suggested she would be carrying a gun to the Capitol. *See* Gov't Sentencing Position at 3-4, D.D.C Case No. 21-cr-195-CKK, ECF No. 122.  Once inside the Capitol building, Sandoval yelled, "Get her ass out here!" referring to former Speaker Nancy Pelosi, went into a private office, and entered the Crypt. *Id.* at 7, 9-10.  In the aftermath of January 6th, and in sharp contrast to Ms. MacAndrew who went above and beyond to provide her phone data to the government, Sandoval deleted messages on her cellphone in an attempt to cover her tracks. *Id.* at 12-15.  This Court sentenced Sandoval to five months in prison followed by a term of twelve months of supervised release. *See* Judgment at 2, *id.*, ECF No. 132 (May 9, 2023).

In *United States v. Ryals*, the felony defendant remained inside the Capitol building for thirty minutes, during which time he broke into a private office, walked through the Rotunda and the Crypt, and yelled at police and other protestors, "we will not concede" and "we have enough

17

people to overthrow this bitch." *See* Gov't Sentencing Position at 6-16, D.D.C. Case No. 21-cr-244-CKK, ECF No. 73. Despite Ryals's significantly more serious conduct and felony conviction, this Court sentenced Ryals to nine months in prison (four months less than the government's request for Ms. MacAndrew) followed by a term of 36 months of supervised release. *See* Judgment at 1-2, *id.*, ECF No. 86 (Oct. 27, 2022).

In contrast to these five defendants, Ms. MacAndrew did not engage in any property damage, enter any private offices, the Crypt, or the Senate gallery. Ms. MacAndrew was only inside the building for approximately eight minutes, a fraction of the amount of time that each of the above five defendants were inside the building. She did not make excessive noise like Ashcraft, yell profanities or chant like Ryals, smoke a cigarette like Sandoval, or otherwise desecrate the Capitol building. Rather, Ms. MacAndrew walked in, took photos and videos, and left when asked to by a police officer. Exh C. at 198:21-25. A sentence of 10 months, or the government's requested sentence of 13 months, would amount to a severe trial tax when the Court considers its past sentencings of these January 6th defendants.

### 3. Ms. MacAndrew's conduct was less severe than Rivera

The government compares Ms. MacAndrew to the defendant in *United States v. Rivera*, a January 6th case that proceeded to trial before this Court. Gov't Sentencing Position at 24. Rivera's conduct both during the riot and since was significantly more serious than Ms. MacAndrew. As the government described in their position paper: "Rivera livestreamed his presence in the Capitol and '[h]e urged his followers watching his Facebook livestream to share his livestream with their friends and followers' and proclaimed he was 'about to take [his] ass to the middle of the [United] State[s] Capitol.'" *See id.* (citations omitted). While Rivera, like Ms. MacAndrew, witnessed "rioters climbing a wall," unlike Ms. MacAndrew, Rivera assisted them

18

by shouting, "there's an easier way up!"  *Id.*  In its papers, the government compares Rivera and
Ms. MacAndrew by pointing out they went to trial and suggests they both show no remorse.  The
government then suggests Ms. MacAndrew should be sentenced more severely simply because
she testified.

  The government omits, however, critical facts about Rivera that demonstrate his more
egregious conduct on January 6th and through its aftermath.  For instance, through his
livestream, Rivera was informed that he was not allowed to be at the Capitol.  *See* Gov't Sent'g
Position at 6-7, *Rivera*, ECF No. 69.  Despite this, Rivera continued, encouraging viewers by
saying "Patriots are going crazy. Let's get out there!"  *Id.*  Rivera watched others breach police
lines and the Senate Wing Door before he entered the building through a broken window,
roamed the halls, and ultimately reached the Crypt, remaining inside the building for over twice
the amount of time Ms. MacAndrew was inside.  *Id.* at 8.  In contrast to a calm and quiet Ms.
MacAndrew, the government described Rivera as a "jubilant participant."  *Id.* at 17, 20.  Most
offensively, Rivera repeatedly bragged about his involvement and mocked the suffering of
Capitol Police officers on social media.  *Id.* at 8-9.  Despite Rivera's clearly more offensive
conduct, probation recommends a 10 month term for Ms. MacAndrew, two months higher than
Rivera's term.

  In light of Ms. MacAndrew's substantial mitigation, her compassionate character, her
cooperation, and her minimal, nonviolent participation in the events of January 6th, Ms.
MacAndrew should not receive a higher sentence than Rivera.  Direct comparison of the two
defendants suggests that this Court should sentence Ms. MacAndrew to a much lower sentence
than Rivera's eight month term, regardless of the guideline range in this case.

  **D.**  **A Noncustodial Sentence Adequately Serves The Traditional Goals**

**Of Sentencing**

Under Section 3553(a)(2), courts consider factors reflective of the traditional goals of sentencing, including: (1) the "seriousness of the offense," "respect for the law," and "just punishment"; (2) "adequate deterrence"; and (3) "protect[ion] [of] the public." 18 U.S.C. § 3553(a)(2).  In Ms. MacAndrew's case, these goals are met with six months of home detention.

This prosecution, the public scrutiny and shame, and the experience of going through the federal court criminal justice system (including her arrest and detention for a day) reflect the seriousness of the offense, the need for respect of the law, and serve as adequate deterrence in this case.  Ms. MacAndrew has lived in a constant state of transition and emotional upheaval since at least her own cancer diagnosis in 2009.  She cared for both of her parents through to the end of their lives and then had to cope with finding her dead brother's body, just before the COVID-19 pandemic swept through the country.  Then, before the COVID-19 pandemic and its impact on daily life could subside, Ms. MacAndrew's life was upended again with this prosecution.  Since she has been charged, Ms. MacAndrew likely lost a job due to this case.  *See* PSR at ¶ 81.  She also lost long-term friendships.  She has been "experiencing considerable stress and anxiety" from this case since she was first interviewed by FBI agents in mid-2021.

The government bases their high sentence request largely on the need for deterrence, both general and specific.  While the need for general deterrence is legitimate, it has been met already in this case given the scope of these prosecutions.  No January 6th defendant is escaping their conduct that day, and this message has been well-spread.

In regards to specific deterrence, not only has Ms. MacAndrew already suffered lifelong consequences, including her first experience in the criminal justice system after being a law-abiding citizen for nearly six decades, she has also expressed her regrets about her mistakes to

20

friends and family.  *See*, *e.g.*, Exh A. at Lttr from M. Huffaker ("For that hour and a half that she

was on the Capitol grounds, she regrets every minute and every choice").  The government's

request is actually a suggestion that Ms. MacAndrew should be severely punished for exercising

her right to go to trial.  It is worth noting that Ms. MacAndrew waived her right to a jury trial and

saved the Court and public considerable time and expense.  Additionally, Ms. MacAndrew

waived jury trial timely to spare the expense of sending summons to potential jurors.  Ms.

MacAndrew's exercise of her right to trial was grounded in her desire to tell the Court how and

why she ended up participating in the events of January 6th.  It does not necessarily call for a

prolonged custodial sentence to deter her from reoffending, particularly when considering her

lack of criminal history and character prior to the offense.

## IV.    CONCLUSION

For the reasons discussed, the Court should sentence Ms. MacAndrew to a sentence of six

months of home detention with a period of supervision to follow.  The defense does not object to

the restitution amount proposed by both Probation and the government.  If the Court is inclined

to sentence Ms. MacAndrew to a period of incarceration, Ms. MacAndrew requests designation

to FCI Dublin in California.

Respectfully submitted,

DATED:  July 24, 2023                 */s/  Lillian Chu*

LILLIAN CHU
Deputy Federal Public Defender
(Cal. Bar No. 279095)
(E-Mail:  Lillian_Chu @fd.org)
Office of the Federal Public Defender, C.D. Cal
321 East Second Street
Los Angeles, California, 90012
Telephone:  (213) 894-5383