# Exhibit B

```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3    UNITED STATES OF AMERICA,    )    Case Number 21-cr-730
                                   )
 4              Plaintiff,         )
                                   )
 5    vs.                          )
                                   )    Washington, D.C.
 6    DANEAN KIMBERLY MacANDREW,   )    January 10, 2023
                                   )    9:06 a.m.
 7              Defendant.         )

 8

 9                              VOLUME I
                        TRANSCRIPT OF BENCH TRIAL
10            BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                      UNITED STATES DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20    COURT REPORTER:            Ms. Lisa Grimminger, RDR, CRR, CRC
                                 100 Centennial Mall North
21                               Room 587
                                 Lincoln, NE 68508
22                               (402) 437-1908

23

24
      Proceedings recorded by stenotype shorthand.
25    Transcript produced by computer-aided transcription
```

```
 1                      A-P-P-E-A-R-A-N-C-E-S

 2    FOR THE PLAINTIFF:            ZACHARY PHILLIPS
                                    DOJ-USAO
 3                                  1801 California Street
                                    Suite 1600
 4                                  Denver, CO 80202

 5                                  JULIE BESSLER
                                    USAO
 6                                  601 D Street NW
                                    Washington, D.C. 20001

 7
      FOR THE DEFENDANT:            LILLIAN CHU
 8                                  Federal Public Defender
                                    411 W. Fourth Street
 9                                  Suite 7110
                                    Santa Ana, CA 92626
10
                                    AMY M. KARLIN
11                                  Federal Public Defender's Office
                                    321 East 2nd Street
12                                  Los Angeles, CA 90012

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1          (At 9:06 a.m. on January 10, 2023; with counsel for the

2     parties and the defendant present:)

3          THE COURT:  Good morning, everyone.  One thing I

4     wanted to make sure of, I know one of the special agents is

5     sitting here at counsel table, but to make sure that none of

6     the other witnesses are in the courtroom.

7          MR. PHILLIPS:  Yes, Your Honor, and at this point

8     there's not.  We actually have another special agent that was a

9     case agent, but we aren't going to call that witness.

10         THE COURT:  Okay.

11         MS. CHU:  The defense would ask for witnesses to be

12    excluded.

13         THE COURT:  Yes.  Well, I think my trial procedures

14    orders -- there's a couple of them -- should have certainly

15    something in it that they should be, you know, not sitting in

16    the courtroom.  We do have one person, obviously, at counsel

17    table, which is not a problem.

18         MR. PHILLIPS:  And we've asked that Special Agent

19    Ballantyne be allowed to stay as an advisory witness.  He was

20    the main investigating agent on the case.

21         THE COURT:  Is he the one at the table or not?

22         MR. PHILLIPS:  He is.

23         THE COURT:  That's the one I'm talking about.

24    I'm sorry.  I couldn't remember your name.

25    I don't have a problem with that because you do have one,
```

```
1    but any other witnesses should not be in the courtroom.

2              MR. PHILLIPS:  Yes.  Thank you, Your Honor.

3              THE COURT:  All right.  Then let's call the case and

4    proceed.

5              COURTROOM DEPUTY:  Criminal Case 21-730, The United

6    States versus Danean Kimberly MacAndrew.

7         Counsel, would you please identify yourself for the

8    record, starting with the government.

9              MR. PHILLIPS:  Good morning, Your Honor.  Zachary

10   Phillips on behalf of the United States.  Also with me at

11   counsel table is AUSA Julie Bessler, Special Agent Braden

12   Ballantyne, and our paralegal who's going to be doing all the

13   magic to the computer, Marcus Bennett.

14             THE COURT:  Okay.  Good morning, everybody.

15             MS. CHU:  Good morning, Your Honor.  Lillian Chu and

16   Amy Karlin on behalf Ms. Danean MacAndrew, who is present in

17   court in person.

18             THE COURT:  All right.  Good morning to all of you.

19        All right.  Let's proceed.  We can proceed with opening

20   statements.

21             MS. BESSLER:  And apologies.  I'm just going to set

22   up my laptop.

23             THE COURT:  All right.

24             MS. BESSLER:  And Your Honor, do you see the

25   PowerPoint?
```

1          And I would ask if counsel also sees the PowerPoint?

2                  THE COURT:  Yes.

3                  MS. BESSLER:  Okay.

4                  THE COURT:  You can speak without your mask.  It's

5      too hard to get a record, frankly.

6                  MS. BESSLER:  Thank you.  Thank you, Your Honor.

7          Your Honor, on January 6th, 2021, Danean MacAndrew chose

8      to breach the United States Capitol.  She did not turn away

9      when rioters harassed and humiliated officers.  She did not

10     turn away after climbing over downed barricades and snow

11     fencing.  She did not turn away when she observed hundreds of

12     officers dressed in riot gear wearing helmets, body armor, face

13     shields.  She did not turn away when she saw her fellow rioters

14     suffering from the effects of pepper spray, and she did not

15     turn away when she heard the alarms blaring inside of the

16     United States Capitol and the Capitol windows and doors

17     destroyed.

18         We are here today because of the choices Danean MacAndrew

19     made on January 6, 2021.  She is --

20                 THE COURT:  Can you move your microphone over just a

21     little bit?  I realize you've got your laptop there.

22                 MS. BESSLER:  Oh, sure.  Is this better, Your Honor?

23         She is guilty of entering and remaining in the United

24     States Capitol and on its restricted grounds, disrupting the

25     orderly conduct of Congress and the certification of the 2020

1    presidential election, engaging in disruptive and disorderly

2    conduct inside the Capitol and on its grounds, and parading and

3    demonstrating, and the evidence will clearly demonstrate that

4    beyond a reasonable doubt.

5        At 2:34 p.m. on January 6th, the defendant is seen

6    observing a line of officers dressed in riot gear pass by her

7    on the west lawn of the Capitol.  This is the first time we

8    have footage of the defendant on Capitol grounds.  She's

9    standing in a restricted area.  The officers, they're wearing

10   riot gear.  They're wearing helmets, face shields, body armor,

11   a very significant number of them.  And in the body-worn camera

12   footage, Your Honor, you will hear the rioters harassing the

13   officers, yelling at them, filming them as they are trying to

14   position themselves to protect the Capitol.

15       The defendant, she's holding her flag, and she's standing

16   there watching the officers with the rest of the demonstrators.

17   She does not turn around and leave, and we see her again at

18   2:40 p.m.  The defendant, she parades across the restricted

19   Capitol grounds and makes her way to the northeast corner of

20   the Capitol.

21       It's where the star is on this side, Your Honor.

22       At this northeast Capitol there's a pathway that leads

23   even closer to the Capitol building itself, and in the CCTV

24   footage of the defendant on this northeast pathway, you can see

25   her climbing over the wall of this pathway.

1        And I'm going to play a small snippet here.

2        (A portion of a video was played.)

3             MS. BESSLER:  And Your Honor, the defendant, she's

4    climbing over the wall of this pathway with assistance from

5    another rioter who is wearing a helmet, and where she climbs

6    over, Your Honor, right here is, in fact, downed barricades and

7    snow fencing which were put up earlier by police to demarcate

8    the restricted grounds.

9        The defendant then lingers on this northeast path for

10   several more minutes.  She has her phone out.  She's taking

11   videos and photos when a second line of MPD officers pass

12   through this very pathway moments later.  She marches up this

13   pathway and climbs a set of stairs onto the landing of the

14   Capitol.

15       She's nearly shoulder to shoulder with the officers, as

16   you can see here, Your Honor.  She's circled in the red on the

17   right-hand side of the screen, the officers in their yellow

18   jackets streaming next to her and behind her, as well as here

19   as she parades to the northwest courtyard of the Capitol, and

20   this is now, at the very least, the second time this defendant

21   has seen a group of officers dressed in riot gear heading to

22   protect the Capitol.

23       And as she parades to the northwest Capitol -- or, I'm

24   sorry, the northwest courtyard, she is flying her flag high.

25   She's circled in the red here on the right-hand side of the

1    screen, and you can see her flag.  She's not only inches away

2    from the group of MPD officers and mere feet away from the

3    Capitol building itself, but she marches by even more

4    barricades with officers positioned behind them.

5          Your Honor, as you can see here, the barricades are not

6    only seen on the CCTV, but in the body-worn camera footage, and

7    on the CCTV behind those barricades, that's the group of United

8    States Capitol Police officers.  In the green, Your Honor,

9    there's a sign on those barricades.  The sign says, "Area

10   Closed."

11         The defendant does not leave.  She does not go back to her

12   hotel.  Instead the defendant makes her way to the northwest

13   courtyard.  Here she takes photos of rioters in gas masks,

14   helmets, and even suffering from the effects of pepper spray.

15         She didn't leave.  Instead she enters the Capitol through

16   the Senate Wing doors at 3:08 p.m.  The defendant filmed her

17   breach into the United States Capitol.  Before she even crosses

18   the threshold, she captures the conditions of the door frame on

19   cell phone video.  The door has been knocked off its hinges.

20   There are nails sticking out of the door frame.

21         And before she even crosses the threshold into the

22   Capitol, alarms are blaring in the video she films.  She is

23   part of the mob causing those alarms to sound.  Alarms, a

24   universal signal to evacuate, to leave, a universal signal of

25   an emergency.  And what did she do?  She ignored those alarms.

1        And on the CCTV footage, inside the Capitol the defendant

2    has her face covered by her red scarf.  It's the first time we

3    ever see the defendant covering her face on restricted Capitol

4    grounds.  You will see that every time her scarf falls off her

5    face inside of the Capitol, she makes it a point to pull it

6    back up.  And in another one of these videos, Your Honor, that

7    the defendant takes on her cell phone inside the Capitol, she

8    talks about getting pepper sprayed.

9        Apologies, Your Honor.  I believe there's an issue with

10    the sound.  One moment.

11        There we go.  It's okay, Your Honor.

12        You will hear that in this video the defendant is saying,

13    "They're gassing us, they're gassing us," Your Honor.  That's

14    what the defendant says in this video, and you will see --

15    you'll hear that in the course of this trial.  In the video

16    people are coughing all around her, and instead of leaving, she

17    stuck around the area of the Senate Wing doors filming people

18    jump out of the Capitol through broken windows.

19        She did not leave.  She continued to watch the rioters

20    exit the Capitol through its broken windows for several more

21    minutes, and in fact, she didn't leave until United States

22    Capitol Police forced the rioters to leave at around 3:17 p.m.

23        It didn't stop there.  The defendant left the Capitol

24    building but remained on its restricted grounds for at least

25    another 40 minutes.  The defendant continued to linger around

1    this northwest courtyard.  She's filming a skirmish line, a

2    huge group of MPD officers dressed in riot gear.  She's

3    standing around again as the angry mob harassed and yelled at

4    them for doing their duty that day.

5         Your Honor, January 6 was a violent, destructive day.

6    This riot affected United States Capitol Police, the

7    Metropolitan Police Department, and others whose mission it was

8    to protect the Capitol.  You'll hear that every member of the

9    mob, none of whom were authorized to be there or had submitted

10   to background checks or security screenings, they all

11   contributed to the destruction of Congress.  Every single

12   person on the restricted grounds that day was considered a

13   security risk.  Every single person impeded law enforcement's

14   efforts to regain control of the Capitol, and they contributed

15   to the civil disturbance.  Their presence, the defendant's

16   presence, Your Honor, was disruptive, disorderly, and disturbed

17   the public peace.  In fact, law enforcement were so overwhelmed

18   by the rioters that they couldn't keep up, and in order to

19   protect Vice President Pence, his family, and other members of

20   Congress, they were forced to pause the Electoral College

21   proceedings.

22        The evidence will show that on January 6, the defendant's

23   conduct was not an accident.  The defendant was not simply

24   following the crowd.  She was not confused about whether she

25   was allowed to be at the Capitol that day.  The defendant's

1    conduct was intentional, and it was done with purpose and with

2    knowledge, and at the end of this trial, Mr. Phillips is going

3    to ask that you deliver the only verdict that the evidence

4    supports, a verdict of guilty on all counts.

5              THE COURT:  All right.  Ms. Chu, are you going to go

6    ahead now, or are you reserving?

7              MS. CHU:  I can present now, Your Honor.

8              THE COURT:  All right.

9              MS. CHU:  Good morning, Your Honor.

10             THE COURT:  Good morning.

11             MS. CHU:  Danean MacAndrew is a single 54-year-old

12   woman who became active in Republican politics during the

13   COVID-19 pandemic.  She began going to Trump rallies in 2020,

14   and when she heard that then-outgoing President Trump was going

15   to speak for the final time in January of 2021, she decided to

16   travel to Washington, D.C., to hear his speech.

17        As the Court will hear during this trial, she did not come

18   with an organized group.  She came by herself.  She went to

19   Washington, D.C., just to hear Former President Trump speak.

20   She got up very, very early on the morning of January 6th to

21   wait in line to enter the Ellipse, standing in the freezing

22   weather for hours, despite how tired she was.  At some point

23   after his speech, she started walking with people as they

24   marched to the Capitol.  She walked with them all the way to

25   the Capitol, following everybody and a giant flag that she saw

1    in the crowd.

2         As she approached the Capitol, Ms. MacAndrew saw that

3    there was a large crowd around the building, and she went up to

4    see what was going on.  Thousands of people were there.  The

5    fencing and other barriers had already been pushed out of the

6    way.  She followed this group of people towards the building.

7         As she approached the building, again she did not see any

8    physical barriers that would signal to her that she could not

9    enter the area.  It was crowded.  She had a limited line of

10   sight.  She walked with that crowd, and the physical barriers

11   were already moved aside.  There were thousands of people there

12   already.  She peacefully and respectfully walked up to the

13   Capitol and into the courtyard in front of the Senate West Wing

14   door.

15        The government videos will show you that she walked

16   slowly, peacefully.  She didn't really talk to anybody.  She

17   was focused on taking photos and videos, and you'll see that in

18   the government's videos.  She was seeing everything through a

19   4-inch screen of her phone.  There was no evidence that she --

20   there -- it will be no evidence that she observed the second

21   breach of the Senate Wing door.

22        When she does turn towards the Senate Wing door, what she

23   could see is a line of people moving into the building.  She

24   did not observe any physical violence.  Some people were

25   chanting, some people were yelling, but not Ms. MacAndrew.

1   There's no evidence that Ms. MacAndrew did anything but walk

2   in, take photos and videos, and walk out when she was asked to

3   leave.

4        She did see police.  There were police outside the

5   building, and there were police right by the door when she

6   entered the building, but there will be no evidence that the

7   police ever told her she could not go in.  There will be no

8   evidence that the police ever blocked her way.  There will be

9   no evidence that they gestured at her or others near her to

10  leave.  What the videos will show instead is that as

11  Ms. MacAndrew entered the building, police were -- officers

12  were standing with a clear view of the door talking with the

13  protesters, they were fist-bumping with the protesters, and

14  this was happening just as she crossed the threshold of the

15  Senate Wing door.

16       And the videos that the government will show you will also

17  indicate that Ms. MacAndrew was calm.  She was quiet.  She was

18  not violent.  She was not disruptive or disorderly.  She only

19  took photos and videos and then left when she was asked.

20       At the end of this case, we ask that the Court find

21  Ms. MacAndrew not guilty on all the counts in the superseding

22  information.

23       Thank you, Your Honor.

24            THE COURT:  All right.  So if the government would

25  call its first witness.

1           MR. PHILLIPS:  Thank you, Your Honor.  The government

2    call United States Secret Service Agent Lanelle Hawa.

3           THE COURT:  All right.  While we're waiting, how are

4    you going to handle your exhibits?

5           MR. PHILLIPS:  Your Honor, I could actually cover

6    that right now if you'd like.

7           THE COURT:  Why don't we, since we don't need to have

8    the witness.  That might be helpful.

9           MR. PHILLIPS:  For the Court's knowledge, during this

10   particular witness, the government's going to use Exhibits

11   Numbered 200, 302 and 303.  There is not a stipulation to

12   those; however, there's no objection by defense on those.

13          THE COURT:  All right.

14          MR. PHILLIPS:  And then --

15          THE COURT:  So --

16          MR. PHILLIPS:  I'm sorry.

17          THE COURT:  Okay.  So is there any objection to

18   admitting them at this point?

19          MS. CHU:  No.  Thank you, Your Honor.

20          THE COURT:  All right.  So I'll go ahead and admit

21   Exhibits 200, 302, and 303 without objection.

22          MR. PHILLIPS:  And then Government Exhibits 304, 306,

23   307, 308, 309, and 310, the parties have agreed that the Court

24   can take judicial notice and admit those.

25          THE COURT:  All right.  Is that correct?

```
 1              MS. CHU:  Yes, Your Honor.

 2              THE COURT:  All right.  Then I'll admit those.  304,

 3      306, 7, 8, 9, and 10.

 4          Your witness is here.

 5              MR. PHILLIPS:  And we're ready.

 6              THE COURT:  All right.  If you'd come over here,

 7      please.

 8          If you'd step up.  Go ahead and step up, and we'll swear

 9      you in.

10              COURTROOM DEPUTY:  Can you raise your right hand,

11      please.

12              THE WITNESS:  Yes.

13               LANELLE HAWA, PLAINTIFF'S WITNESS, SWORN

14              THE COURT:  You can go ahead and sit.  You can take

15      your mask off in speaking so we can get a record.

16          If you'd speak into the microphone directly, and what I

17      would ask is that you allow counsel to finish their question

18      before you start to answer even if you know what they're going

19      to ask you so we make sure we have the question and the answer

20      and people are not speaking at the same time.

21          If you see counsel start to stand or you hear the word

22      "objection," if you haven't started to answer, don't.  If

23      you're in the middle of your answer, wait.  Let me hear the

24      objection.  I'll make a ruling and tell you whether you can go

25      forward.  All right?
```

1    THE WITNESS:  Thank you, Your Honor.

2    THE COURT:  That's all.

3                    DIRECT EXAMINATION

4    BY MR. PHILLIPS:

5    Q.   If you could, please introduce yourself to the Court and

6    spell your name for the record.

7    A.   Yes.  It's Lanelle Hawa.  First name, L-A-N-E-L-L-E, last

8    name, Hawa, H-A-W-A.

9    Q.   And how are you employed?

10   A.   With the United States Secret Service.

11   Q.   If you could, please describe to the Court some of your

12   training and experience as being employed by the United States

13   Secret Service.

14   A.   Well, I was trained in our academy, which is about a

15   six-month training, and I've served in various divisions in the

16   agency.  I've served in our Washington field office.  I've

17   served on the President's detail.  I've served in our

18   Investigative Division.  I've served in our Liaison Division.

19   I've served -- currently I serve in our Inspection Division.

20   Q.   And how long have you been with the Secret Service?

21   A.   I've been with the Secret Service for 24 years.

22   Q.   And taking you back to January of 2021 -- you just

23   mentioned you'd served in a bunch of different capacities.

24   Where were you serving at that time?

25   A.   I was with our Liaison Division.

1    Q.   And if you could, describe to the Court what the Liaison

2    Division is and what your duties were as part of that

3    assignment.

4    A.   So in the Liaison Division we coordinate with our outside

5    partners.  Specifically, my role was I was assigned to the U.S.

6    Capitol, so I would coordinate with our partners over at the

7    Capitol, specifically U.S. Capitol Police, the Senate Sergeant

8    at Arms, the House Sergeant at Arms, and we would help

9    coordinate visits of our protectees.

10        When I say "protectees," I mean the President, Vice

11   President, any visiting heads of state that would come to the

12   Capitol.  And we would coordinate with our partners to

13   facilitate their movements around the Capitol complex.

14   Q.   And you just mentioned the Capitol.  Just dotting an "I"

15   and crossing the "T," is the United States Capitol located

16   within the District of Columbia?

17   A.   Yes.

18   Q.   Now, you just mentioned some of your duties working with

19   the liaison office.  What happens, or what is involved if one

20   of your protectees is to visit the Capitol?

21   A.   Again, we would coordinate with our partners at the U.S.

22   Capitol and any of the Secret Service agents who are assigned

23   to that particular protectee coming to the Capitol and

24   basically helping with the access control of that individual

25   coming and coordinating with the U.S. Capitol Police special

1    events, again, the particular Sergeant at Arms, depending on

2    where that protectee is going on the Capitol complex.

3              MR. PHILLIPS:  And I'm going to ask now for

4    Government's Exhibit 303, which has been admitted, to be

5    published.

6    BY MR. PHILLIPS:

7    Q.   And is that up there on your screen?

8    A.   Yes.

9    Q.   What is Government's Exhibit 303?

10   A.   So that is our Head of State Worksheet that we utilize in

11   the Liaison Division, and we use that for visits to the

12   Capitol, in particular for the President and the Vice President

13   or a visiting head of state.

14   Q.   And this particular Exhibit 303, is it for a particular

15   day and for a particular protected person?

16   A.   Yes.  So that was used when Vice President Michael Pence

17   came to visit the Capitol on January 6, 2021.

18   Q.   And if you could take the Court through kind of what she's

19   looking at there and the important parts of this exhibit and

20   what it does and why you use it.

21   A.   Sure.  So there would have been a cover sheet, if you

22   will, an email.  This would have been the attachment to the

23   email that I sent the day before.  So on January 5th, 2021, I

24   would have sent this to the Capitol Police to a group that we

25   refer to as special events just notifying them that we were

1    anticipating a visit of Vice President Michael Pence as well as

2    his wife and their daughter, Charlotte, to the U.S. Capitol.

3    We also include information about the motorcade departure

4    times, arrival, locations, some points of contact, and then

5    phone numbers obviously, and then itinerary where the

6    protectees will be going to and times and locations once they

7    are on the Capitol complex.

8    Q.   And was Vice President Pence, on January 6 of 2021, coming

9    to the U.S. Capitol for a specific purpose?

10   A.   Yes.

11   Q.   And what was that specific purpose?

12   A.   My understanding was he was coming to certify the

13   Electoral College votes.

14   Q.   Now, you've just mentioned that you had sent this as part

15   of an email the day prior.

16         MR. PHILLIPS:  If you could, please publish what's

17   already been admitted Government's Exhibit Number 302.

18   BY MR. PHILLIPS:

19   Q.   Do you recognize that?

20   A.   Yes.

21   Q.   And what is that?

22   A.   So that is the sheet that just made reference to the email

23   that I mentioned was kind of the cover sheet to the attachment

24   that we just looked at.

25   Q.   Okay.  Now, you'd mentioned that you start taking activity

1   and so forth for somebody coming to visit, specifically Vice

2   President Pence and his family on January 6 of 2021.  What sort

3   of actions are taken prior to him coming to the Capitol?  Is

4   there any type of extra security or anything of that nature?

5   A.   So, I mean, that would be -- there would be some

6   coordination, maybe some discussions with Capitol Police,

7   again, maybe some conversations on a higher level.  Not

8   necessarily me or the particular said agent, but if there is

9   any kind of a threat assessment or known events within the

10  Capitol region, the National Capitol region, then consideration

11  would be given -- there may be consideration given to other

12  events at the Capitol complex, you know, just kind of based on

13  how we may bring in -- you know, where we might bring the

14  motorcade in.

15        Consideration is given to locations, motorcade arrival or

16  departure locations, or staging areas so, you know, movements

17  around and about the Capitol may be taken into consideration.

18  So it's for security, again, based on events in the area.  If

19  they know of any protests, there might be some extra fencing

20  put in or bike rack put around the Capitol, so anything of that

21  nature might be brought to our attention.  Again, that's what

22  we're there to do, is to liaison with our counterparts over at

23  the Capitol.

24  Q.   Now, you've mentioned that there might be extra fencing or

25  security of that nature.  I'm going to ask you to look at

1     Government Exhibit Number 200, which has just been admitted,

2     and I'd ask to publish.

3          Do you recognize this?  Are you familiar with what this

4     photograph shows?

5     A.   Yes.

6     Q.   And what is that, if you would.

7     A.   So that is the perimeter.  Some extra fencing was set up

8     on January 6th by the Capitol Police.

9     Q.   And when you say that, are you talking about the red line

10    that's around?

11    A.   Yes.

12    Q.   Okay.  If you could, describe to the Court exactly what

13    she's seeing here and what you're referring to.

14    A.   I'm sorry.  Repeat that.

15    Q.   If you could, what is the building in this --

16         THE COURT:  You can also -- you can point and touch

17    the screen.  It'll leave a mark if you want.

18    BY MR. PHILLIPS:

19    Q.   If you touch the top right-hand corner, you can actually

20    mark on this.

21    A.   Okay.  And what are you asking me to do?

22    Q.   What building are we seeing there?

23    A.   Okay.  The U.S. Capitol.

24    Q.   And around the Capitol is some red line.  What is that red

25    line?

1    A.    That's the perimeter, some extra fencing or bike rack that

2    the U.S. Capitol Police set up on January 6, 2021.

3              THE COURT:  Move your microphone over just a teeny

4    bit.  You're looking at the photograph, so you're not quite

5    speaking into it.

6         Go ahead.

7    BY MR. PHILLIPS:

8    Q.    And was the Capitol open to the public on January 6 of

9    2021?

10   A.    It was not.

11   Q.    And do you know why it wasn't?

12   A.    I believe it was because of COVID and perhaps also because

13   of the particular event that was taking place that day, but

14   that would be a question that I think would best be answered by

15   Capitol Police.

16   Q.    Okay.  And you'd mentioned that there was -- and I'm --

17   well, let me ask you this:  Taking you back to January 6 of

18   2021, your day on that day, when did you first arrive at work?

19   A.    I want to say I got there probably, I don't know, probably

20   between nine and ten that day.

21   Q.    And when you arrived at work, did you observe anything

22   that would be relevant to this particular photograph as far as

23   gates or bike fencing or snow fencing and signs at the Capitol?

24   A.    Yeah.  I mean, I observed all of that fencing, snow

25   fencing, signage, bike rack, yes.  I was aware of that.

1    Q.   And is it fair to say that the bike racking and snow

2    fencing was all the way around the Capitol with signs showing

3    that it was, in fact, closed?

4    A.   Yes.

5    Q.   Now, you'd mentioned that you got to work.  At about

6    12:37 p.m., what, if anything, happened that was important to

7    you or specific to you?

8         Or let me ask you this:  When did Vice President Pence

9    arrive?

10   A.   He arrived right around 12:30 p.m.

11   Q.   And what, if anything, did he do upon arriving at the U.S.

12   Capitol, and what did you do with him?

13   A.   So I met the Vice President and his family at, again,

14   right around 12:30 p.m. in the Senate carriage, and we moved to

15   his ceremonial office which is located on the second floor of

16   the Senate side of the Capitol, and then from there he moved to

17   the Senate Chamber to meet with the other senators, and from

18   there they moved over to -- he and the other senators walked

19   over to the House Chamber a little before 1:00 p.m., and I

20   think it was more of, like, it's -- a very ceremonial kind of

21   choreographed proceeding takes place at that point when the

22   certification of the votes began.

23        So at 1 o'clock, I want to say, it began.  They went over

24   in the House Chamber, and we were there until approximately

25   1:15 p.m., when my understanding was there was an objection to

1    one of the state's votes -- I believe it was Arizona -- and

2    then we made our way back over.  The group, you know, the

3    senators and the Vice President, we led them back over to the

4    Senate Chamber.

5    Q.   And when you got back to the Senate Chamber, what was the

6    Vice President doing?

7    A.   When we got back to the Senate Chamber?

8    Q.   Yes.

9    A.   My understanding -- I didn't go back into the chamber with

10   him, but my understanding they were meeting as a group and kind

11   of discussing what to do at that point and how they were going

12   to handle what needed to happen procedurally.

13   Q.   And as the day progressed, did things begin to change, or

14   did your regular plan change that particular day?

15   A.   It did.  It changed when we were over on the House side

16   and as we were kind of moving from the House side to the Senate

17   side.  I want to say we were getting notification while we were

18   on the House side before we moved over.  We had gotten some

19   notifications that there had been a security breach on the west

20   side of the Capitol with some unknown individuals that had

21   moved from an event that was taking place on the Ellipse, had

22   moved, you know, from the Ellipse towards the Capitol, and they

23   had breached some of the fencing and the snow fencing and had

24   made their way onto the west lawn.

25        And eventually, you know, as we moved from the House side

1    to the Senate side of the Capitol, you know, we were getting

2    more and more information.  We had learned that they -- these

3    unknown individuals had breached not only the west lawn, but

4    eventually had made their way onto the inaugural platform which

5    is on the west side of the Capitol and then eventually were

6    getting information that they were -- had breached the, you

7    know, west side of the Capitol.  They were breaching the House

8    side of the Capitol.  They were making their way onto the plaza

9    side of the Capitol or the east side of the Capitol, and then

10   the breaches were just building and building as the time went

11   on.

12   Q.   And when you have a head of state coming to the U.S.

13   Capitol, is part of your preparation something called an

14   emergency action or -- emergency action plan?

15   A.   Yes, that's correct.

16   Q.   If you could, describe to the Court what that is and why

17   you have that.

18   A.   So an emergency action plan is just an alternate plan that

19   we prepare in the event of some sort of an emergency that may

20   occur.  It could be a medical emergency.  It could be some sort

21   of a natural disaster, you know, emergency occurs.  It could be

22   a security breach, an emergency that is just not planned for or

23   something that is -- that kind of deviates from, as you said,

24   the original plan.  So it's just an opportunity for us to be

25   prepared and obviously be able to move or evacuate our

1   protectees to a place where they will be safe.

2   Q.   And you had mentioned earlier that you had heard about

3   breaches coming across the west lawn and up onto the inaugural

4   stage and all around the Capitol.  As the day progressed, did

5   you personally see any type of breaches that caused you concern

6   or made you act in a different way?

7   A.   Yes, I did.

8   Q.   If you could, describe to the Court what you saw.

9   A.   So at some point early, as I said, once -- I would say

10  when -- early on when we had moved from the House side to the

11  Senate side, initially I had looked out the window at some

12  point, and I saw, you know, some of these unknown individuals

13  very close on the Senate side out the window and thought, you

14  know, why are these individuals so close?  It was odd to me,

15  because clearly they had breached the security perimeter.

16       And then, when I was looking into our emergency action

17  plan, knowing that we had to go an alternate route, I had moved

18  down some stairs from the Vice President's ceremonial office to

19  check 'er out, and in doing so I came upon a group of

20  unauthorized individuals within the building on the Senate side

21  near our route and came face to face with my Capitol Police

22  counterparts with me, and it was a, you know, rowdy group of

23  individuals who we kind of had to push back and explain that,

24  you know, they weren't to be there and they couldn't come in to

25  the area they were trying to come in to, so it was not a

1    comfortable position to be in knowing that we had to try to

2    keep these unknown individuals -- we had no idea what their

3    intentions were.

4         We didn't -- obviously, they weren't screened by us.  We

5    had no idea if they had weapons on them or if they were

6    intending to do harm to us or the public or, you know, what

7    their reasons were for being there, so that was -- and I could

8    obviously hear them, you know, as they were breaching, you

9    know, the echoing throughout the Capitol, and so I saw -- I

10   would say I saw them on the Senate side, I saw them out the

11   windows, and then obviously later on saw that they -- what

12   the...

13   Q.   And you'd mentioned earlier that the emergency plan may

14   have to go in effect if there's a breach.  Did it go in effect

15   that day?

16   A.   Yes.

17   Q.   And when that went in effect, what, if anything, did you

18   and other Secret Service as well as Capitol Police officers do

19   in order to protect all the people inside the Capitol that were

20   there with permission as opposed to without?

21   A.   Can you ask that question again.

22   Q.   That was a really long, bad question.  Thank you.

23        When you activated the emergency plan, what did you do?

24   A.   Yeah.  So when it was safe to do so, we did move the Vice

25   President from his office to a safe location within the

1    Capitol.

2    Q.    And was he within the Capitol the entire time on January 6

3    of 2021?

4    A.    Yes.

5    Q.    And when you had to move Vice President Pence, fair to say

6    that all activity and business by Congress had to end because

7    of that?

8    A.    Yes.

9    Q.    And is that because of the people that had breached the

10   Capitol?

11   A.    Yes.

12   Q.    Do you remember approximately what time the emergency

13   action plan went into effect?

14   A.    Sometime between when we came back over about one -- let's

15   see.  I would say sometime between one -- I would say 1:30, 2

16   o'clock and -- I mean, around 2:25, 2:30, we moved the Vice

17   President, but I can't speak to, you know, an emergency action

18   plan happening on the other side, you know, for the other

19   executive members, you know, the leadership from the Capitol.

20   So I think there were multiple EA plans happening that day

21   so...

22   Q.    Fair to say your focus was Vice President Pence and his

23   family?

24   A.    Yes.

25   Q.    And you mentioned that approximately 2:20, 2:30, somewhere

1    in there.  Probably not looking at your watch as the day goes

2    on --

3    A.    Correct.

4    Q.    -- I'm guessing.

5    A.    Yes.

6    Q.    Did you stay with Vice President Pence as he was moved to

7    a secure location inside the Capitol?

8    A.    Yes.

9    Q.    And how long were you with him, and how long was he in

10   that secure location?

11   A.    We were in the secure location for about five hours.

12   Q.    And after five hours -- or during that five hours, what

13   was -- what was taking place, or what were you hoping would

14   take place in order for Vice President Pence to be able to

15   resume his duties?

16   A.    We were hoping to make the environment that they were

17   needed to come back into safe, to clear out the unknown,

18   unauthorized individuals from the Capitol and make sure that

19   there was, you know, nothing of danger within the Capitol and

20   the chambers where they were needing to return to.

21   Q.    And would somebody inside the Capitol, say, 3:09 p.m. that

22   was unauthorized or not permitted to be there affect Vice

23   President Pence and his ability to work with Congress and do

24   his constitutional duties?

25   A.    If there was somebody unauthorized in the Capitol, we

1    would not advise returning to the Capitol at that time, yes,

2    correct.

3    Q.   And with people inside the Capitol, did you, in fact, not

4    allow Vice President Pence or not advise him to return to the

5    Senate to resume his constitutional duties?

6    A.   That's correct.

7    Q.   And was that -- when was he allowed to go back -- or when

8    did you advise him he could go back to the Senate and resume

9    his constitutional duties?

10   A.   Once we deemed it safe and what we would consider a

11   security sweep.  We had multiple law enforcement partners

12   respond to the Capitol and conduct security sweeps, you know,

13   in conjunction with the U.S. Capitol Police and Secret Service

14   and others.  Like I said, multiple partners responded to

15   conduct security sweeps to ensure there was no explosives or

16   substances or individuals within the Capitol that would be

17   harmful or a danger of a threat to the Vice President, his

18   family, or, you know, returning members of Congress.

19   Q.   And ultimately were law enforcement able to clear the

20   Capitol of all the rioters so that Vice President Pence could

21   resume his duties?

22   A.   Yes.

23   Q.   And approximately when was that?

24   A.   I want to say they resumed -- gosh, I want to say it was

25   approximately 8 p.m. or 9 p.m., I believe.

1    Q.   And fair to say that those constitutional duties went into

2    actually the early morning or the next day before it could be

3    completed?

4    A.   That's correct.

5    Q.   And when did you ultimately work that day -- particular

6    day?

7    A.   I stayed at the Capitol until, I want to say, like, after

8    midnight.  It was, like, 12:30 a.m. on the 7th.  January 7th is

9    when I left.

10        MR. PHILLIPS:  If I may have one moment, Your Honor.

11        Thank you, Your Honor.  No further questions of this

12   witness.

13        THE COURT:  All right.  Cross.

14                       CROSS-EXAMINATION

15   BY MS. CHU:

16   Q.   Good morning.

17   A.   Good morning.

18   Q.   Just a few questions.  You mentioned that you heard about

19   the initial breach of the Capitol; correct?

20   A.   Yes.

21   Q.   And that happened around midday?

22   A.   The initial breach?

23   Q.   Yes.

24   A.   Yes.  When you say "midday," I mean --

25   Q.   Around -- was that around 1 o'clock?

1    A.    Yes.

2    Q.    Okay.  And you also mentioned that you saw a rowdy group

3    of individuals inside the Capitol?

4    A.    Correct.

5    Q.    All right.  And was that also around 1 o'clock?

6    A.    That would have been -- it would have been probably, I

7    don't know, sometime after or maybe 1:30 or so.

8    Q.    You testified that you moved Vice President Pence by 2:25;

9    correct?

10   A.    Yes.

11   Q.    And that the emergency protocol went into effect sometime

12   between 1:30 and 2 p.m.?

13   A.    Yes.  And again, I wouldn't -- the times would be

14   recorded, but at some point we would have moved the Motorcade

15   off of the plaza, and again, we moved Vice President Pence, I

16   want to say, around two -- between 2:20, like, 2:25, 2:30, we

17   moved him from his office.  I don't have the exact time of when

18   we moved the Motorcade off of the plaza.

19   Q.    Again, at that point the Capitol had already been

20   breached?

21   A.    Yes, that's my understanding.  I believe the House side

22   was breached first.  Again, security -- if we go to the actual

23   breach of the security perimeter, I don't have the exact time

24   when the west side was breached, but the physical structure,

25   again, that was happening on the House side first.

1   Q.   But the Senate side, by the time you moved Vice President

2   Pence, had already been breached as well?

3   A.   That's correct.

4   Q.   And all of that happened well before 3 p.m.?

5   A.   Yes, that's correct.

6   Q.   And you never saw my client personally?

7        And you weren't at the Capitol around --

8             THE COURT:  I didn't hear an answer.

9   A.   I don't recall seeing your client, no.

10  BY MS. CHU:

11  Q.   And you weren't in the Capitol at the time between

12  2:40 p.m. on?

13  A.   I was in the Capitol the entire time.

14  Q.   Oh, I'm sorry.  You weren't actually seeing what was

15  happening outside of the Capitol in terms of the breach; right?

16  A.   On the exterior of the Capitol?

17  Q.   Correct.

18  A.   I was not on the exterior of the Capitol, that is correct.

19  Q.   You weren't seeing what the crowd was doing around 2:40 to

20  3:10 p.m.?

21  A.   I did not see what the crowd was doing on the outside of

22  the Capitol, that's correct.

23            MS. CHU:  Just a moment, Your Honor.

24       Thank you.  No further questions.

25            THE COURT:  Any redirect?

```
1              MR. PHILLIPS:  No.  Thank you, Your Honor.

2              THE COURT:  All right.  You can step down.

3              THE WITNESS:  Thank you, Your Honor.

4              MS. CHU:  Your Honor, the defense just respectfully

5     asks for a break before the next witness.  We just need a

6     bathroom break over here.

7              THE COURT:  Can she be excused altogether, or did you

8     wish to have her wait?

9              MR. PHILLIPS:  I believe she can be excused unless

10    there's an objection by the defense.

11             MS. CHU:  None, Your Honor.

12             THE COURT:  So you can be excused altogether.

13         All right.  It's five to ten.  Why don't I make it

14    15 minutes in terms of it actually being practical?  So ten

15    after ten we'll pick up with the next witness.

16         (Recess taken at 9:55 a.m.)

17         (At 10:12 a.m. on January 10, 2023; with counsel and the

18    defendant present:)

19             THE COURT:  All right.  Call your next witness.

20             MR. PHILLIPS:  Thank you, Your Honor.  The government

21    would call Captain Jessica Baboulis.

22             THE COURT:  If you would step up over here, please.

23         If you would go ahead and step up, and we'll swear you in.

24             COURTROOM DEPUTY:  Raise your right hand, please.

25             JESSICA BABOULIS, PLAINTIFF'S WITNESS, SWORN
```

1          COURTROOM DEPUTY:  Please be seated.

2          THE COURT:  You can take your mask down when speaking

3     so we get a record, and I would ask that you speak into the

4     microphone in a nice, loud, clear voice.  Allow counsel to

5     finish their question before you start to answer even if you

6     know what they're asking you, and they should do the same so we

7     make sure we have the question and the answer.  If you hear

8     counsel say "objection" or start to stand, they're going to

9     object.  If you have not started to answer, please don't.  If

10    you're in the middle of your answer, stop.  Let me hear the

11    objection, and then I'll tell you whether to go forward.  All

12    right?

13         THE DEFENDANT:  Yes, Your Honor.

14         MR. PHILLIPS:  And if it's more comfortable, you can

15    actually take your mask off.

16         THE COURT:  Yes.  You don't need to leave it up.

17         THE WITNESS:  Thank you.

18         MR. PHILLIPS:  For the Court's knowledge and to

19    streamline this particular witness, the following exhibits --

20    there's not a stipulation, but there is no objection, and those

21    are Government Exhibits 200, 206, 208, 209, 210, 211, and 300.

22         THE COURT:  All right.  So I'm assuming there's no

23    objections, Ms. Chu; is that correct?

24         MS. CHU:  Just a moment, Your Honor.

25         THE COURT:  Sure.  No problem.

1          MS. CHU:  Your Honor, there's no objection as to

2    foundation.  Depending on how they're used we may have, but

3    it's nothing to the foundation and its actual admissibility in

4    this general --

5          THE COURT:  Okay, all right.  So then I'll admit

6    Government's Exhibit 200, 206, 208, 209, 210, 211, and 300.

7          MR. PHILLIPS:  And then also the government's going

8    to be using Government Exhibit 400, 431 and 432 in this

9    witness, and those are stipulated to.

10         THE COURT:  All right.  So if they're stipulated,

11   there is no objection, so I'll admit Exhibits 400, 431, 432.

12                       DIRECT EXAMINATION

13   BY MR. PHILLIPS:

14   Q.   Now that we've done all the housekeeping, if you could

15   please introduce yourself to the Court and spell your name for

16   the record.

17   A.   Yes, sir.  I'm Captain Jessica Baboulis.  I'm with the

18   United States Capitol Police.  It's Jessica, J-E-S-S-I-C-A.

19   Baboulis is B, as in boy, A-B, as in boy, O-U-L-I-S, as in Sam.

20   Q.   And you mentioned you're employed by the Capitol Police.

21   What is your rank with the Capitol Police?

22   A.   I'm currently a captain.

23   Q.   If you could, please describe to the Court some of your

24   training and experience as a Capitol Police officer.

25   A.   Yes.  I've been on for 24 years.  I have served as an

1    intelligence agent, a public information officer, a motor

2    commander of a motor unit, a patrol officer.  I've worked in

3    our policy office, background investigations, and several other

4    assignments on the agency, so I've worked in most all of our

5    bureaus inside of the agency.

6    Q.    And you mentioned you're a captain now.  What are your

7    duties as a captain with the Capitol Police?

8    A.    I currently work in the United States Capitol building,

9    and I oversee nearly 400 officers through the United States

10   Capitol building and grounds.  I also oversee our bicycle

11   response unit, which is a unit that responds to crowd

12   management.

13   Q.    And you mentioned that you're employed in the Capitol

14   building.  Where is the Capitol building located?

15   A.    The Capitol building is located in what we refer to as the

16   centralized portion of Washington, D.C., so roughly three

17   blocks from here.

18   Q.    I'm going to ask what's been stipulated to with no

19   objection -- or not stipulated to, but no objection, to look at

20   Government Exhibit Number 206 and see if you recognize that.

21   A.    I do.

22   Q.    And that's not it.

23   A.    Oh, sorry.

24   Q.    That's it.  And do you recognize 206?

25   A.    I do.

1    Q.    What is that?

2    A.    This is a depiction of the United States Capitol building

3    itself and somewhat of its immediate perimeter.

4    Q.    All right.  And if you would, please describe to the Court

5    some of the important features or how this building is laid

6    out.  And if you can, in the top right-hand corner of your

7    screen, I think if you touch it, a little pencil sign will come

8    up, and if it does, then I think you can actually draw on the

9    screen.

10   A.    Okay.

11   Q.    Is that working?

12   A.    It is working.

13   Q.    If you could, describe to the Court where north and south

14   and east and west is on this particular building.

15   A.    Sure.  This would be the north side.  This is the south

16   side, east, and, I'm sorry, west (indicating throughout).

17   Q.    The first three were X's, but the last was a west with a

18   "W"; correct?

19   A.    Yes.

20   Q.    And which side of the building -- what is that for the

21   U.S. Capitol?  And I've circled the largest part of the

22   building on the left side of the screen or the north side of

23   the building.

24   A.    That is the Senate Wing of the U.S. Capitol building.

25   Q.    And what is this area here that I've circled, a lawn area

1    on the northwest side of the building?

2    A.   That is considered the northwest side of the Capitol

3    building.

4    Q.   And if you could, describe to the Court what this

5    particular area is there that I just circled on the north side

6    of the building but on the easternmost side of the building.

7    A.   That is the north sidewalk that leads to the north

8    screening facility.

9    Q.   And are you familiar where Senate doors are?

10   A.   Yes.

11   Q.   Where are the Senate door -- or where's the Senate door on

12   this exhibit?

13   A.   Sure.  The Senate door would be located over on this side

14   (indicating).

15   Q.   Okay.  And is there another door that's in this area right

16   here (indicating)?

17   A.   Yes.  These doors here under this portico are doors that

18   are not used, but that is the Senate Wing access point fire

19   doors of the U.S. Capitol building.

20   Q.   And when you say they're not used, what do you mean by

21   that?

22   A.   They are secured at all times.  The only use of that area

23   is for egress in a fire.

24   Q.   Let's see if I can clear some of this out just so it's a

25   little bit clearer.

1    And on January 6th of 2021, fair to say that this

2    depiction is from that particular day or events of that day?

3    A.    Yes.

4              MS. CHU:  Objection, Your Honor.

5              THE COURT:  What's the objection?

6              MS. CHU:  The picture isn't from January 6th.

7              THE COURT:  I can't hear you.

8              MS. CHU:  The picture is not from January 6.

9              THE COURT:  No.  He's asked if this is -- is it fair

10   to say that this depiction is from that particular events of

11   that day, so I'm assuming it meant this is accurate at that

12   time.

13        You're not asking whether this was the -- it's a drawing,

14   for one thing.

15             MR. PHILLIPS:  The Court's correct.

16             THE COURT:  I'll interpret your answer, if this is

17   correct, Captain, that this is a fair depiction on January 6 of

18   what the Capitol looked like, the structure.

19             THE WITNESS:  Yes, Your Honor.

20             THE COURT:  All right.  Let's go ahead.

21   BY MR. PHILLIPS:

22   Q.    And I just circled an area here on the west side.  What is

23   that area?

24   A.    That area is what we call the inaugural platform.  So

25   typically on January 6th, every four years this area would look

1    like that, and particularly on this January 6th.  There is a

2    stage that is built out in preparation for the pending

3    inauguration of the President of the United States.

4    Q.   And is that normally there other than for the

5    inauguration?

6    A.   It is not.

7    Q.   I'm going to ask you to look at Government Exhibit

8    Number 200 and ask to publish, please.

9         Do you recognize this photograph?

10   A.   Yes, I do.

11   Q.   If you could, describe to the Court what you're looking at

12   here and what we're seeing on the screen in this photograph.

13   A.   The red line surrounding the photo, this is what we refer

14   to as a perimeter bike rack map.  This is the initial perimeter

15   that was utilized.

16   Q.   And when you say "perimeter," if you could describe to the

17   Court what you mean by "perimeter" and how that perimeter is

18   established and what it looks like.

19   A.   Yes.  So once we determine what the perimeter for security

20   needs to be for any particular event, it would be initiated

21   with a map of this nature.  So this map indicates what the

22   perimeter for the event would be, so the red notes indicates

23   where that would be.

24   Q.   And how is that perimeter erected, or what is it made out

25   of?

1    A.   So typically it's utilized with bike rack, so racks that

2    appear to be where you would put a bike, they are connected and

3    linked.  On this particular day we also utilized snow fencing.

4    So surrounding those areas in many portions, there's what's

5    referred to as the Olmsted walls, and those are permanent

6    structures.  They would have been supplemented with snow

7    fencing.

8    Q.   And if you could, mark where those Olmsted walls are and

9    how that relates to this particular photograph.

10   A.   Sure.  So there's several in this vicinity.  They are --

11   throughout the grounds there's different areas that they might

12   be had, but in particular this area here is bounded by Olmsted

13   walls.  I'm sorry.  I went a little too far on that side

14   (indicating throughout).

15            THE COURT:  Can you describe on the photograph so if

16   we read it in a transcript, looking at this exhibit, we'd know

17   what you were talking about.

18            THE WITNESS:  Yes, Your Honor.  On the west center

19   portion of the U.S. Capitol grounds along First Street, so it

20   would be bounded by Pennsylvania and Maryland Avenue on the

21   west side.

22   BY MR. PHILLIPS:

23   Q.   If you would, could you please mark where Pennsylvania and

24   where those streets are.

25   A.   Here in the northwest sector is Pennsylvania Avenue, and

1    that runs on a diagonal, and in this area, this is Maryland

2    Avenue.  That's in the southwest sector of the building.  In

3    between there in the center portion of the West Front of the

4    Capitol grounds, that area is bounded by those Olmsted walls.

5    They also run up the sidewalk here on Maryland Av. again in the

6    southwest corner.

7         That continues up to the lower west terrace of the U.S.

8    Capitol, so the improved area of the West Front, and also again

9    back in that northwest sector that Maryland -- I'm sorry.  The

10   Pennsylvania Avenue walkway also continues up to the lower west

11   terrace, the improved areas.  That is bounded by an Olmsted

12   wall which is often supplemented with snow fencing.  We no

13   longer use snow fencing, however, since January 6.

14   Q.   And going back, I'm going to circle an area right there.

15   What is that?  And if you could describe where it is and what

16   that is.

17   A.   Sure.  Again, that is in the northwest sector of the

18   Capitol grounds.  That is considered Peace Circle.  We refer to

19   that.  There is a monument in the center of that circle which

20   is the Peace Monument.

21   Q.   On January 6 of 2021, was the U.S. Capitol open to the

22   public?

23   A.   It was not.

24   Q.   And why was that?

25   A.   There were several reasons.  One was the Capitol building

1    had been closed since March of 2020 for COVID restrictions, and
2    particularly on this day we were hosting a joint session of
3    Congress which would involve both parties of the House as well
4    as external branches of government, so it was additionally --
5    additional restrictions were in place for that, and the grounds
6    of the west side of the Capitol were also typically closed due
7    to the preparation of the inaugural stage.
8    Q.   And when you say the grounds to the west side of the
9    Capitol, is that the grounds that are within the red line
10   depicted in Government's Exhibit 200?
11   A.   Yes.
12   Q.   And on -- if the -- if the Capitol is open to the public,
13   could you describe to the Court what has to take place in order
14   for somebody to come visit the U.S. Capitol.
15   A.   Yes.  So there are two entrances that are utilized for
16   those that are on official business, and that would be on the
17   far north end of the building and the far south end of the
18   building.  And in order to come into the building, any
19   individual, any staff member would need to go through a
20   security screening process, and that would consist of walking
21   through a magnetometer and placing your packages on an x-ray
22   machine for screening.  Those would be two of the minimal
23   screening procedures that would be utilized.
24        In addition to that, when the building is open to the
25   general public, there is the CBC Visitor Center, which is the

1    Capitol Visitor's Center which is on the furthest east side of

2    the grounds where individuals would line up.  They would have

3    tour reservations or come in, in a line.  If tours allowed for

4    them to come in, they would be screened at that point through

5    similar measures with potentially some additional screening

6    measures at that location.

7    Q.   And just to be clear, that would be if the Capitol was

8    actually open to the public, but on January 6 of 2021, it was

9    not open to the public?

10   A.   That's correct.  The Capitol Visitor's Center had been

11   closed since March of 2020.

12   Q.   I want to take you back.  You'd mentioned that it was

13   closed, the Capitol was closed.  Looking at Government's

14   Exhibit Number 300, see if you recognize that.

15   A.   Yes.

16   Q.   Do you recognize that?  What is Government's Exhibit 300?

17   A.   This is a Capitol Police Board Order.  So the Capitol

18   Police is overseen by a Capitol Police Board that has the

19   authority to make these closures, so this is noting what the

20   perimeter of that closure would be.

21   Q.   And is that closure consistent with the red line that we

22   were looking at earlier in Government Exhibit Number 200?

23   A.   Yes.

24          MR. PHILLIPS:  Now I want to go back to and I want to

25   pull up Government's Exhibit Number 208.

Baboulis - Direct (Phillips)                                      46

1    BY MR. PHILLIPS:

2    Q.   You'd mentioned earlier that the Capitol on January 6 of

3    2021 was secured by both snow fencing as well as bike racks.

4    What do you see in Government Exhibit 208, and if you could

5    please describe that to the Court.

6    A.   Sure.  This is a photo that is taken from First Street in

7    the west, so this is the center of the West Front grounds of

8    the U.S. Capitol building.  What you can see -- you can't see

9    the Olmsted wall.  That would be directly in front of the snow

10   fencing at the bottom of the screen, so that's the first line.

11   And then behind it you can see small white squares.  That is

12   the second line of perimeter, and on that fence there are signs

13   that say that the area is restricted, that it's not open.

14           MR. PHILLIPS:  And let's go to Government's

15   Exhibit 209, please.

16   BY MR. PHILLIPS:

17   Q.   You had mentioned a sign and bike racks.  What do you see

18   in this photograph, and do you recognize it?

19   A.   I do.

20   Q.   And what is important to you and what -- what is helpful

21   to you in testifying here in front of Her Honor?

22   A.   There's a few things.  I recognize this to be the first

23   area that was breached on January 6th.

24   Q.   And what area was that?

25   A.   That is the Peace Circle area.  This is taken from kind of

1    the circle of Peace Circle, and they're forcing through

2    barricades leading up to the Pennsylvania Avenue walkway in the

3    northwest sector of the Capitol grounds.

4    Q.   And what else is important for you in this photograph?

5    A.   There are the notations.  You can see here the actual bike

6    racks that I was referring to along with snow fencing and the

7    posted signs that say area closed, and you can see our

8    officers, U.S. Capitol Police officers, attempting to hold and

9    maintain those bike racks as people are trying to push through.

10   Q.   And as people are trying to push through, is this a secure

11   area that they are trying to push through to?

12   A.   It is.

13           MR. PHILLIPS:  Going to Government's Exhibit

14   Number 210, please.

15   BY MR. PHILLIPS:

16   Q.   If you could, describe to the Court what this is and why

17   it's important to you.

18   A.   Again, this is that northwest area of the grounds, so this

19   is further south in that northwest area where they are looking

20   onto the West Front center grassy area grounds.  You again can

21   see they're leaning on that Olmsted wall, which is that

22   permanent structure, and behind it the snow fencing stating the

23   area is closed, and again you could see officers in that

24   vicinity monitoring the area.

25   Q.   And what were those officers' duties or responsibilities

1    on January 6 of 2021?

2    A.    Those officers were there to monitor crowds for crowd

3    control, for ensuring that nobody entered into the grounds.

4              MR. PHILLIPS:  And going to Government's Exhibit

5    Number 211, please.

6    BY MR. PHILLIPS:

7    Q.    What is that?

8    A.    That is a sign that states that the area is closed.

9    Q.    And in preparation for January 6 of 2021 and the erection

10   of the snow fencing and the bike racks, where were those signs

11   placed, and how often or how regular were those signs in the

12   area of the Capitol on January 6 of 2021?

13   A.    Those signs were strategically placed roughly every 6 to

14   10 feet apart from one another anywhere that there was snow

15   fencing or bike rack, which would have been along the entirety

16   of the perimeter that was shown in the earlier map that had the

17   red line around it.

18   Q.    Okay.  I want to take you back to January 6 of 2021 and

19   specifically your workday.  How did your workday begin, and

20   what were your responsibilities as that day started?

21   A.    On January 6th, I arrived between 7 and 7:30 a.m.  I was

22   assigned to the southeast sector of the U.S. Capitol grounds

23   and surroundings.  The Library of Congress buildings and

24   grounds, I was the acting division commander that day.  I was

25   responsible for interior of buildings, exterior grounds, and

1    ensuring that my officers who were assigned to assist with

2    crowd control at the Capitol were accounted for and sent over.

3    Q.   And when you arrived at work, what, if anything, did you

4    do, or what did you observe?

5              MS. CHU:  Objection, relevance.

6              THE COURT:  No.  I'll allow.

7         Go ahead.

8    A.   That morning we had received information that there would

9    be large crowds in the area.  We also had observed large crowds

10   traversing the grounds to get to the event that was being held

11   downtown, so I was out and about speaking to all of my officers

12   who worked in the exterior of the grounds along with the garage

13   entrances and building entrances to let them know, you know, to

14   ensure that they kept people away from the buildings and

15   grounds.

16             MR. PHILLIPS:  Maybe let's go back to Government

17   Exhibit Number 206, please.

18   BY MR. PHILLIPS:

19   Q.   In looking at Government Exhibit 206, you mentioned that

20   you were just talking to troops or people that work for you at

21   the Capitol, and you went to specific locations.  What

22   locations did you go to?  And please just mark those for the

23   Court.

24   A.   Sure.  And this here is Independence Avenue.  I was in the

25   buildings that were occupied along First Street here in the

1  east and the grounds kind of leading in this direction a little

2  bit south, so along the top right corner of this picture

3  (indicating throughout).

4  Q.   Okay.  And on January 6, 2021, was there a specific event

5  taking place at the Capitol that was important?

6  A.   Yes.

7  Q.   And what was that?

8  A.   That was the counting of the presidential ballots, the

9  Electoral College, so they were confirming the presidency

10  through the Congress.

11  Q.   Now, you've been with the Capitol Police for 24 years.

12  Have there been other Electoral Colleges that took place during

13  those 24 years?

14  A.   Yes, sir.

15  Q.   If you could, describe to the Court what those days are

16  typically and also how it relates to January 6 of 2021.

17  A.   Sure.  Every four years, again, the same pattern is held

18  as far as the events that transpire on Capitol grounds.  Most

19  particular days we wouldn't refer to as January 6th.  We would

20  just refer to it as a joint session of Congress, which again

21  indicates that both parties will be together, both Houses of

22  the Congress, along with an external branch of government.

23  Q.   And on January 6 of 2021, was, in fact, the Vice President

24  of the United States to be present at the Capitol?

25  A.   Yes, sir.

1   Q.   And when the Vice President is going to be present at the

2   Capitol, do you liaison with United States Secret Service and

3   other agencies?

4   A.   Yes, sir.

5   Q.   And what takes place, or what do you do as a result of

6   that?  What specific actions take place that are different than

7   a typical day at the Capitol?

8   A.   We ensure enhanced security and collaboration of security

9   with the United States Secret Service when they are arriving

10  and while they are on our grounds.

11           MR. PHILLIPS:  And Your Honor, at this time I would

12  ask the Court to take judicial notice and the stipulation on

13  the electoral vote, which is at ECF Document 56.  It's the

14  stipulation regarding Exhibit Number 500.

15           THE COURT:  Okay.  I will take judicial notice of

16  that.

17  BY MR. PHILLIPS:

18  Q.   And Captain, as the day progresses, did things take place

19  which caused your day to be different than a typical day at the

20  U.S. Capitol?

21  A.   Yes.

22  Q.   If you could, describe to the Court what took place and

23  caused your day to be not so typical.

24  A.   My day, the challenges started between 11 and 12 a.m.  I

25  was called by one of our investigators, an officer.  They

1    indicated that they had found a pipe bomb behind the Republican

2    National Committee, which is in the area of my responsibility,

3    just outside of it and just outside of my office, so I

4    responded to that area to ensure that we established a

5    perimeter around that pipe bomb.

6        I ended up spending a few hours there due to the fact that

7    we uncovered a second pipe bomb at the Democratic National

8    Committee, which I was in between the two ensuring that we had

9    a safe perimeter of the grounds of which they occupied and

10   ensuring that we can go and render those devices safe through

11   our hazardous device team.

12   Q.   And when you were, for lack of a better term, dealing with

13   the pipe bombs or supervising the dealing with the pipe bombs,

14   are you in communication with others that are actually on the

15   Capitol grounds or in the Capitol building?

16   A.   Yes.  So every member of the United States Capitol Police,

17   particularly those that are working, are required to carry an

18   issued radio.  So with that radio there's shared communications

19   that you can hear across the grounds of everything that's

20   occurring in the event we need to provide assistance somewhere

21   or awareness.

22   Q.   And as the day progressed, as you were on the radio or

23   listening to the radio, did things take place at the Capitol

24   which caused you and other people with the Capitol Police to

25   have to act and take certain actions?

Baboulis - Direct (Phillips)                                53

1    A.    Yes.   While we were trying to ensure the area was safe for

2    the hazardous device team to detonate the pipe bombs, we had

3    been in the process of evacuating buildings and moving

4    everybody north, which would have been towards the U.S. Capitol

5    building.   We were divided.   The pipe bombs were divided by

6    simply the House office buildings and then the Capitol

7    building, so we had initially been working to move everybody

8    north away from the explosive devices when we realized that

9    large crowds were coming to the grounds, so it was a --

10   Q.    And when you say "grounds," I just want to be clear.

11   Which grounds are we talking about?

12   A.    I'm sorry.   To the U.S. Capitol building itself.   So while

13   I was situated at a command post waiting for the devices to be

14   detonated, we were listening to all of the radio communications

15   and attempting to ensure that we were doing the right things as

16   to how we were handling the evacuations so that we didn't put

17   anybody in harm's way sending them in a different direction.

18   Q.    And just to be clear, were you -- you had mentioned you

19   were sending people north.   Were you sending people into the

20   secured area of the U.S. Capitol or no?

21   A.    No.   Just within the buildings we had pushed everybody

22   from the south sides of the House office buildings to the north

23   side, and we also began evacuating fully and sending people

24   home in the Library office buildings on the east side.

25   Q.    And with your 24-plus years with the Capitol Police, does

1    the Capitol have CCTV?

2    A.   Yes, sir.

3    Q.   And if you could describe to the Court how that CCTV works

4    and how it is monitored.

5    A.   There are numerous cameras throughout the Capitol complex

6    on the interior and exterior of the buildings and grounds.

7    Those cameras are monitored by a command center that has the

8    ability to, when they hear something over the radio or just

9    through observation, really pan into those areas to see what's

10   going on.

11   Q.   And were those cameras working on January 6th of 2021?

12   A.   Yes, sir.

13   Q.   And are those cameras recorded 24 hours a day, seven days

14   a week?

15   A.   Yes, sir.

16   Q.   And on January 6th of 2021, as you were listening to your

17   radio as a commander, as a captain with the United States

18   Capitol Police, did ultimately breaches take place at the U.S.

19   Capitol that were of concern to you?

20   A.   Yes.

21        MR. PHILLIPS:  Your Honor, at this time I'd ask to

22   publish Government Exhibit Number 400.

23        THE COURT:  You may.

24   (A portion of Exhibit 400 was played.)

25        MR. PHILLIPS:  If you could pause right there.

1          We're paused at 12:51:03 p.m. with the date January 6 of

2    2021 in the top left of Government Exhibit Number 400.

3    BY MR. PHILLIPS:

4    Q.   What area is that?

5    A.   That is -- the photo appears to actually be taken from the

6    Peace Monument.  You can see it is facing towards the U.S.

7    Capitol building, which the building is in the top right

8    corner, and that is what we refer to as the Pennsylvania Avenue

9    walkway where the officers are standing.

10   Q.   And this area here -- and I'm circling right at the bottom

11   of the stairs in front of the officers on Exhibit Number 400.

12   Are those bike racks with the signs advising the area's closed?

13   A.   Yes, they are.

14        MR. PHILLIPS:  You can go ahead and play.

15        (A portion of Exhibit 400 was played.)

16        MR. PHILLIPS:  If I may pause there.

17   BY MR. PHILLIPS:

18   Q.   Where was the first breach of the Capitol grounds on

19   January 6 of 2021?

20   A.   The first breach was in Peace Circle in the area of the

21   Pennsylvania Avenue walkway, which was in the photo just shown.

22        MR. PHILLIPS:  You can push play.

23        (A portion of Exhibit 400 was played.)

24        MR. PHILLIPS:  If we could pause right there.

25   Pausing at 12:58 and 34 seconds.

1    BY MR. PHILLIPS:

2    Q.    What are we seeing in this part of Government Exhibit

3    Number 400?

4    A.    What we see is in the top of the photo, you can see that

5    second line of fencing that was shown in an earlier photo from

6    a different direction.

7    Q.    And if you could mark that for the Court for the Court's

8    attention.

9    A.    Yes.  So this is the second perimeter (indicating).

10   Q.    Fair to say that's almost at the top of the screen as

11   we're looking at it?

12   A.    That's correct.

13   Q.    Okay.  And what side of the building or of the Capitol are

14   we looking at there?

15   A.    We are looking at the West Front of the U.S. Capitol

16   building.

17          MR. PHILLIPS:  If you could push play, please.

18          (A portion of Exhibit 400 was played.)

19          MR. PHILLIPS:  Pause, please.

20   BY MR. PHILLIPS:

21   Q.    At 2:09 and 50 seconds, what area is that of the U.S.

22   Capitol?

23   A.    That is the Lower West Terrace, what we call kind of the

24   middle level.  So that level divides the ground area of the

25   West Front, the improved area, and the Upper West Terrace, so

1    they are traveling up the Senate steps of the Upper West

2    Terrace --

3              MR. PHILLIPS:  Push play.

4    A.   -- alongside of the inaugural platform.

5    BY MR. PHILLIPS:

6    Q.   Thank you.

7         (A portion of Exhibit 400 was played.)

8              MR. PHILLIPS:  Pause, please.

9    BY MR. PHILLIPS:

10   Q.   I think I asked you earlier and you -- on a different

11   exhibit you mentioned doors near the Senate that aren't

12   normally used, but they are there for a fire exit.  Do you

13   recognize where that is in this particular exhibit?

14        And if you could mark that for the Court.

15   A.   I do.  This is a door here, and that is a hallway that

16   leads -- that adjoins the Capitol building proper to the Senate

17   Wing of the U.S. Capitol building (indicating).

18   Q.   And for the record, fair to say that you've put an "X" in

19   the middle of the three openings in the center of the screen?

20   A.   Yes.

21   Q.   What is in the -- on either side of that "X," the other

22   two openings?  What are those?

23   A.   Windows.

24             MR. PHILLIPS:  Thank you.  Push play.

25        (A portion of Exhibit 400 was played.)

```
 1              MR. PHILLIPS:  Pause, please.

 2     BY MR. PHILLIPS:

 3     Q.   Do you recognize this area?

 4     A.   I do.

 5              MR. PHILLIPS:  And for the record, it's at 2:12, 15

 6     seconds.

 7     BY MR. PHILLIPS:

 8     Q.   What is this area?

 9     A.   This is the hallway on the inside of the picture that was

10     just shown.  Again, the far left side is the initial Capitol

11     building, and this is a connecting hallway to the U.S. Senate

12     Wing of the Capitol.

13     Q.   And earlier I'd asked you to mark the door in this area

14     that you had said just is used just as a fire door but not as

15     an entry area.  And fair to say that there's no security here

16     or magnetometers or x-rays or anything of that nature?

17     A.   That's correct.

18     Q.   And if you could mark where that door is now from the

19     inside of the building.

20     A.   (The witness complied.)

21     Q.   And for the record, it's the center door, the only door

22     that's depicted in this particular exhibit at this time;

23     correct?

24     A.   Correct.

25              MR. PHILLIPS:  Push play, please.
```

1             (A portion of Exhibit 400 was played.)

2     BY MR. PHILLIPS:

3     Q.    At 2:12, 59 seconds, and continuing on --

4             MR. PHILLIPS:  Pause for a moment.

5     BY MR. PHILLIPS:

6     Q.    What is taking place and being depicted in the CCTV in

7     Government Exhibit 400?

8     A.    Rioters have broken the windows on either side of the

9     window and have entered in through those broken windows.

10    Q.    And are these people that are permitted into the U.S.

11    Capitol?

12    A.    Absolutely not.

13    Q.    And why is that?

14    A.    For several reasons.  The building is closed, and if it

15    had not been, shattering windows and busting through them would

16    not be the entry point.

17    Q.    And is there anybody located in the U.S. Capitol that

18    you're responsible for or the Capitol Police and Secret Service

19    are responsible for their safety and their abilities to perform

20    their constitutional duties?

21    A.    Yes, sir.

22    Q.    And who was that on January 6 of 2021?

23    A.    It was both the House of Representatives for the United

24    States Congress, the Senate of the United States Congress, the

25    Vice President of the United States, and anyone -- any staff or

1   people assisting in this process.

2            MR. PHILLIPS:  Push play, please.

3        (A portion of Exhibit 400 was played.)

4            MR. PHILLIPS:  Pause, please.

5   BY MR. PHILLIPS:

6   Q.   At 2:42 and 7 seconds, in the upper left-hand corner of

7   Government Exhibit 400, what area is that?

8   A.   This is the area of the parliamentarian's office.  This --

9   if you were looking from the photo showed earlier from the

10  exterior where we were looking straight ahead at a fire door

11  and two windows, this door that's being breached would have

12  been on the very left side of that photo.

13  Q.   And maybe, if we go back to Government Exhibit 206

14  briefly, are you able to mark that on there even though it's --

15  A.   Yes.  So in the interior of this area.  It would have been

16  along this wall here (indicating).

17  Q.   So looking at the photograph, on the north side of the

18  building, the first "U" area, on the left-hand side of that "U"

19  area?

20  A.   Yes.

21           MR. PHILLIPS:  And going back to 400, please.

22  Continue to play, please.

23       (A portion of Exhibit 400 was played.)

24           MR. PHILLIPS:  Pause, please.

25  BY MR. PHILLIPS:

1    Q.   Looking at this, at Government Exhibit 400 --

2         MR. PHILLIPS:  And the time presently is 2:24 and

3    36 seconds.

4    BY MR. PHILLIPS:

5    Q.   What is taking place in Government 400 at this time?

6    A.   So it's clear that one of our civil disturbance units was

7    dispatched to this area, and they are attempting to keep people

8    from entering in through the building of that Senate Wing.

9         MR. PHILLIPS:  Continue to play, please.

10        (A portion of Exhibit 400 was played.)

11   BY MR. PHILLIPS:

12   Q.   We've just seen a compilation of some of the breaches that

13   took place at the U.S. Capitol on January 6 of 2021.  When the

14   Capitol was breached, what action did you and other law

15   enforcement have to take in order -- well, as a result of those

16   breaches?

17   A.   Sure.  Well, it was critical, one, that we evacuated all

18   of our protectees out of the vicinity so that we can regain

19   control of the building and grounds.  They were all removed to

20   secure locations, and we then reestablished the perimeter that

21   had been in place before we can allow them to continue to do

22   business.

23   Q.   And when we removed those members of Congress and the

24   Senate and the Vice President as a result of the rioters

25   breaching the Capitol, were the senators, congressmen, and Vice

1    President able to perform their constitutional duties on

2    January 6 of 2021?

3    A.   Not during the time that they were inside breaching and

4    rioting inside the building, no.

5    Q.   And if somebody was inside the Capitol at 3:09 p.m. not

6    permitted to be in the Capitol as one of the rioters, would

7    that, in fact, affect the lawmakers' abilities to perform their

8    duties?

9    A.   Absolutely.

10   Q.   Fair to say that the certification of the vote was stopped

11   or at least delayed that day as a result of the rioters of

12   January 6 of 2021?

13   A.   Yes.

14   Q.   I'm going to take you to Government's Exhibit Number 431,

15   please.

16        (A portion of Exhibit 431 was played.)

17   BY MR. PHILLIPS:

18   Q.   Looking at Government Exhibit Number 431, a different

19   exhibit that -- from the same camera view from a

20   previous exhibit --

21        MS. CHU:  Objection, cumulative.  We're going to look

22   at the same video of the first breach again, basically.

23   There's going to be the same snapshot.

24        THE COURT:  I'm sorry.  What was your objection?

25        MS. CHU:  Cumulative.

1              THE COURT:  No.

2              MS. CHU:  Just 403.

3              THE COURT:  I'll allow him.  I assume there's another

4      purpose.

5      BY MR. PHILLIPS:

6      Q.   And looking at Government Exhibit Number 431, again, where

7      is that depicted, and where is that in the Capitol?

8      A.   The dividing hallway between the Capitol and the Senate

9      Wing of the U.S. Capitol building.

10             MR. PHILLIPS:  Push play, please.

11         (A portion of Exhibit 431 was played.)

12     BY MR. PHILLIPS:

13     Q.   And as we watch this video, what is taking place at the

14     Capitol?

15     A.   Individuals who have breached multiple perimeter lines

16     have now made their way up and are banging on the windows and

17     door of the Senate Wing of the building.

18         (A portion of Exhibit 431 was played.)

19     BY MR. PHILLIPS:

20     Q.   And does this depict the first breach of the Senate Wing

21     of the building of the U.S. Capitol?

22     A.   Yes.

23             MR. PHILLIPS:  You can stop there.

24         Going to Government's Exhibit Number 432.

25         (A portion of Exhibit 432 was played.)

1    BY MR. PHILLIPS:

2    Q.   Government's Exhibit 432, what area is this again, just

3    for the record?

4    A.   It's the same area, the Senate Wing of the U.S. Capitol

5    building; however, it's now occupied by several rioters.

6    Q.   And would those rioters have an effect on the ability of

7    lawmakers to perform their constitutional duties on January 6

8    of 2021?

9    A.   Yes, they would.

10        MR. PHILLIPS:  And if you would, please fast-forward

11   to the 17-minute mark of the video as it reads on the bottom.

12   BY MR. PHILLIPS:

13   Q.   What is taking place at the 17-minute mark of Government

14   Exhibit Number 432?

15   A.   Civil disturbance units have been directed to the area,

16   and they're attempting to regain that perimeter of the building

17   and prohibit anybody else from trying to force their way in.

18        MR. PHILLIPS:  And if you could, please fast-forward

19   to 21 minutes of Government's Exhibit 432.

20        (A portion of Exhibit 432 was played.)

21        MR. PHILLIPS:  Pause, please.

22   BY MR. PHILLIPS:

23   Q.   As the counter in the top left corner shows 2:47 and

24   31 seconds, what is taking place in Government's Exhibit 432?

25   A.   The rioters have began again pushing through our civil

Baboulis - Direct (Phillips)                                          65

1    disturbance lines.

2              MR. PHILLIPS:  Push play, please.

3         (A portion of Exhibit 432 was played.)

4    BY MR. PHILLIPS:

5    Q.   And as this video plays, do the rioters, in fact, again

6    breach the U.S. Capitol?

7    A.   They are.  They're striking the officers with large

8    flagpoles, throwing objects at them, and again continuing to

9    push and attempt to breach.

10   Q.   And again, as rioters breached the U.S. Capitol, did that,

11   in fact, affect those people that you were protecting in the

12   Capitol and the ability for them to perform their duties?

13   A.   Absolutely.

14             MR. PHILLIPS:  You can take that down now.

15   BY MR. PHILLIPS:

16   Q.   Now, you had mentioned that a large part of your duties on

17   that particular day was dealing with pipe bombs that had been

18   placed at places outside of the actual U.S. Capitol perimeter.

19             MS. CHU:  Objection, relevance.

20   A.   Correct.

21             THE COURT:  You're going to have to put your mask

22   down.  I can't hear what you're saying.  I'm sorry.

23             MS. CHU:  Objection, relevance.

24             MR. PHILLIPS:  I'm simply trying to bring her to her

25   next step, Your Honor.

1              THE COURT:  All right.  Go ahead.

2    BY MR. PHILLIPS:

3    Q.   After you had had an ability to deal with those pipe

4    bombs, what did you do on that particular day?

5    A.   What I did is once we were able to get the pipe bombs

6    under control, we identified that there was also a vehicle that

7    was parked inside of that perimeter of the pipe bombs that

8    contained numerous explosive materials and weapons, so I worked

9    to collectively gather the staff that I was overseeing at the

10   time, the officers of roughly 150, and ensure that we can

11   evacuate all of our buildings, gather collectively in the

12   southeast perimeter corner of the U.S. Capitol building.  All

13   of my officers, once they had cleared their responsibilities, I

14   was ensuring that we sent teams over to assist with the riot.

15        I was also making sure that people were holding the line

16   for safety of those in the area, 'cause there were lots of

17   people in the area, to make sure that they didn't get near this

18   secondary vehicle with explosive devices.  Many people at this

19   time were maneuvering around the grounds, and some were

20   attempting to access the metro, which was something we needed

21   to keep them a few blocks away from, so it was a multitude of

22   things.

23        I was also checking on my officers who had been assigned

24   to the evacuation of the body of the House of Representatives

25   to make sure that they were accounted for.  It was very

1    difficult to get on the radio that day to be able to

2    communicate as we normally would due to what was going on, so I

3    was working throughout the south side of the Capitol, again,

4    making sure that we maintained a perimeter, that we got

5    everybody out of the office buildings safely and evacuated them

6    off of the U.S. Capitol grounds and sent them home, making sure

7    that my officers who were evacuating the Congress were okay,

8    and making sure that my officers who were on that line were

9    also okay and accounted for.

10   Q.   And did you ultimately personally make your way back to

11   the U.S. Capitol?

12   A.   I did.

13   Q.   If you could describe to the Court what you did when you

14   arrived back at the Capitol.

15   A.   Later that evening -- it was sometime after dark -- I was

16   able to make my way.  I know on the south side of the Capitol,

17   in one of the buildings in that area, we had somewhat of a

18   triage area, so I was checking with other commanders to see

19   what additional resources they needed and just moving

20   throughout the grounds, again, making sure that everybody was

21   okay and that we can ultimately get back to business.

22   Q.   And you say "ultimately get back to business."  If you

23   could, describe to the Court what was necessary in order for

24   the members of Congress to ultimately get back to business.

25   A.   It was critical, we knew, that this vote had to continue

1    forward, and so we knew that we had to safely make those

2    grounds accessible again for the Congress and for the Vice

3    President of the United States, so we were working to ensure

4    the building was clear, but not only the building, but the

5    grounds, and that we were able to resecure the perimeter that

6    had initially been in place.

7    Q.   And what does it mean when you say we had to make sure the

8    building and grounds were clear and they were resecured?

9    A.   So we needed to not only make sure that all of the

10   individuals were out of the area, but to ensure that nothing

11   hazardous, dangerous, was left behind that could have impacted

12   the Congress when they returned to those grounds.

13   Q.   And were you ultimately able to clear the Capitol of

14   rioters as well as anything that you may have deemed dangerous

15   for the lawmakers?

16   A.   Yes, sir.

17   Q.   And you mentioned earlier -- I think your words were "get

18   back to business"?

19   A.   Yes.

20   Q.   Ultimately were our lawmakers able to get back to

21   business?

22   A.   They were.

23   Q.   And when was that?

24   A.   It was late into the evening.  I believe by the time both

25   parties had entered, it was roughly around 9 p.m. or so, and we

1    ultimately, around 4 a.m., were able to see that to its

2    conclusion.

3    Q.   And the conclusion being the Electoral College vote?

4    A.   Yes.

5    Q.   Certification?  I'm sorry.  Certification?

6    A.   Yes.

7    Q.   And were you there until that certification was complete?

8    A.   Yes, I was.

9             MR. PHILLIPS:  If I may have one moment, Your Honor.

10            THE COURT:  Certainly.

11            MR. PHILLIPS:  If we could -- whoops.

12   BY MR. PHILLIPS:

13   Q.   Going back to Government Exhibit 206, please.

14        We talked about this walkway (indicating), and I'm not

15   sure what you called it.  What was that?

16   A.   So I would refer to that as the north walkway.  There's

17   steps on that walkway that differentiate it, and it's outside

18   our north screening facility.

19   Q.   And fair to say, as we're looking at Government

20   Exhibit 206, what I've circled at the top of the building on

21   the north side is a walkway with pillars on each end.  Kind of

22   a bad description, but is that fair to say?

23   A.   Yes, yes.  So that is a walkway that has a couple of steps

24   on it, and those pillars on either side are just kind of the

25   foundation, that permanent foundation I referred to earlier as

1   the Olmsted walls, so those are walls that surround a walkway.

2   Q.   And coming down this area, I guess I would be traveling

3   west on the north side of the U.S. Capitol and this lawn area

4   that's to the west side of the U.S. Capitol.  Was that, in

5   fact, a secured area on January 6 of 2021 (indicating)?

6   A.   Yes, all of that area was in the secure perimeter.

7            MR. PHILLIPS:  Thank you, Your Honor.  No further

8   questions.

9            THE COURT:  All right.  Cross.

10                    CROSS-EXAMINATION

11  BY MS. CHU:

12  Q.   Good morning, Officer.

13  A.   Good morning.

14  Q.   I'm sorry.  Captain.

15  A.   Good morning.

16  Q.   I want to just go back to some of the testimony you gave

17  about the timing of the breaches.  So you mentioned that the

18  first breach that you heard of was at -- I think it was Peace

19  Circle?

20  A.   Correct.

21  Q.   And that was around 12:54 p.m.; correct?

22  A.   Yes.

23  Q.   And at that point the crowd was starting to knock down

24  fencing; is that correct?

25  A.   That's correct.

1    Q.    And the bike racks were also starting to get pushed to the

2    side?

3    A.    Yes.

4    Q.    And you mentioned that the breach continued at 12:58 p.m.

5    The crowd had then pushed onto the west lawn and the west

6    plaza; is that right?

7    A.    Yes.

8    Q.    And so at that point, again, we have the fencing and the

9    bike racks being pushed down and to the side by the crowd?

10   A.    Yes.

11   Q.    At 2:09 p.m. it -- if -- and correct me if you think my

12   estimates are wrong here, but it sounds like the Lower West

13   Terrace was breached by the crowd.

14   A.    I believe it was during that time frame, yes, somewhere

15   around that time frame.

16   Q.    Okay.  And again, we had -- any barriers that were in the

17   way of this crowd, the crowd was pushing them down; right?

18   A.    Correct.

19   Q.    And so the people who were behind the initial folks

20   breaching, these barriers would not have been in their way?

21   A.    I can't say that they were nonetheless removed from the

22   grounds.  They were just moved and shifted.

23   Q.    And there was a very large crowd.  By around probably

24   2:30 p.m., you would say there was a very large crowd there?

25   A.    Yes.

1   Q.   Thousands of people?

2   A.   Yes.

3              THE COURT:  Where?

4              MS. CHU:  I'm sorry.  At the Capitol grounds.

5              THE COURT:  Okay.

6   BY MS. CHU:

7   Q.   I'm just going to turn your attention to a second -- to

8   what I think you described as a hallway behind the Senate Wing

9   door.

10  A.   Yes.

11  Q.   And you called that a -- you called it a hallway that

12  connected the initial Capitol building to the Senate Wing; is

13  that correct?

14  A.   Correct.

15  Q.   So it's not really a room.

16  A.   No.

17  Q.   It's not very big.

18  A.   It is not.

19  Q.   The AUSA went through with you the breach of that Senate

20  Wing door, the first breach.

21  A.   Yes.

22  Q.   And that first breach occurred around 2:11, 2:12 p.m.;

23  correct?

24  A.   Yes.

25  Q.   And at that point people had pushed those doors open?

1    A.    The door, yeah, it was pretty much torn off, and the

2    windows were shattered.

3    Q.    So the doorway was clear?

4    A.    I don't want to refer to it as clear, no.

5    Q.    But the door wasn't there?

6    A.    The door was in the vicinity.

7    Q.    Okay.  But it was torn off, you said, from the hinges?

8    A.    I can't speak exactly to the positioning of the door.  The

9    door was still located there in the video footage shown.

10   Q.    Okay.

11   A.    Just shattered through.

12   Q.    But it wasn't blocking the way of anybody going in?

13   A.    It was not secured in its fire egress position.

14   Q.    And then the second breach, that happened around

15   2:48 p.m., 2:47, 2:48 p.m.  Is that about right?

16   A.    Yes.

17   Q.    And at that point we have a large crowd of people pushing

18   in again?

19   A.    Yes.

20   Q.    And they're pushing in through the door?

21   A.    Yes.

22   Q.    And so they're entering through the door?

23   A.    Yes.

24   Q.    I think we even saw some people were entering in through

25   windows at that point; correct?

1          THE COURT:  Are you asking her a question?

2          MS. CHU:  Yes.

3     A.   Yes.

4     BY MS. CHU:

5     Q.   And so the hallway fills up with people at that point?

6          THE COURT:  You need to put timing in here because

7     there's two breaches, so if you'd be a little more specific,

8     I'd appreciate it.

9          MS. CHU:  Understood, Your Honor.

10    BY MS. CHU:

11    Q.   So we're talking about the second breach, and at that --

12    after the second breach we have a lot of people coming into

13    that hallway; correct?

14    A.   There is a period of time where people are occupying that

15    hallway.

16    Q.   And right after the second breach, we see a lot of people

17    coming in through those doors; is that correct?

18    A.   Yes.

19    Q.   Okay.  And I think when we look at the 20, 30 minutes or

20    so right after that second breach, we see that hallway's filled

21    with people.

22    A.   There was a point in the video that the hallway had

23    several people in the hallway.

24         MS. CHU:  Just a moment, Your Honor.

25         THE COURT:  Certainly.

Baboulis - Cross (Chu)                                              75

1    BY MS. CHU:

2    Q.   All right.  Captain, I'm just going to go back to when we

3    were talking about that door after the first breach.  We were

4    talking about that door being, you said, torn off of the -- the

5    doorway; right?

6    A.   In the video there's two individuals who have kicked the

7    door, which would have prohibited or not permitted for the door

8    to be resecured.  So the door was there not in the form --

9    there was clearly damage in the video to the door.

10   Q.   It wasn't a usable door anymore; correct?

11   A.   I can't answer that.

12   Q.   Okay.  You just said that it couldn't be resecured;

13   correct?

14   A.   From the way it was kicked off, it could not have been

15   resecured.

16   Q.   And in fact, I think the end of this first breach,

17   officers have come in with plastic shields in order to push

18   people out; is that right?

19   A.   That is correct.

20   Q.   And it took officers with the plastic shields to push the

21   people out because they couldn't use the doors to push the

22   people out; right?

23   A.   They were there using shields, which would be the natural

24   response to trying to push crowds back.  I can't speak to what

25   they believed, that door to be useful or not useful.  I wasn't

 1    there.

 2    Q.   I think in the videos we also see that there is a piece of

 3    wooden furniture that's pushed up against the doorway after the

 4    first breach?

 5    A.   I don't recall that.  I'd have to see it again.

 6              MS. CHU:  Could I actually just have the

 7    government -- if they could pull up -- I think it was

 8    Exhibit 431.

 9         And thank you for your assistance.

10         And if we can kindly go to the video, let's go to around

11    2:40 p.m.

12         (A portion of Exhibit 431 was played.)

13    BY MS. CHU:

14    Q.   I see this video actually goes to 2:14, but, Captain, if

15    we could just talk about this.  You can see at this point the

16    door is either open or not on its hinges anymore; correct?

17    A.   Correct.

18              MS. CHU:  No further questions.

19              THE COURT:  Any redirect?

20              MR. PHILLIPS:  No.  Thank you, Your Honor.

21              THE COURT:  All right.  I do have one question.

22         You testified that because of the Vice President's visit

23    there was collaboration between the Capitol Police and the

24    Secret Service; is that correct?

25              THE WITNESS:  Yes, Your Honor.

1            THE COURT:  In terms of the designation of the

2    restricted area, the perimeter which in the one of the

3    exhibits -- I don't remember the number -- has the red marking

4    that would have been the restricted area, what, if any, role

5    did the Capitol Police have in relation to that restricted area

6    perimeter in terms of designating or doing anything else with

7    it, if they had any role?

8            THE WITNESS:  Yes.  So the Capitol Police designates

9    that area.  We do work very closely with the U.S. Secret

10   Service.  They are aware of what -- you know, what area we

11   restrict, but we kind of maintain that security.  So the U.S.

12   Capitol Police solely, that morning and on most where we

13   conduct a bike rack perimeter of that nature, we would man that

14   perimeter with U.S. Capitol Police officers.

15           THE COURT:  All right.  If my question has generated

16   any other questions, follow-up, go ahead.

17           MR. PHILLIPS:  Nothing by the government.  Thank you,

18   Your Honor.

19           THE COURT:  Ms. Chu.

20           MS. CHU:  No.  Thank you, Your Honor.

21           THE COURT:  You may step down.

22       Can she be excused altogether or...

23           MR. PHILLIPS:  The government's fine with her being

24   excused.

25           MS. CHU:  Defense is fine as well.  Thank you, Your

1    Honor.

2              THE COURT:  All right.  You can be excused, then.

3              THE WITNESS:  Thank you, Your Honor.

4              THE COURT:  All right.  Let's move to the next

5    witness, unless people need a break at this point.

6              MR. PHILLIPS:  Well, Your Honor, my co-counsel has

7    asked if she could take a bathroom break.

8              THE COURT:  Well, let's take our full morning break

9    at this point.  So it's 11:25, so at 20 to 12.

10             MR. PHILLIPS:  Thank you, Your Honor.

11             THE COURT:  Who is your next witness?

12             MR. PHILLIPS:  Special Agent Braden Ballantyne.

13             THE COURT:  Okay.

14        (Recess taken at 11:25 a.m.)

15        (At 11:42 a.m. on January 10, 2023; with counsel and the

16   defendant present:)

17             THE COURT:  Are we ready to resume or not ready to

18   resume?

19             MS. CHU:  Yes, Your Honor.

20             MS. BESSLER:  Yes, Your Honor.

21             THE COURT:  All right.  Special Agent Ballantyne, I

22   believe you are the next witness.

23             THE WITNESS:  Yes, Your Honor.

24             THE COURT:  Please come on up.

25             COURTROOM DEPUTY:  Raise your right hand, please.

1    BRADEN BALLANTYNE, PLAINTIFF'S WITNESS, SWORN

2    COURTROOM DEPUTY:  Please be seated.

3    THE COURT:  All right.  Special Agent, and I know

4  you've been listening to me give instructions, but I'll repeat

5  them anyway.  Just make sure you let them finish their

6  question.  Give a beat in there before you start to answer so

7  we have the question and answer, and they shouldn't interrupt

8  you either.  And then, objections, if they start to stand or

9  whatever, you know, don't answer.  If you're in the middle

10 or -- stop if you're starting to answer it so I can hear what

11 the objection is, and then I'll let you know.  All right?

12    THE DEFENDANT:  Yes, Your Honor.

13    MS. BESSLER:  Thank you, Your Honor.  And before I

14 begin, there are a few housekeeping matters.  If Your Honor

15 would permit, I would like to just go through the exhibits that

16 I do intend to introduce.  There have been stipulations to the

17 majority of these.

18    THE COURT:  Okay, all right.

19    MS. BESSLER:  It will be Exhibits 1 through 12 which

20 are admitted pursuant to stipulation.

21    THE COURT:  All right.  Then I'll admit those because

22 they've been consented to.

23    MS. BESSLER:  Okay.  23 and 24, also admitted through

24 stipulation.

25    THE COURT:  All right.  I'll admit those as well.

1          MS. BESSLER:  114 and 124, the government does intend

2     to introduce these exhibits.  There has not been an agreement

3     to those stipulations, however.

4          THE COURT:  Okay.  So are there objections to those?

5     To their admissibility, let's start with that.

6        You're talking about 114 and 124?

7          MS. BESSLER:  Yes.

8          THE COURT:  I assume you've seen those.

9          MS. CHU:  I have, Your Honor.  You know, there is a

10    foundation issue, in our opinion.  We're, number one, not sure

11    how they were collected, and up until now I think we weren't

12    sure who collected them.  And then we have some questions,

13    actually, about them because our understanding is that this

14    Twitter account was shut down and not accessible, and when we

15    look at the screenshots, it's -- there's a foreign language on

16    some of these.

17         MS. BESSLER:  And Your Honor, I have questioning for

18    Agent Ballantyne regarding all of those things.

19         THE COURT:  All right.  So at this point you're

20    holding off with your access, so let's set the foundation for

21    getting these admitted.

22         MS. BESSLER:  Okay.

23         THE COURT:  This would have been helpful to have done

24    this in advance of the trial.  Go ahead.  Are there others?  Or

25    I don't want to stop you there.

 1          MS. BESSLER:  Oh, yes, there are additional ones.

 2          THE COURT:  Okay.  Why don't we go through the rest,

 3     and if these -- are these the only ones that are at issue or

 4     some of the others?

 5          MS. BESSLER:  No.  The rest are not at issue, Your

 6     Honor.

 7          THE COURT:  Let's go through all of them.  It makes

 8     it faster.

 9          MS. BESSLER:  Okay.  Exhibit 206, which has already

10     been admitted.

11          THE COURT:  All right.

12          MS. BESSLER:  Exhibit 414, 424, 425, 426, 427, 428,

13     429, and 430, which are admitted pursuant to stipulation.

14          THE COURT:  All right.  Then I'll admit those which

15     is -- so with this one we have 1 through 12; 23; 24; 206, which

16     has already been admitted; 414; 424 through 430 are the ones

17     that are admitted at this point, and we're holding in abeyance

18     114 and 124.

19          MS. BESSLER:  Yes.  424 to 430, that's correct.  And

20     with that may I begin?

21          THE COURT:  Okay.  So you've got additional ones, 424

22     and 430?

23          MS. BESSLER:  424 through 430 is what --

24          THE COURT:  430 is -- okay.  That's the ones that I

25     already mentioned.

```
 1                MS. BESSLER:  Okay.  Yes.

 2                THE COURT:  All right.  I've admitted those.

 3                MS. BESSLER:  Okay.  And may I begin, Your Honor?

 4                THE COURT:  Yes.  Go ahead.

 5                MS. BESSLER:  Thank you.

 6                       DIRECT EXAMINATION

 7   BY MS. BESSLER:

 8   Q.   Good morning, Agent Ballantyne.

 9   A.   Good morning.

10   Q.   Could you please state and spell your name for the record.

11   A.   Yes.  Braden Ballantyne.  B, as in boy, R-A-D-E-N, last

12   name Ballantyne, B-A-L-L-A-N-T-Y-N-E.

13   Q.   Agent, where do you currently work?

14   A.   I'm a special agent for the Federal Bureau of

15   Investigation at the Los Angeles Field Office, more

16   specifically the Orange County Resident Agency.

17   Q.   Okay.  And how long have you worked at the FBI?

18   A.   Approximately two years.

19   Q.   Okay.  And when did you start working at the FBI?

20   A.   On January 15th of 2021.

21   Q.   Okay.  And Agent, what are your job duties as a special

22   agent?

23   A.   So I am -- I investigate domestic terrorism and subjects

24   in violation of federal law.

25   Q.   Okay.  Can you tell me about your training and experience
```

1    in becoming a special agent?

2    A.   Yeah.  So I received six months of training while at

3    Quantico, where I was trained in investigative techniques,

4    interview, firearms, defensive tactics, effectuating search and

5    arrest warrants, cyber, evidence recovery, among other things,

6    and while in the field I received formal training on

7    interviewing and interrogation techniques as well as human

8    intelligence.

9    Q.   And Agent, what types of investigations have you done

10   since being with the FBI?

11   A.   So I've been involved in approximately ten investigations

12   into January 6th rioters.

13              THE COURT:  Excuse me.

14   BY MS. BESSLER:

15   Q.   Sorry.  You can continue.  Or you can repeat for the court

16   reporter.

17   A.   Yeah.  I'm sorry.  So I've been involved in approximately

18   ten investigations into January 6 rioters.

19   Q.   Okay.  And when you graduated from the academy, what was

20   your assignment?

21   A.   I was assigned to the Los Angeles Field Office Orange

22   County Resident Agency on the Domestic Terrorism Squad.

23   Q.   Okay.  And you mentioned that you investigated about ten

24   January 6 related cases; is that right?

25   A.   Yes.

1    Q.   Okay.  And was one of those investigations regarding or

2    involving Danean MacAndrew?

3    A.   Yes.

4    Q.   And when did you become part of the team investigating the

5    defendant?

6    A.   Danean MacAndrew?

7    Q.   Yes, Danean MacAndrew.

8    A.   I would say approximately September of 2021.

9    Q.   Okay.  And prior to court today did you ever have the

10   opportunity to meet Danean MacAndrew?

11   A.   Yes.

12   Q.   And when was the first time you met Danean MacAndrew?

13   A.   I believe it was September 28th, 2021.

14   Q.   Okay.  And what occurred on September 28th, 2021?

15   A.   Myself and another agent interviewed Danean MacAndrew at

16   her residence in Mission Viejo, California.

17   Q.   And that other agent, what is -- what is his or her name?

18   A.   That's Special Agent Karen Smyth.  She's also part of the

19   Domestic Terrorism Squad.

20   Q.   Okay.

21        THE COURT:  Can you spell her last name.

22        THE WITNESS:  S-M-Y-T-H.

23   BY MS. BESSLER:

24   Q.   And where did you meet Danean MacAndrew?

25   A.   At her residence in Mission Viejo, California.

1    Q.   Were you inside her home, outside?

2    A.   We were not inside.  We were just outside of the front

3    door.

4    Q.   And how long did you speak with her that day?

5    A.   Approximately half an hour.

6    Q.   What time of day did you meet her?

7    A.   Midday.

8    Q.   Midday?

9    A.   It was bright outside.

10   Q.   It was bright outside?

11   A.   Yes.

12   Q.   Okay.  And how far away was she from you?

13   A.   Approximately 3 feet.

14   Q.   And was there anything obstructing or covering her face

15   that day?

16   A.   No.  She was not wearing a mask.

17   Q.   Okay.  And were you able to get a good look at her?

18   A.   Yes.

19   Q.   And Agent, do you see Danean MacAndrew in court today?

20   A.   Yes.

21   Q.   And can you please identify her by article of clothing or

22   location in courtroom.

23   A.   Yeah.  She's sitting third person at the counsel table

24   with a black mask, appears to be black jacket, and a red shirt.

25            MS. BESSLER:  And Your Honor, let the record reflect

1    the witness has identified the defendant by location in

2    courtroom and article of clothing.

3             THE COURT:  I assume there's no objection, and so it

4    will reflect in the record.

5    BY MS. BESSLER:

6    Q.   Agent, did you review security footage from the United

7    States Capitol building from January 6, 2021?

8    A.   Yes.

9    Q.   And did you review any body-worn camera footage from

10   January 6, 2021?

11   A.   Yes.

12   Q.   Did you compare the person you saw in person to the visual

13   evidence from January 6, 2021?

14   A.   Yes.

15   Q.   And did you find Danean MacAndrew inside the Capitol and

16   on its grounds on January 6?

17   A.   Yes.

18   Q.   And Agent, did you have the opportunity to meet Danean

19   MacAndrew after you spoke with her in September of 2021?

20   A.   Yes.

21   Q.   And when -- when was that?

22   A.   So that was on December 1st of 2021, where we effectuated

23   the arrest of Danean MacAndrew.

24   Q.   And where was she arrested?

25   A.   She was arrested in the parking lot of the FBI Orange

Ballantyne - Direct (Bessler)                                    87

1    County Resident Agency.

2    Q.   Okay.  And were you present for that arrest?

3    A.   Yes.

4    Q.   And were you involved in the processing of her arrest?

5    A.   Yes.  I was involved in the arrest, the transport, and I

6    also attended her initial appearance that afternoon.

7    Q.   Okay.  And on December 1st of 2021, how much time did you

8    spend with her?

9    A.   Approximately two hours.

10   Q.   And again, was there anything obstructing or covering her

11   face that day?

12   A.   You did have to wear a mask inside the courtroom, yes, but

13   initially, no.

14   Q.   Okay.  And did you have the opportunity to meet Danean

15   MacAndrew again after her arrest?

16   A.   Yes.

17   Q.   And when was that?

18   A.   I believe that was January 19th, 2022.

19   Q.   Okay.  And why did you meet her on January 19th, 2022?

20   A.   I met Danean MacAndrew on January 19, 2022, for a consent

21   search of her cell phone.

22   Q.   Okay.  And what does that mean, "consent search of her

23   cell phone"?

24   A.   Danean MacAndrew and counsel came in to the Orange County

25   FBI Resident Agency and allowed me to search her cell phone.

Ballantyne - Direct (Bessler)                                        88

1    Q.   Okay.  And we will talk more about this later, but did you

2    obtain anything from the defendant that day through her phone?

3    A.   Yes.  We obtained multiple photos and videos from

4    January 6, 2021, taken on Danean MacAndrew's cell phone.

5    Q.   Okay.  Now, did you have the opportunity to investigate

6    the defendant's social media posts in the aftermath of

7    January 6, 2021?

8    A.   Yes.

9    Q.   Did you confirm whether the defendant had any social media

10   accounts?

11   A.   Yes.

12   Q.   How did you confirm that?

13   A.   The defendant told me.

14   Q.   What did she tell you?

15   A.   She confirmed that -- we presented a picture of her Gab

16   account, and she confirmed, yes, this is my account.  She said,

17   "I'm Danean on social media."

18   Q.   Okay.  And when did she say that to you?

19   A.   So that was during the course of the interview on

20   September 28th, 2021.

21   Q.   Okay.  And as part of your investigation into this case

22   and other January 6 cases, are there computer programs used by

23   the FBI to comb and identify readily available social media

24   posts or sites?

25   A.   Yes.

1    Q.   And what is that program called?

2    A.   So there's a program called The Wayback Machine that combs

3    the internet archive using bots for publicly available

4    accounts.

5    Q.   Okay.  And bots, are those B-O-T-S?

6    A.   B-O-T-S.

7    Q.   The Wayback Machine, does it comb through public and

8    private sites?

9    A.   No.  Just public.

10   Q.   And as part of this investigation, was The Wayback Machine

11   used?

12   A.   Yes.

13        MS. BESSLER:  And at this time I would pull up

14   Exhibit 124 just for the witness to see.

15   BY MS. BESSLER:

16   Q.   Agent, what is Exhibit 124?

17   A.   Exhibit 124 is a screen grab captured via The Wayback

18   Machine of Danean MacAndrew's Twitter account.

19   Q.   Okay.  And on the top left corner, I'm going to -- well,

20   on the top left corner, does that say Wayback Machine?

21   A.   Yes.

22   Q.   Is this a screenshot of the tweet that The Wayback Machine

23   was able to capture?

24   A.   Yes.

25        MS. BESSLER:  Okay.  And you can zoom back out.

1          Thank you.

2     BY MS. BESSLER:

3     Q.   What is the username on this account?

4          And if you could circle it for Her Honor.

5     A.   Yes.  The username is @DaneanHere.

6     Q.   Okay.  And removing that.

7          What is the profile name on this account?

8     A.   The profile name is D Restored.

9     Q.   Okay.  Thank you.

10          MS. BESSLER:  And circling, Your Honor, for the

11     record, on the left-hand side of the exhibit.

12     BY MS. BESSLER:

13     Q.   And Agent, does this resemble any other social media

14     accounts belonging to the defendant that you saw during your

15     investigation?

16     A.   Yes.  This resembles the defendant's Gab account.  It

17     has -- the Gab account has username @DRestored, similar to the

18     profile name D Restored seen here, as well as the same profile

19     picture on this Twitter as used as a profile picture on her Gab

20     account.

21     Q.   Now I want to turn your attention to the biography of this

22     Twitter account.  Can you first show Her Honor where exactly

23     that biography is located on this exhibit.

24     A.   Yes.  It's in the bottom left corner.

25     Q.   Okay.  Thank you.  And does the biography of user -- of

1    the Twitter user here reference other accounts belonging to

2    this user?

3    A.    Yes.  It referenced a Gab account, D_Restored, and a

4    Parler account, DaneanHere.

5    Q.    Okay.  And you just testified that username @D_Restored is

6    the defendant's Gab account?

7    A.    Yes.

8             THE COURT:  Can you highlight that a little bit.

9    It's a little easier for me to read it if you could.

10             MS. BESSLER:  Yeah.

11        Zoom in.

12        Thank you.

13        Is that better, Your Honor?

14             THE COURT:  Yeah.  That makes it easier.

15             MS. BESSLER:  I'll try to clear the screen.

16    Apologies.

17             THE COURT:  Go ahead.

18             MS. BESSLER:  I'm sorry.  If we could zoom that in

19    again.

20        Thank you.

21    BY MS. BESSLER:

22    Q.    Okay.  And just to reiterate, D_Restored, that -- you

23    confirmed that that was the defendant's Gab account?

24    A.    Yes.

25    Q.    Okay.  And going back to the biography again, is there a

1    location mentioned on this biography?

2    A.    Yes.

3    Q.    What is the location?

4    A.    California.

5    Q.    And in your experience as an agent, do these locations on

6    biographies indicate where the user lives or is from?

7    A.    Yes.

8    Q.    And is the defendant from California?

9    A.    Yes.

10   Q.    And going back to the biography again, does it show when

11   this account was created?

12   A.    Yes.

13   Q.    When was -- when is that?

14   A.    Joined March 2009.

15   Q.    So based on your investigation did you determine who this

16   account belonged to?

17   A.    Based on my investigation I determined that this account

18   belonged to Danean MacAndrew.

19         MS. BESSLER:  And Your Honor, at this time I would

20   move to admit Government's Exhibit 124 into evidence.

21         THE COURT:  Do you want to do any voir dire, or

22   what's your position?

23         MS. CHU:  No, not on this exhibit, Your Honor.  No

24   objection.

25         THE COURT:  Are you agreeing to it or not?

1          Let me ask it this way:  Are you not objecting to it?

2               MS. CHU:  No objection, Your Honor.

3               THE COURT:  All right.  Then I'll admit Government's

4     Exhibit -- I guess it's 124.

5               MS. BESSLER:  124, Your Honor.

6               THE COURT:  All right.

7               MS. BESSLER:  And if we can zoom back out to the

8     whole exhibit again, please.

9          Thank you.

10    BY MS. BESSLER:

11    Q.   Agent, when was this tweet posted, the at -- I'm sorry.

12    This Twitter user, the defendant's Twitter @DaneanHere, when

13    was this tweet posted?

14    A.   So this tweet was posted, you can see here, at 4:23 p.m.

15    on 6 January 2021.

16    Q.   And Agent, the tweet that is authored by the defendant,

17    @DaneanHere, is it in response to another tweet?

18    A.   Yes.

19    Q.   And is that tweet authored by Former President Trump?

20    A.   Yes.

21    Q.   And Agent, I'll read Former President Trump's tweet, and

22    you can read the defendant's reply.  The tweet by Donald J.

23    Trump, @realDonaldTrump, says, "Please support our Capitol

24    Police and Law Enforcement.  They are truly on the side of our

25    Country.  Stay peaceful!"

Ballantyne - Direct (Bessler)                                94

1    A.    In response, Danean posted, "I respectfully disagree, Sir.

2    Capitol Police were pepperspraying Patriots before the building

3    was breached by infiltrators.  Not cool."

4              MS. BESSLER:  Thank you.  We can take down

5    Exhibit 124 and pull up Exhibit 114.

6    BY MS. BESSLER:

7    Q.    Agent, what is Exhibit 114?

8    A.    Exhibit 114 is a tweet from Danean MacAndrew's Twitter

9    account.

10   Q.    Okay.  Now, the text -- there's some text here that seems

11   to be in German.  Can you circle that for Her Honor.

12   A.    Yes.  It's in a few places.  It's here, here, as well as

13   here (indicating).

14   Q.    And why would the text here be in German?

15   A.    So The Wayback Machine, the way it works, when it surfs

16   the Web, the bots use random IP addresses, and this IP address

17   at the time that it captured this tweet would have been in or

18   around Germany; however, the fact that some of it is written in

19   German does not affect nor change Danean MacAndrew's original

20   tweet.

21   Q.    Okay.  And so The Wayback Machine, it pulls from IP

22   addresses all over the world?

23   A.    Yes.

24   Q.    Okay.  And just to confirm, this is a screenshot of the

25   tweet that The Wayback Machine was able to capture?

Ballantyne - Direct (Bessler)                                          95

1   A.   Yes.

2   Q.   And does Exhibit 114 have the same username as we just saw

3   in Exhibit 124?

4   A.   Yes, username @DaneanHere.

5   Q.   Okay.  And does it have the same profile name as we saw in

6   Exhibit 124?

7   A.   Yes.  Profile name D Restored.

8            MS. BESSLER:  And Your Honor, at this time I would

9   move to admit Government's Exhibit 114 into evidence.

10           THE COURT:  Any voir dire, any objection?

11           MS. CHU:  Just a couple of questions, Your Honor.

12           THE COURT:  Sure.

13                     VOIR DIRE EXAMINATION

14   BY MS. CHU:

15   Q.   Agent Ballantyne, how are you familiar with how The

16   Wayback Machine works in terms of pulling from foreign IP

17   addresses?

18   A.   I'm familiar based on what our intelligence analyst who

19   used this Wayback Machine informed me.

20   Q.   And do you have any familiarity with what time stamps are

21   actually on -- like, on this Twitter, for instance, this

22   Twitter post, what time stamp it would be?  Would it be German?

23   Would it be a American time stamp?

24   A.   I do not know.

25           MS. CHU:  Your Honor, I think -- so we wouldn't

1    object to this exhibit except the time stamp, so I would just

2    note for the record that the time stamp is not reliable.

3              THE COURT:  Anything you -- if he doesn't know, then

4    it seems to me at this point I can -- I'll admit it, and we'll

5    exclude the time stamp at this point unless you can come up

6    with another way of getting it in.

7              MS. BESSLER:  Okay, Your Honor.

8              THE COURT:  All right.  So I'll admit it but not the

9    time stamp.

10             MS. CHU:  And Your Honor, I think included in that

11   would be the date itself.

12             THE COURT:  Well, it's the whole thing.

13             MS. CHU:  Thank you, Your Honor.

14             THE COURT:  The date and the time.  As I said, if

15   there's another way of getting this in, you're open to do so,

16   but at least not assuming it, the bottom line.

17             MS. BESSLER:  Okay.  Thank you, Your Honor.

18   BY MS. BESSLER:

19   Q.   Agent, the tweet that is authored by the defendant,

20   @Daneanhere, is it in response to another tweet?

21   A.   Yes.

22   Q.   And is that tweet authored by Former President Trump?

23   A.   Yes.

24   Q.   And again, I will read Former President Trump's tweet, and

25   you can read the defendant's response.

1        Donald J. Trump, @realDonaldTrump, tweeted, Looks like

2    they are setting up a big voter dump against the Republican

3    candidates.  Waiting to see how many votes they need.

4    A.    In response, Danean MacAndrew tweeted, "Traps set again at

5    another #RiggedElection."

6             MS. BESSLER:  Thank you.  We can pull down

7    Exhibit 114.

8    BY MS. BESSLER:

9    Q.    And Agent, I want to move to the evidence that the

10   defendant provided to the FBI during her arrest.  Did the

11   defendant agree to provide certain physical evidence and her

12   cell phone in lieu of the government obtaining search warrants

13   for those items?

14   A.    Yes.

15   Q.    And I will go more into depth about the electronic

16   evidence later, but did the defendant also agree to provide

17   certain electronic evidence in lieu of the government obtaining

18   search warrants for those items?

19   A.    Yes.

20            MS. BESSLER:  And I want to turn back to the physical

21   evidence provided by the defendant.  If we can pull up

22   Exhibit 1, which has already been admitted into evidence.

23   BY MS. BESSLER:

24   Q.    Agent, what is Exhibit 1?

25   A.    Exhibit 1 is a picture of a red scarf that Danean

1    MacAndrew was wearing on January 6, 2021, that she provided to

2    me.

3    Q.    Okay.  Did you take this photo?

4    A.    Yes.

5    Q.    And is Exhibit 1 a photograph of the scarf provided by the

6    defendant that she wore to the Capitol on January 6, 2021?

7    A.    Yes.

8    Q.    And is it consistent with what you saw in CCTV footage?

9    A.    Yes.

10            MS. BESSLER:  Okay.  And turning to Exhibits 3, 4 and

11    5.

12        So Exhibit 3.

13        And we can turn to Exhibit 4.

14        And Exhibit 5.

15    BY MS. BESSLER:

16    Q.    Agent, did you take these photos?

17    A.    Yes.

18    Q.    Are Exhibits 3, 4 and 5 photographs of the hat provided by

19    the defendant that she wore to the Capitol on January 6, 2021?

20    A.    Yes.

21    Q.    And is it consistent with what you saw in CCTV footage?

22    A.    Yes.

23            MS. BESSLER:  And turning to Exhibits 6 and 7, which

24    are already admitted.

25        And turning to Exhibit 7.

```
1    BY MS. BESSLER:

2    Q.   Did you take these photos of Exhibits 6 and 7?

3    A.   Yes.

4    Q.   And are Exhibits 6 and 7 photographs of the phone that the

5    defendant took to the Capitol on January 6, 2021?

6    A.   Yes.

7    Q.   And is it consistent with what you saw on CCTV footage?

8    A.   Yes.

9    Q.   Okay.  Now, Agent --

10        MS. BESSLER:  We can take Exhibit 7 down.

11   Thank you.

12   BY MS. BESSLER:

13   Q.   I want to turn to the defendant's conduct on Capitol

14   grounds prior to entering the Capitol.  As part of the

15   investigation into the defendant's presence at the Capitol on

16   January 6, 2021, did you obtain and review United States

17   Capitol Police CCTV footage?

18   A.   Yes.

19   Q.   And did you also obtain and review body-worn camera

20   footage as part of your investigation into Danean MacAndrew's

21   case?

22   A.   Yes.

23   Q.   And as part of your review of those videos, did you locate

24   the defendant?

25   A.   Yes.
```

 1   Q.   Excuse me.  Agent, have you reviewed Exhibits 414, 425 and

 2   426?

 3   A.   Yes.

 4   Q.   And do they contain CCTV and body-worn camera footage

 5   showing the defendant on Capitol grounds on January 6?

 6   A.   Yes.

 7        MS. BESSLER:  And Your Honor, I want to pull up

 8   Exhibit 206, which has already been admitted into evidence.

 9   BY MS. BESSLER:

10   Q.   So now I just want to walk through for Her Honor where you

11   first identified and located the defendant on Capitol grounds,

12   okay?  Where on the Capitol grounds did you first identify the

13   defendant or locate her?

14   A.   I first identified the defendant within the restricted

15   area on the northwest lawn approximately right there

16   (indicating).

17   Q.   Thank you.

18        THE COURT:  Describe it for the record as being

19   whatever -- however you want to describe it.

20        THE WITNESS:  The lower left-hand corner of the

21   picture on the northwest lawn.

22        THE COURT:  Okay.

23   BY MS. BESSLER:

24   Q.   Thank you.  And as you said, is this considered the

25   northwest lawn of the Capitol?

1    A.    Yes.

2    Q.    Or the west lawn.  Okay.  And is this on restricted

3    grounds?

4    A.    Yes.

5          MS. BESSLER:  Thank you.  We can take down

6    Exhibit 206 and pull up Exhibit 414, which has already been

7    admitted into evidence.

8          THE COURT:  You need to erase the...

9          MS. BESSLER:  Oh, yes.  Apologies.

10         THE COURT:  There you go.

11         MS. BESSLER:  Thank you.

12   And we can pause at the very beginning, please.

13   Thank you.

14   BY MS. BESSLER:

15   Q.    What is Exhibit 414?

16   A.    Body-worn camera footage.

17   Q.    Okay.  And can we see the -- whoops.  Can we see the date

18   and the time at the top right-hand corner?

19   A.    Yes.

20   Q.    And does that -- can you read it for Her Honor.

21   A.    Yeah.  2021-1-6 at 14:28:29.

22   Q.    Okay.  And is that January 6, 2021?

23   A.    January 6, 2021.

24         MS. CHU:  I'm sorry.  Your Honor, if can we clarify

25   for the record, is this -- are we looking at 415 or 414?

```
 1                MS. BESSLER:  Sorry.  I misread it.  If we can pull
 2      up 414.
 3           Thank you, Lillian.
 4           Your Honor, Court's brief indulgence.
 5                THE COURT:  No problem.
 6                MS. BESSLER:  Apologies, Your Honor.
 7                THE COURT:  No problem.  My law clerk indicates that
 8      he may be able to do it if you're having problems.
 9                MS. BESSLER:  Thank you.
10                THE COURT:  You provided us extra copies.
11                MS. BESSLER:  Yes, Your Honor.  I appreciate the
12      Court's assistance.  Thank you.
13                THE COURT:  No problem.
14                MS. BESSLER:  And can Your Honor see the screen now,
15      the exhibit?
16                THE COURT:  Yes.
17                MS. BESSLER:  Thank you.
18                THE COURT:  Everybody else?
19      BY MS. BESSLER:
20      Q.   Okay.  Agent, what is Exhibit 414?
21      A.   Body-worn camera footage.
22      Q.   And can we see the date and the time at the top right-hand
23      corner of Exhibit 414?
24      A.   Yes.  January 6, 2021, at 2:20.
25                MS. BESSLER:  Okay.  And I'm going to skip forward to
```

1    13:17, 13 minutes and 17 seconds.

2         (A portion of Exhibit 414 was played.)

3              MS. BESSLER:  And pausing at, I think -- I believe it

4    says 13:24 here.

5    BY MS. BESSLER:

6    Q.   What is the time stamp here?

7    A.   January 6, 2021, at 2:33 p.m.

8    Q.   Thank you.

9              MS. BESSLER:  And at this time I will play

10   Exhibit 414 and -- at 13:24 seconds.

11        (A portion of Exhibit 414 was played.)

12             MS. BESSLER:  I'm pausing at 14 minutes and 2

13   seconds.

14   BY MS. BESSLER:

15   Q.   Agent, do you see the defendant in this frame?

16   A.   Yes.

17   Q.   And can you please circle her for Her Honor.

18   A.   Yes.

19   Q.   Thank you.  And Agent, what, if anything, did you hear in

20   the background?

21   A.   I heard rioters verbally harassing officers.

22   Q.   And where the defendant is standing, is this where you

23   showed Her Honor on Exhibit 206?

24   A.   Yeah.  On the northwest lawn, yes.

25   Q.   Okay.  And again, is she standing on restricted grounds?

1    A.    Yes.

2    Q.    And what do you notice about the officers in this video?

3    A.    I notice that the officers are wearing riot gear,

4    including face shields and body armor, which indicates to me

5    that they are expecting confrontation.

6    Q.    Okay.  Is there one officer or many?

7    A.    There are many officers.

8    Q.    Okay.  And did she eventually leave this area?

9    A.    Yes.

10        MS. BESSLER:  Thank you.  I'm taking down

11   Exhibit 414.  I will provide the computer back to your law

12   clerk.  Thank you, Your Honor.

13        Thank you.

14        And if we can pull up Exhibit 206 again, which has already

15   been admitted.

16        THE COURT:  I missed that.  Which exhibit?

17        MS. BESSLER:  206.

18   BY MS. BESSLER:

19   Q.    Now, Agent, where do we see the defendant next on

20   body-worn camera and CCTV footage?

21   A.    We see the defendant on the left-hand side of the picture

22   on around the north path.

23   Q.    Okay.  And is this approximately on the northeastern side

24   of the Capitol or the northeastern corner of the Capitol?

25   A.    Yes.

1    Q.   And is this on restricted grounds?

2    A.   Yes.

3            MS. BESSLER:  Thank you.  We can take down

4    Exhibit 206 and pull up Exhibit 425, which has already been

5    admitted, and we can pause at zero seconds, please.

6    BY MS. BESSLER:

7    Q.   Is Exhibit 425 a side-by-side of CCTV and body-worn camera

8    footage from Metropolitan Police officers?

9    A.   Yes.

10   Q.   And is the defendant highlighted later in this video just

11   to make tracking her movements easier for Her Honor?

12   A.   Yes.

13   Q.   And what time does this video start?

14   A.   January 6, 2021, at 2:38 p.m.

15   Q.   Thank you.

16           MS. BESSLER:  We can continue playing and pause at 7

17   seconds.

18       And there is no audio in the beginning portion, Your

19   Honor.

20       (A portion of Exhibit 425 was played.)

21   BY MS. BESSLER:

22   Q.   I'm directing your attention to the body-worn camera

23   footage on the right hand of the screen.  What do we see on the

24   right side of the body-worn camera footage, particularly behind

25   the guy in the blue jeans?

1    A.    So I see what looks like downed green snow fencing which

2    would have been used to keep rioters out of the restricted

3    area.

4    Q.    And can you circle that for Her Honor.

5    A.    Yeah.  Bottom right.

6    Q.    Thank you.

7          MS. BESSLER:  And we can please continue playing and

8    pause at 17 seconds.

9          (A portion of Exhibit 425 was played.)

10   BY MS. BESSLER:

11   Q.    And on the body-worn camera, again, on the right-hand side

12   of the screen, what do we see behind the person in this brown

13   leather jacket?

14   A.    So on the bottom right hand, I see what appear to be two

15   toppled over barricades which once again would have been used

16   to keep rioters out of the restricted area.

17         MS. BESSLER:  Thank you.  Please continue playing,

18   and pause at 23 seconds.

19         (A portion of Exhibit 425 was played.)

20   BY MS. BESSLER:

21   Q.    And again directing your attention to the body-worn camera

22   footage, can you please describe what the officer is passing to

23   the right-hand side of him.

24   A.    Yes.  The officer appears to be passing a downed white

25   umbrella.

1   Q.   And is there anything else that he appeared to have passed

2   as well?

3   A.   Can you play that back, please.

4   Q.   Sure.

5        MS. BESSLER:  If we can rewind a few seconds, please.

6        (A portion of Exhibit 425 was played.)

7   A.   Yeah.  Appears he also passed down bike racks which were,

8   once again, used as barricades to keep rioters out of the

9   restricted area.

10       MS. BESSLER:  Thank you.  And we can please continue

11  playing and pause at 45 seconds.

12       (A portion of Exhibit 425 was played.)

13  BY MS. BESSLER:

14  Q.   And on the body-worn camera footage, can you please

15  describe what we see behind the man standing in the -- what's

16  standing behind the man in the plaid jacket and the red hat?

17  A.   Yeah.  In the bottom right-hand corner, I see multiple

18  barricades that appear to have been moved with some signs on

19  them.

20       MS. BESSLER:  Okay.  And we can play and pause at 1

21  minute, 32 seconds.

22       (A portion of Exhibit 425 was played.)

23       MS. BESSLER:  Please pause.

24       Thank you.

25  BY MS. BESSLER:

1    Q.   Who do we see here with the red arrow pointing downward?

2    A.   We see Danean MacAndrew.

3    Q.   And what time does she enter the frame?

4    A.   At 2:40 p.m.

5    Q.   And is she holding anything in her hand?

6    A.   Yeah.  She's holding a blue Trump flag.

7              MS. BESSLER:  Okay.  We can continue playing and

8    pause at 2 minutes, 5 seconds.

9         (A portion of Exhibit 425 was played.)

10   BY MS. BESSLER:

11   Q.   Agent, what did you observe the defendant doing right

12   before I paused at 2 minutes and 5 seconds?

13   A.   I observed Danean MacAndrew being helped up onto the north

14   path by a rioter who was wearing a helmet.

15   Q.   And when you say helped up on -- helped up, exactly where

16   was she being helped up?

17   A.   She's being lifted from the lawn onto the north path.

18   Q.   Okay.  And is it over this wall that I'm circling here?

19   A.   Yes.

20   Q.   And how did she get helped up over that wall?

21   A.   It appears that a rioter who was wearing a helmet reached

22   down and lifted her and assisted her up onto that path.

23   Q.   Okay.  And how did he assist her?

24   A.   By pulling her up.

25   Q.   Okay.  And where we just saw the defendant climb over this

1    wall, is this the same area that we saw the MPD officer climb

2    over earlier in this exhibit on his body-worn camera footage?

3    A.   Yes.

4    Q.   Okay.  And that's where we saw the downed barricades and

5    snow fencing?

6    A.   Yes.

7    Q.   And do you see the barricades and snow fencing in the CCTV

8    here?

9    A.   I do see a barricade.  I cannot pick out the snow fencing

10   from this footage.

11   Q.   That's fine.  Can you circle where you see the barricade,

12   please.

13   A.   (The witness complied.)

14   Q.   And again, just to be clear, that's what we saw in the

15   officer's body-worn camera footage earlier in this exhibit?

16   A.   Yes.

17        MS. BESSLER:  Okay.  Now we can please play, and

18   pause at 3 minutes, 11 seconds.

19        (A portion of Exhibit 425 was played.)

20   BY MS. BESSLER:

21   Q.   And pausing at 3 minutes, 11 seconds, what, if anything,

22   do we see the defendant doing here?

23   A.   We see the defendant appears to be walking alongside the

24   line of police officers in riot gear.

25   Q.   And can you point those officers out to Her Honor on the

1    CCTV side of this exhibit.

2    A.   Yes.  You can see them in yellow jackets (indicating).

3           MS. BESSLER:  Thank you.  We can please play and

4    pause at 3 minutes, 55.

5           (A portion of Exhibit 425 was played.)

6    BY MS. BESSLER:

7    Q.   And at 3 minutes, 55 seconds, on the body-worn camera side

8    of this exhibit, what do we see on the right-hand side?

9    A.   We see barricades.

10   Q.   Okay.  And is that the same barricades that we saw earlier

11   in Exhibit -- in this exhibit?

12   A.   Yes.

13   Q.   Okay.  And can we see it even though there appears to be

14   more people at this -- on this landing now?

15   A.   Yes.

16          MS. BESSLER:  Okay.  Thank you.  We can take down

17   Exhibit 425.

18       And please pull up Exhibit 206, which has already been

19   admitted.

20   BY MS. BESSLER:

21   Q.   Now, Agent, where did you identify the defendant next?

22   A.   So next we identified the defendant on the north side of

23   the Capitol walking towards the front, or the west side, of the

24   Capitol (indicating).

25   Q.   And can you put a "W" where the west side of the Capitol

1   is, please.

2   A.   Yes.  So this is north.  That is west.

3   Q.   Okay.  Thank you.  So she -- where does -- just to be

4   clear, where does she start her path, and where does she end it

5   on this -- in this particular time frame?

6   A.   Yeah.  So she's walking downwards that way (indicating).

7            MS. BESSLER:  Thank you.  We can take down

8   Exhibit 206 and pull up Exhibit 426, which is already admitted.

9        (A portion of Exhibit 426 was played.)

10           MS. BESSLER:  Pause, please.

11  BY MS. BESSLER:

12  Q.   Now, Agent, is Exhibit 426 a side-by-side of CCTV footage

13  as well as body-worn camera footage?

14  A.   Yes.

15  Q.   And is the defendant highlighted in this video just to

16  make tracking her movements easier?

17  A.   She will be, yes.

18  Q.   Okay.  And what time does this video start?

19  A.   January 6, 2021, at 2:42 p.m.

20  Q.   And the video on the left, the CCTV, can you describe the

21  angle of this camera.

22  A.   Yeah.  So that's on the north side of the Capitol facing

23  west.

24  Q.   Okay.  Thank you.  And is that on the north path that you

25  just highlighted for Her Honor in Exhibit 206?

1    A.    Yes.

2          MS. BESSLER:  Okay.  Please play Exhibit 426, and we

3    can pause at 59 seconds.

4          (A portion of Exhibit 426 was played.)

5    BY MS. BESSLER:

6    Q.    And I'm directing your attention to the barricade seen on

7    the body-worn camera side of this exhibit.  Is there anything

8    significant about the barricades in this frame?  Or we can

9    rewind or fast-forward if you need to take another look.

10   A.    Yeah.  You can't see in this where it's paused currently,

11   but there is a sign on the barricade that says area closed.

12         MS. BESSLER:  Okay.  And if we can fast-forward maybe

13   one second.  If we can try to get that frame for Her Honor.

14         (A portion of Exhibit 426 was played.)

15   BY MS. BESSLER:

16   Q.    Okay.  And did the officer just pass a sign there that

17   said area closed?

18   A.    Yes.

19   Q.    Okay.  And to the left of those bike racks and barricades,

20   I think we can see a little easier in the CCTV, but who's

21   standing to the left of those bike racks?

22   A.    Multiple officers.

23   Q.    Okay.  And are there one or more barricades that are set

24   up there?

25   A.    There appear to be two barricades.

Ballantyne - Direct (Bessler)                                          113

1    Q.    Okay.  And can you circle those barricades for Her Honor.

2    A.    Yes.

3    Q.    Thank you.  And are those the same barricades that we see

4    in the side-by-side with the body-worn camera footage?

5    A.    Yes.

6          MS. BESSLER:  Okay.  We can please play, and pause at

7    1 minute, 46 seconds.

8          (A portion of Exhibit 426 was played.)

9    BY MS. BESSLER:

10   Q.    What is the time stamp on 1 minute, 46 seconds?

11   A.    January 6, 2021, at 2:43 p.m.

12         MS. BESSLER:  Thank you.  We can take down

13   Exhibit 426 and pull up Exhibit 427, which has already been

14   admitted.

15         (A portion of Exhibit 427 was played.)

16         MS. BESSLER:  Thank you.  We can pause it at zero

17   seconds.

18   BY MS. BESSLER:

19   Q.    Does this body-worn camera start at 2:44 p.m.?

20   A.    Yes.

21   Q.    And is that about 15 seconds after where we just ended

22   Exhibit 426?

23   A.    Approximately, yes.

24   Q.    Okay.  And where is this body-worn camera footage filmed?

25   A.    So this is on the north side of the Capitol, once again

Ballantyne - Direct (Bessler)                                    114

1    facing west on the northwest corner.

2    Q.   Okay.  And that's essentially the last spot where we ended

3    off in Exhibit 426?

4    A.   Yes.

5             MS. BESSLER:  Okay.  And please play until the end of

6    this video.

7         (A portion of Exhibit 427 was played.)

8    BY MS. BESSLER:

9    Q.   What is the defendant doing in Exhibit 427?

10   A.   The defendant is taking a photo or video of the line of

11   officers.

12   Q.   And what are the rioters doing around the defendant?

13   A.   The rioters appear to be aggressive, and they are verbally

14   harassing the police by saying, "Don't be a commie," and "Keep

15   your oath."

16   Q.   And what's -- what's their demeanor?  What did you observe

17   their demeanor to be like?

18   A.   Aggressive.

19   Q.   And are they getting physically closer to the officers?

20   A.   Yes.

21   Q.   And as they're getting physically closer to the officers,

22   what is their demeanor?

23   A.   More aggressive.

24   Q.   And how far are those rioters from the defendant?

25   A.   Two -- approximately 2 feet.

1          MS. BESSLER:  Thank you.  We can please pull up

2     Exhibit 206 again, which has been previously admitted.

3     BY MS. BESSLER:

4     Q.   Now I want to turn to the defendant's conduct on the

5     northwest courtyard of the Capitol building prior to her

6     entering the Capitol.  Can you please show us on Exhibit 206

7     where the northwest courtyard is.

8     A.   Yes.  It is in this circle (indicating).

9          MS. BESSLER:  Thank you.  And for the record,

10    that's -- Agent Ballantyne circled approximately the center of

11    this -- of this exhibit.

12    BY MS. BESSLER:

13    Q.   And can you please show us in this exhibit where the

14    Senate Wing door is.

15    A.   Yes.  The Senate Wing door is approximately within that

16    circle in the middle of the picture.

17    Q.   Okay.  And there -- it looks like there are three openings

18    where you just circled.  Where is the Senate Wing door?

19    A.   The middle of those three.

20    Q.   Okay.  And we'll discuss this in a little bit, but where

21    does the defendant enter the Capitol through?

22    A.   Through that door.

23    Q.   That's the Senate Wing door?

24    A.   The Senate Wing door, yes.

25    Q.   Okay.  Now, you told us earlier that the defendant agreed

Ballantyne - Direct (Bessler)                                        116

1    to a search of her cell phone?

2    A.   Yes.

3    Q.   And was there information on the defendant's phone

4    relating to her presence at the Capitol on January 6?

5    A.   Yes.

6         MS. BESSLER:  We can please take down Exhibit 206.

7    BY MS. BESSLER:

8    Q.   And Agent, have you reviewed Exhibits 8 through 12 in this

9    case?

10   A.   Yes.

11   Q.   And are Exhibits 8 through 12 photographs that the

12   defendant took on her Samsung cell phone on January 6, 2021?

13   A.   Yes.

14   Q.   And were Exhibits 8 through 12 provided to you by the

15   defendant through a consent search?

16   A.   Yes.

17        MS. BESSLER:  And Your Honor, Exhibits 8 through 12

18   are admitted, and I would like to pull up Exhibit 8 first.

19   BY MS. BESSLER:

20   Q.   Now, while Mr. Bennett is pulling up Exhibit 8, Exhibits 8

21   through 12, were these photographs taken before or after the

22   defendant entered the Capitol?

23   A.   Before.

24   Q.   Okay.  Now, in Exhibit 8 what do we see here?

25   A.   We see a rioter in a gas mask.

1    Q.    Okay.  Is he alone or in a group?

2    A.    In a group of other rioters.

3          MS. BESSLER:  Okay.  We can take down Exhibit 8 and

4    pull up Exhibit 9.

5    BY MS. BESSLER:

6    Q.    Agent, where was this photo taken?

7    A.    So this photo was taken in the northwest courtyard.

8    Q.    Okay.  And the Senate Wing door, can you see that from

9    this picture?

10   A.    Yes.

11   Q.    Where do you -- can you circle it for Her Honor.

12   A.    Yeah.  It's in the bottom right-hand corner within that

13   circle (indicating).

14   Q.    Thank you.  And what do we see in Exhibit 9?

15   A.    I see multiple rioters.  I also see a rioter wearing a

16   helmet.

17   Q.    And can you circle that rioter for Her Honor.

18   A.    Yes.  He is in the bottom right-hand corner (indicating).

19   Q.    And does it appear he's wearing a camouflage helmet?

20   A.    Yes.

21         MS. BESSLER:  Thank you.  We can take down Exhibit 9

22   and pull up Exhibit 10.

23   BY MS. BESSLER:

24   Q.    Exhibit 10.  Where did the defendant take this photograph?

25   A.    Once again in the northwest courtyard.

Ballantyne - Direct (Bessler)                                      118

1   Q.   And again can we see the Senate Wing door in this

2   photograph?

3   A.   Yes.

4   Q.   And where is that?

5   A.   It is in the middle behind the man in the red hat and

6   sunglasses.

7   Q.   Okay.  And what do we see here?

8   A.   We see another group of rioters, and I see an individual

9   in a black puffy jacket that says USA wearing a beige hat with

10  some facial hair.  His skin appears to be red and irritated.

11  Q.   Okay.  And is he in the dead center of this exhibit?

12  A.   Yes, dead center.

13  Q.   Okay.  And what, if anything, do you notice about his

14  eyes?

15  A.   I noticed that his eyes appear to be puffy and teary.

16  Q.   Okay.  We can -- and Agent, to the immediate left of the

17  male in the beige cap, do you see another rioter to the

18  immediate left of him?

19  A.   I do.  I also see another rioter in a helmet with goggles.

20       MS. BESSLER:  Okay.  Thank you.  We can pull -- we

21  can take down Exhibit 10 and pull up Exhibit 11, please.

22  BY MS. BESSLER:

23  Q.   And again, where was this photograph taken?

24  A.   The northwest courtyard.

25  Q.   And this rioter here in the beige cap, is this the same

1    person we saw in Exhibit 10?

2    A.    Yes.

3    Q.    And what do you notice about him?

4    A.    I noticed that his skin is red and irritated, his eyes

5    appear to be puffy and teary, and he appears to be in some sort

6    of pain, holding a water bottle.

7              MS. BESSLER:  Okay.  Thank you.  And we can take down

8    Exhibit 11 and pull up Exhibit 12, please.

9    BY MS. BESSLER:

10   Q.    And Exhibit 12, is this again in the Senate -- this

11   northwest courtyard?

12   A.    Yes.

13   Q.    Okay.  And the person in this black jacket here that we

14   see, is this the same person that we saw in Exhibit 10 and 11?

15   A.    Yes.

16   Q.    And how can you tell?

17   A.    He's wearing the black puffy jacket with USA on the chest.

18   Q.    Okay.  And on what do you -- what's going on with him?

19   What do you notice about what he's doing?

20   A.    I notice that he is pouring water into his eyes, which

21   indicates to me that he was recently pepper sprayed, and I know

22   this based off of my experience being pepper sprayed while I

23   was at training in Quantico, that pouring water into your eyes

24   can help alleviate some of the symptoms.

25   Q.    Okay.  And Exhibits 8 through 12, again, are these

1   photographs the defendant took before she entered the Capitol?

2   A.   Yes.

3          MS. BESSLER:  Okay.  Now we can take down Exhibit 12.

4   BY MS. BESSLER:

5   Q.   I want to now turn to the defendant's conduct while inside

6   of the Capitol.  You testified that as part of the

7   investigation into the defendant's presence at the Capitol on

8   January 6, 2021, you obtained and reviewed United States

9   Capitol Police CCTV footage?

10  A.   Yes.

11  Q.   Is that right?  Okay.  And were there cameras capturing

12  the defendant's entry into the United States Capitol on

13  January 6?

14  A.   Yes.

15         MS. BESSLER:  Okay.  We can now pull up Exhibit 424,

16  which has already been admitted.  We can just pause at zero

17  seconds.

18  BY MS. BESSLER:

19  Q.   Agent, earlier you testified the defendant agreed to

20  provide certain electronic evidence in lieu of the government

21  obtaining a search warrant for those items; is that correct?

22  A.   Yes.

23  Q.   And the electronic evidence, did it include cell phone

24  video that the defendant took inside the U.S. Capitol on

25  January 6th?

1    A.    Yes.

2    Q.    So in your review of Exhibit 424, does it include a

3    side-by-side of CCTV footage alongside the videos that were

4    provided to you by the defendant?

5    A.    Yes.

6    Q.    And does -- the CCTV and the cell phone video, do they

7    match up in time?

8    A.    Yes.

9    Q.    Okay.  This video starts at 3:07 p.m.  What are we looking

10   here at zero seconds?

11   A.    We are looking at CCTV footage from inside the Capitol

12   just inside the northwest courtyard.

13   Q.    Okay.  And which area -- the interior of the Capitol,

14   where are we here?

15   A.    So this would be the interior of the Senate Wing emergency

16   door.

17         MS. BESSLER:  Okay.  And Your Honor, for purposes of

18   this direct, I will refer to this door right here I circle at

19   the top middle of the exhibit.  I will refer to this as the

20   Senate Wing door and then what we see on the CCTV as the Senate

21   Wing door area or the Senate Wing door vestibule just for

22   purposes of this direct.

23         THE COURT:  All right.

24         MS. BESSLER:  And we can please play Exhibit 424 and

25   pause at 2 minutes, 12 seconds.

1              (A portion of Exhibit 424 was played.)

2              MS. BESSLER:  And apologies.  If we can just pause at

3      2:12.

4          There we go.  Thank you.

5      BY MS. BESSLER:

6      Q.   The defendant's cell phone video on the right of

7      Exhibit 424, does it begin before she enters the Capitol?

8      A.   Yes.

9      Q.   And what can you hear?

10     A.   I hear a loud alarm blaring in the background.

11     Q.   And what do you notice about the door frame?

12     A.   I notice that the door frame is broken.  There is

13     splintered wood.  There is also nails sticking out.

14     Q.   Okay.  And can you circle where you see that for Her

15     Honor.

16     A.   Yes.  It's on the left-hand side (indicating).

17     Q.   Thank you.  Circling the --

18             MS. BESSLER:  I'm sorry.  The agent circled towards

19     the middle of this exhibit.

20         And we can play, and pause at 2:29.

21         (A portion of Exhibit 424 was played.)

22             MS. BESSLER:  Thank you.  Pausing at 2 minutes,

23     30 seconds.

24     BY MS. BESSLER:

25     Q.   Do you see the defendant in the frame that's paused?

1    A.    Yes, on the CCTV footage, yes.

2    Q.    And what time does she approximately enter?

3    A.    Approximately 3:09 p.m.

4    Q.    Okay.  And does she have that red arrow pointing above

5    her?

6    A.    Yes.

7    Q.    And what do you notice about the defendant's appearance?

8    A.    I notice that the defendant has the red scarf pulled up

9    over her face.

10   Q.    Okay.  And in your investigation into her conduct on

11   January 6, is this the first time that you saw the defendant's

12   face covered by a scarf or anything else?

13   A.    Yes.

14   Q.    And is this different than your observations of her

15   outside of the Capitol on Capitol grounds?

16   A.    Yes.

17            MS. BESSLER:  We can continue playing, and pause at

18   2:35.

19         (A portion of Exhibit 424 was played.)

20   BY MS. BESSLER:

21   Q.    Now, at two -- I'm sorry.  Where are we?  2:35, yes.  Do

22   you hear alarms still going off?

23   A.    Yes, I do.

24   Q.    Okay.  And in this cell phone clip and the CCTV, can you

25   describe the group of people who have entered directly through

1    the Senate Wing door around the threshold of the Senate Wing

2    door?

3    A.    Yes.  I see a group of rioters that entered directly

4    through the threshold of the Senate Wing door.

5    Q.    And do we see any officers in that particular group near

6    the Senate Wing door itself?

7    A.    No, I do not see any officers near the door.  I see

8    officers a few yards away in front of the hallway.

9    Q.    Okay.  And can you circle for -- where you see those

10   officers for Her Honor.

11   A.    Yes.  In the middle of the exhibit on the bottom

12   right-hand corner of the CCTV footage as well as in the middle

13   of the exhibit on Danean MacAndrew's video.

14   Q.    And what are these officers wearing?

15   A.    Officers are wearing riot gear.  A few of them have their

16   face shields down.  It appears to be wearing body armor with

17   plastic shields, which once again indicates to me that they are

18   expecting confrontation.

19   Q.    Okay.  And directing your attention particularly to the

20   cell phone video on the right of this screen, can you tell the

21   Court the significance of where these officers are positioned

22   in this frame.

23   A.    The officers appear to be blocking a hallway.

24   Q.    Okay.  And that hallway appears to be behind them?

25   A.    Yes, the hallway's behind them.

1          MS. BESSLER:  Okay.  And we can continue playing, and

2     pause at 3:07.

3          (A portion of Exhibit 424 was played.)

4          MS. BESSLER:  And apologies.  If we can just

5     forward -- or play it for another second.

6     BY MS. BESSLER:

7     Q.   Okay.  And that happened very quickly, so I'm going to

8     direct your attention to the cell phone video that we just saw

9     and right before we paused.

10         And again, apologies.  That happens very quickly, but what

11    does the defendant capture footage of?

12    A.   So on the defendant's phone you can see her capture

13    footage of an individual entering the Capitol from the broken

14    window.  He appears to be wearing a black jacket.  He is to the

15    left of the man in the blue jacket holding the American flag.

16         MS. BESSLER:  Okay.  And it appears we have rewinded

17    to 3:11.  If --

18         (A portion of Exhibit 424 was played.)

19    BY MS. BESSLER:

20    Q.   Okay.  And you said that the defendant -- I'm sorry, the

21    rioter that the defendant captured was wearing a black jacket.

22    Can you identify where that person is on the CCTV footage here.

23    A.   Yes.  He's in the bottom right-hand corner wearing a black

24    jacket, black backpack, and appears to be wearing a black

25    helmet.

1    Q.   Okay.  And just to be clear, this is the person that you

2    also saw in the footage that she captured?

3    A.   Yes.

4              MS. BESSLER:  Okay.  We can play, and pause at 4

5    minutes, 2 seconds.

6         (A portion of Exhibit 424 was played.)

7    BY MS. BESSLER:

8    Q.   Now, between where we last paused at 3 minutes, 7 seconds,

9    and where we just paused, what, if anything, did you notice

10   about the windows that are near the defendant?

11   A.   I noticed that multiple rioters were entering and exiting

12   through the broken windows.

13   Q.   Okay.  And is it this window here on the right of the

14   exhibit (indicating)?

15   A.   Yes.

16   Q.   And how far away is she from those rioters?

17   A.   Approximately 5 feet.

18   Q.   And what does she appear to be doing?

19   A.   She appears to be taking photo and video of those rioters.

20   Q.   Does she appear to be filming anybody else?

21   A.   It also appears to be filming the police.

22             MS. BESSLER:  Okay.  We can continue playing, and

23   pause at 4:26.

24        (A portion of Exhibit 424 was played.)

25   BY MS. BESSLER:

1    Q.   At 4:26 what do we see on the floor to the immediate left

2    of the defendant?

3    A.   We see a toppled over and broken wooden table.

4    Q.   And can you describe the condition of that furniture.

5    A.   Yeah.  That furniture is broken.

6    Q.   Okay.  And do you know where that furniture was originally

7    located?

8    A.   Originally it was located under the window.

9    Q.   Okay.  Are the windows of the Senate Wing door area?

10   A.   Under -- yes, one of the two windows at the Senate Wing

11   door area.

12        MS. BESSLER:  Okay.  And we can continue playing, and

13   pause at 5 minutes, 30 seconds.

14        (A portion of Exhibit 424 was played.)

15   BY MS. BESSLER:

16   Q.   And here at 5 minutes, 30 seconds, there was a man talking

17   in this video.  Did you hear what he said?

18   A.   Yes.

19   Q.   And what did he say?

20   A.   He mentioned that the SWAT team is on the way.

21        MS. BESSLER:  Okay.  Please continue playing, and

22   pause at 5 minutes, 46 seconds.

23        (A portion of Exhibit 424 was played.)

24   BY MS. BESSLER:

25   Q.   And right before we just paused, did you hear any chanting

1    in the background of the cell phone video?

2    A.   Yes.  I heard USA chants.

3    Q.   Okay.  And here at 5 minutes, 46 seconds, I'm directing

4    your attention particularly to the cell phone video.  What do

5    you observe about the rioters in this still?

6    A.   So I observe a group of rioters.  I see one individual

7    appears to be wearing a black helmet and goggles.  I see

8    another rioter wearing a black helmet on the right-hand side.

9    I also see another rioter who appears to be wearing some sort

10   of a gas mask (indicating).

11            MS. BESSLER:  Okay.  Thank you.  We can continue

12   playing, and pause at 6:12.

13        (A portion of Exhibit 424 was played.)

14   BY MS. BESSLER:

15   Q.   And right before we paused at 6 minutes, 12 seconds, did

16   you see a rioter in a tank top in this clip?

17   A.   Yes.

18   Q.   And was there anything about him that stood out to you?

19   A.   Yes.  He appeared to be in pain.  He was in a tank top

20   that appeared to be drenched in water, which indicates to me

21   that he was recently pepper sprayed and, similar to the rioter

22   in the northwest courtyard, poured water on himself to

23   alleviate the pain from being pepper sprayed.

24   Q.   Okay.  And before -- again, we paused here at 6:12.  Did

25   you recognize the defendant's voice in this clip?

1    A.    Yes.

2    Q.    And what did you hear her saying?

3    A.    "They're gassing us."

4    Q.    Did she say it once or twice?

5    A.    Twice.

6    Q.    And do you hear people coughing in the clip that we just

7    watched?

8    A.    Yes.

9          MS. BESSLER:  Okay.  We can continue playing, and

10   pause at 6:34.

11        (A portion of Exhibit 424 was played.)

12        MS. BESSLER:  Apologies.  We can continue playing.

13   We can pause here.

14   BY MS. BESSLER:

15   Q.    Pausing at 6:54, what is the defendant doing with her left

16   hand in this frame?

17   A.    With her left hand she appears to be holding up the red

18   scarf over her face.

19   Q.    And has she been doing that throughout the CCTV footage

20   that we've been watching thus far?

21   A.    Only inside the building.

22        MS. BESSLER:  Okay.  Please continue playing.

23        (A portion of Exhibit 424 was played.)

24   BY MS. BESSLER:

25   Q.    Sorry.  Pausing at 7:13, what did we just see there?

1    A.   We saw the defendant taking a video of a rioter exiting

2    through the broken window.

3              MS. BESSLER:  Okay.  And we can continue playing

4    until 4:26.

5         I'm sorry.  7:26.  My apologies.

6         (A portion of Exhibit 424 was played.)

7    BY MS. BESSLER:

8    Q.   And in the clip that we just saw, what is the defendant

9    doing?

10   A.   Appears to be taking photo -- or appears to be taking

11   video of the rioters.

12   Q.   And what are they doing?  What are the rioters doing?

13   A.   Can you please rewind.

14   Q.   Sure.

15   A.   Rioters appear to be parading inside the Capitol at the

16   Senate wing.

17             MS. BESSLER:  Okay.  And we can continue playing, and

18   pause at 7:33.

19        (A portion of Exhibit 424 was played.)

20   BY MS. BESSLER:

21   Q.   And at 7:33 what did you observe the defendant doing?

22   A.   I observed the defendant using her left hand to pull her

23   red scarf over her face again, as well as taking more photo and

24   video of the rioters, potentially in the direction of rioters

25   exiting the building through the window.

Ballantyne - Direct (Bessler)                                      131

1          MS. BESSLER:  And can you -- can we please continue

2    playing until 7:50.

3          (A portion of Exhibit 424 was played.)

4    BY MS. BESSLER:

5    Q.   Right before we paused at 7:50, what was the defendant

6    doing?

7    A.   The defendant is still holding up the red scarf over her

8    face and appeared to be taking photo or video of a rioter

9    exiting through the broken window.

10   Q.   Okay.  And did she have her phone pointed towards that

11   window?

12   A.   It appeared to be, yes.

13         MS. BESSLER:  Okay.  And we can continue playing, and

14   pause at 8:20.

15         (A portion of Exhibit 424 was played.)

16   BY MS. BESSLER:

17   Q.   From where we last paused at 7:50 to where we just paused

18   at 8:20, what was the defendant doing?

19   A.   The defendant was observing rioters parading inside the

20   Capitol building and her -- appeared to be looking in the

21   direction of the broken window.

22         MS. CHU:  Objection, Your Honor.  Calls for a legal

23   conclusion on the term "parading."

24         THE COURT:  All right.  I'll sustain that.

25         MS. BESSLER:  Okay.  We can continue playing, and

1    pause at 8:27.

2          (A portion of Exhibit 424 was played.)

3    BY MS. BESSLER:

4    Q.   And again, what did we just see the defendant do there?

5    A.   I noticed the defendant use her left hand to lift the red

6    scarf over her face.

7              MS. BESSLER:  Okay.  We can continue playing, and

8    pause at 9:16.

9          (A portion of Exhibit 424 was played.)

10             MS. BESSLER:  Can we just pause -- can I have the

11   Court's indulgence for one moment?

12             THE COURT:  Sure.

13             MS. BESSLER:  Your Honor, apologies.  There was an

14   issue with this video that I have fixed by our litigation

15   technology.  I can pull up the corrected video if you don't

16   mind.

17             THE COURT:  Okay.  I'll tell you what.  It's ten

18   after one.  I was sort of waiting for you to finish.  Why don't

19   we take our lunch break, and you can get everything set up, and

20   it'll make it easier.

21             MS. BESSLER:  All right.  Thank you, Your Honor.

22             THE COURT:  Come back at 2:15, and we'll come back at

23   that point.

24         And you should not talk to others about your testimony.

25             THE WITNESS:  Yes, ma'am.  Thank you.

1          (Recess taken at 1:08 p.m.)

2          (At 2:16 p.m. on January 10, 2023; with counsel and the

3     defendant present:)

4        BRADEN BALLANTYNE, PREVIOUSLY SWORN, RESUMED THE STAND

5             THE COURT:  Good afternoon, everyone.

6        All right.  We'll pick up at this point with the direct

7     with Special Agent Ballantyne.  And are we still on the same

8     exhibit, or have you...

9             MS. BESSLER:  Yes, Your Honor.  We are still on the

10    same exhibit, Exhibit 424.  We did find the correct --

11            THE COURT:  No problem.  I just want to put something

12    on the record as to where we're resuming.

13            MS. BESSLER:  Yes.

14            THE COURT:  Keep in mind I need to stop at around

15    4:20 or something, because I have an executive session at 4:30.

16            MS. BESSLER:  Okay.

17            THE COURT:  So just so to time your...your case.

18            MS. BESSLER:  Okay.  And Your Honor, again, this is

19    Exhibit 424.  We're going to play from starting from 8 minutes

20    and 21 seconds and stopping at 9 minutes, 16 seconds.

21            THE COURT:  All right.

22            MS. BESSLER:  And again, that will be 8:21 if the --

23    the video decides to cooperate.

24        Apologies, Your Honor.  We seemed to be going pretty

25    smoothly throughout the morning.

```
 1              THE COURT:  No problem.

 2              MS. BESSLER:  Perfect.

 3          (A portion of Exhibit 424 was played.)

 4              MS. BESSLER:  May I have the Court's brief

 5    indulgence?

 6              THE COURT:  Sure.

 7              MS. BESSLER:  Thank you.

 8              THE COURT:  If you're having trouble, I think my law

 9    clerk may have it.  You gave us copies, so I don't know whether

10    that -- you want to try that.

11              MS. BESSLER:  That may very well work, Your Honor,

12    yeah.  Hopefully it's the corrected one, but we can check.

13              THE COURT:  Well, you can take a look, and you'll

14    know whether it is or isn't.

15              MS. BESSLER:  Okay.  Yes.  Thank you.

16              THE COURT:  Let me just put on the record that we

17    asked for extra copies of everything so that when we're doing

18    findings, et cetera, I had them, so that's what we happen to

19    have.

20              MS. BESSLER:  This is the corrected version.

21              THE COURT:  Okay.  Why don't you look at it, Ms. Chu,

22    to make sure you don't have any problem with it.  They gave us

23    a copy, so we don't have anything independently.  It's whatever

24    they gave us, but I want to make sure you get to look at it.

25              MS. CHU:  As long as it's working, it's fine.
```

1      Thank you, Your Honor.  It's fine.

2          MS. BESSLER:  Thank you.  Okay.  Your Honor, thank

3   you for your indulgence.  I'm going to be starting at 8

4   minutes, 13 seconds, and playing until 9 minutes, 16 seconds.

5      (A portion of Exhibit 424 was played.)

6   BY MS. BESSLER:

7   Q.    Agent Ballantyne, I'm pausing here at 9 minutes,

8   16 seconds.  What, if anything, did you notice about the police

9   presence in the last few moments of this clip?

10  A.    It appeared that reinforcements arrived you can see on the

11  right-hand side of the screen in the yellow jackets.  I also

12  noticed that an officer near Ms. MacAndrew began pointing

13  towards the exit.

14  Q.    Okay.  And can you circle that officer for Her Honor.

15  A.    Yeah.  On the left-hand side of the screen (indicating).

16  Q.    Thank you.  And the defendant, where does she appear to be

17  looking?

18  A.    She appears to be looking in the general direction of that

19  officer.

20          MS. BESSLER:  Okay.  And I'm going to continue

21  playing and pause at 10 minutes, 12 seconds.

22      (A portion of Exhibit 424 was played.)

23          MS. BESSLER:  I'm pausing at 10 minutes, 12 seconds.

24  BY MS. BESSLER:

25  Q.    Has the defendant exited the Capitol at this point?

1   A.   Yes.

2   Q.   And at what time did she exit?

3   A.   3:17 p.m.

4           MS. BESSLER:  Okay.  And I'm going to continue

5   playing and pause at 10:50.

6       (A portion of Exhibit 424 was played.)

7           MS. BESSLER:  I'm pausing at 10:50.

8   BY MS. BESSLER:

9   Q.   What does it appear the officers were doing in the clip

10  that we just saw?

11  A.   On the right-hand side of the screen, it appears that the

12  officers are attempting to rebarricade the previously broken

13  window.

14  Q.   Okay.  And are they trying to corral the rest of the

15  rioters out of the building?

16  A.   Yes.

17          MS. BESSLER:  Okay.  Taking down Exhibit 424.  Thank

18  you again for the Court's assistance on this.

19      And we can pull up Exhibit 23, please, which has already

20  been admitted.

21  BY MS. BESSLER:

22  Q.   Agent Ballantyne, what is Exhibit 23?

23  A.   Exhibit 23 is video taken from the consent search of

24  Danean MacAndrew's phone.

25  Q.   And was this video taken before or after she entered the

1    Capitol?

2    A.    After.

3           MS. BESSLER:  Okay.  And can we please play

4    Exhibit 23.

5        (A portion of Exhibit 23 was played.)

6    BY MS. BESSLER:

7    Q.    Now, Agent, who is the defendant filming?

8    A.    The defendant is filming rioters exiting the Senate wing.

9    Q.    And did you -- what did you notice about what some of

10   those rioters were wearing?

11   A.    I noticed one rioter was coughing.  I also noticed another

12   rioter was wearing helmet, goggles, and what appeared to be

13   body armor.

14   Q.    Okay.  And at 16 seconds here, what did you notice

15   around -- what do you notice about -- around the window frame,

16   particularly at the bottom?

17   A.    I notice that the previously broken windows are now shut,

18   and I also noticed broken glass around the base of the window.

19   Q.    And did we, in fact, hear the shuttering of those windows

20   in this clip?

21   A.    It appeared to be that we heard the shuttering of those

22   windows, yes.

23           MS. BESSLER:  Okay.  And we can continue playing

24   Exhibit 23.

25        (A portion of Exhibit 23 was played.)

1             MS. BESSLER:  We can take down -- we can take that

2     down and pull up Exhibit 24, which has already been admitted.

3             (A portion of Exhibit 24 was played.)

4     BY MS. BESSLER:

5     Q.    Agent Ballantyne, what is Exhibit 24?

6     A.    Exhibit 24 is video from the consent search of Danean

7     MacAndrew's phone.

8     Q.    And is this taken before or after exiting the Capitol?

9     A.    After.

10            MS. BESSLER:  Okay.  We can please play Exhibit 24.

11            (A portion of Exhibit 24 was played.)

12            MS. BESSLER:  Now we can keep Exhibit 24 up.

13    BY MS. BESSLER:

14    Q.    What did we see in Exhibit 24, Agent Ballantyne?

15    A.    We saw multiple rioters outside of the Senate Wing door.

16    We also saw a line of officers in yellow on the left-hand side

17    of the video.  We heard alarms continuing to blare.  We also

18    saw the broken door frame of the Senate Wing door.

19    Q.    And the officers that you just mentioned, can you show

20    where they are for Her Honor.

21    A.    Yeah.  They're on the left-hand side in the yellow

22    jackets.

23            MS. BESSLER:  And if we can pause at 14 seconds,

24    please.

25            (A portion of Exhibit 24 was played.)

1    BY MS. BESSLER:

2    Q.   What do you notice about the door frame here?

3    A.   I noticed that the door frame appeared to be splintered

4    and broken off.

5            MS. BESSLER:  Okay.  And we can take Exhibit 24 down.

6    BY MS. BESSLER:

7    Q.   And now, Agent Ballantyne, I want to turn to the

8    defendant's conduct after she exits the Capitol.

9            MS. BESSLER:  If we can please pull up Exhibit 428,

10   which is already admitted.

11   BY MS. BESSLER:

12   Q.   Agent Ballantyne, is Exhibit 428 a clip of body-worn

13   camera footage with a side-by-side of the defendant's own cell

14   phone video?

15   A.   Yes.

16   Q.   And what time does Exhibit 428 start?

17   A.   January 6, 2021, at 3:45 p.m.

18   Q.   And do you know where this body-worn camera footage was

19   filmed?

20   A.   I believe it was on the corner -- the northwest corner of

21   the building.

22   Q.   Okay.  Is that -- do you mean the northwest courtyard?

23   A.   Yeah.  The northwest courtyard towards the northwest

24   corner of the building, yeah.

25   Q.   Okay.  Thank you.  And is this within the restricted area?

1    A.    Yes.

2              MS. BESSLER:  And if we can please play Exhibit 428

3    and pause at 1:23.

4         (A portion of Exhibit 428 was played.)

5    BY MS. BESSLER:

6    Q.    And stopping at 1:23, what is the defendant doing?

7    A.    The defendant appears to be taking photo or video of the

8    line of police officers and the group of rioters.

9    Q.    And are people chanting, or do you hear anything in the

10   background of this video?

11   A.    Yes.  I hear them chanting USA.

12             MS. BESSLER:  Okay.  And we can continue playing

13   Exhibit 428.

14        (A portion of Exhibit 428 was played.)

15             MS. BESSLER:  Now, that gets cut off quickly there,

16   but I want to go to the portion where the defendant is also

17   taking video, Mr. Bennett, in this exhibit.

18        (A portion of Exhibit 428 was played.)

19             MS. BESSLER:  Now I'm pausing at 2 minutes,

20   30 seconds, on Exhibit 428.

21   BY MS. BESSLER:

22   Q.    Agent Ballantyne, what are the officers -- what are they

23   wearing in the video to the right hand of the screen?

24   A.    The officers appear to be in riot gear with face shields

25   and gas masks and batons in hand, which indicates to me that

1    they're expecting confrontation.

2    Q.   And do you see in the background of this video who is

3    standing in the background of this video?

4    A.   I'm unclear.  Of the --

5    Q.   I'm sorry.  So around -- around here, who does it appear

6    is standing there (indicating)?

7    A.   It appears that there is another line of officers.

8    Q.   Okay.  And how about over here (indicating)?

9    A.   It's far away, but it appears that there is another line

10   of officers wearing yellow jackets.

11        MS. CHU:  Your Honor, could we just get clarification

12   of "here" for the record?

13        MS. BESSLER:  Oh, apologies.  Yes, Your Honor.  And

14   the first place that I circled, that is going to be in the

15   middle of -- the middle of the cell phone video that the

16   defendant took, and the second place that I circled is also on

17   the cell phone video that the defendant took on the left-hand

18   side.

19        And we can -- well, before we move on from this, again,

20   the clip does end abruptly, but if we can go to the very end

21   and pause just to get the time stamp on that, please.

22   BY MS. BESSLER:

23   Q.   Does this clip roughly end around 3:49 p.m., Agent?

24   A.   Yes.

25        MS. BESSLER:  Okay.  We can take down Exhibit 428 and

1    pull up 429, which is already admitted.

2        (A portion of Exhibit 429 was played.)

3    BY MS. BESSLER:

4    Q.   And Agent, is 429 just a continuation of Exhibit 428 --

5    A.   Yes.

6    Q.   -- that got cut off?

7        MS. BESSLER:  Thank you.  And we can play to the end.

8        (A portion of Exhibit 429 was played.)

9        MS. BESSLER:  Thank you.  We can take down Exhibit 29

10   [sic], and we can pull up Exhibit 430, which is also admitted.

11       (A portion of Exhibit 430 was played.)

12   BY MS. BESSLER:

13   Q.   And Agent, what time does Exhibit 430 start?

14   A.   January 6, 2021, at 3:49 p.m.

15   Q.   And is this body-worn camera footage?

16   A.   Yes.

17   Q.   And where is this footage filmed?

18   A.   The northwest courtyard.

19       MS. BESSLER:  Okay.  And we can please fast-forward

20   to 35 seconds and just pause there.

21   BY MS. BESSLER:

22   Q.   And what time does this start?

23   A.   January 6, 2021, at 3:50 p.m.

24       MS. BESSLER:  Okay.  And we can play -- excuse me.

25   We can play, and pause at 50 seconds, please.

1          (A portion of Exhibit 430 was played.)

2     BY MS. BESSLER:

3     Q.   Agent Ballantyne, what is the defendant holding in her

4     right hand at 50 seconds?

5     A.   It appears the defendant is holding her cell phone

6     video -- or her cell phone.

7          MS. BESSLER:  Okay.  And we can just continue

8     playing.

9          (A portion of Exhibit 430 was played.)

10          MS. BESSLER:  Can we pause there.

11     BY MS. BESSLER:

12     Q.   Is it clear now what the defendant is holding?

13     A.   Yeah.  My apologies.  It appeared that when you previously

14     asked me that question, the defendant is holding a rolled-up

15     flag.  It was in her right hand.  It is now in her left hand.

16          MS. BESSLER:  Thank you.  And we had paused at 1:45,

17     for the record, and we can play till the end.

18          (A portion of Exhibit 430 was played.)

19          MS. BESSLER:  Thank you.

20     BY MS. BESSLER:

21     Q.   And Agent, does this clip end at roughly 3:56 p.m?

22     A.   I did not catch the ending.  If you can pull it back up.

23     Q.   Apologies.

24     A.   Yes.

25     Q.   And is this the last time we are able to locate the

Ballantyne - Cross (Chu)                                          144

1   defendant on body-worn camera footage or CCTV?

2   A.   Yes.

3   Q.   And in Exhibits 428, 429 and 430, is the defendant's face

4   covered or uncovered?

5   A.   Uncovered.

6           MS. BESSLER:  And Your Honor, Court's indulgence.

7           THE COURT:  Certainly.

8           MS. BESSLER:  I have no further questions for this

9   witness.

10          THE COURT:  All right.  Cross.

11          MS. CHU:  Your Honor, during cross I'm going to need

12  that same exhibit that the government had problems with.  I was

13  wondering --

14          THE COURT:  Okay.  Tell us which one it is, and we

15  can use -- we can bring it up.

16          MS. CHU:  It'll be Exhibit 424, and I can signal to

17  you when I need it.  I just wanted to give your law clerk a

18  heads-up.  Thank you.

19          THE COURT:  Okay.

20                        CROSS-EXAMINATION

21  BY MS. CHU:

22  Q.   Good afternoon, Agent Ballantyne.

23  A.   Good afternoon.

24  Q.   I wanted to start with just clarifying one of the exhibits

25  we talked about in the very beginning of your testimony,

1    Exhibit 114.

2              MS. CHU:  And with the assistance of the government,

3    could we pull up Exhibit 114.  It just probably speeds it up so

4    I don't have to hook up my computer.

5    BY MS. CHU:

6    Q.   Agent Ballantyne, can you see Exhibit 114 on your screen?

7    A.   Yeah.  It's small, but I can see it.

8    Q.   You are able to read it?

9    A.   Yes.

10   Q.   And are you -- is this -- okay.

11   A.   I can see it now, full screen.

12   Q.   Understood.

13             MS. CHU:  I'm sorry.  Can we pull up Exhibit 124.

14   This is the -- this is the one in German, so this one.

15        Thank you so much.

16   BY MS. CHU:

17   Q.   Okay.  So now are you able to read the time stamp on here

18   on the very bottom?

19   A.   Yes.

20   Q.   And I'm just circling that for your convenience, and it

21   says 4:23 p.m.; correct?

22   A.   Correct.

23   Q.   And just look at the top, and we see that this is a

24   response to Former President Trump's tweet?

25   A.   Correct.

Ballantyne - Cross (Chu)                                          146

1    Q.   And I'm circling that there, and not very well, but you

2    can see that he tweeted that it appears approximately five

3    hours before Ms. MacAndrew responds to it; correct?

4    A.   Correct.

5    Q.   Okay.  And so five hours before 4:23 p.m. would put that

6    at about 11:23 p.m.; is that right?  Or a.m.; is that right?

7              THE COURT:  Who's -- clarify who's doing what,

8    whether she's doing it or whether you're talking about

9    President Trump.

10             MS. CHU:  Certainly, Your Honor.  I'm talking about

11   President Trump's original tweet.

12             THE COURT:  Okay.

13   BY MS. CHU:

14   Q.   So if it was five hours before Ms. MacAndrew's response,

15   we'd actually be looking at about sometime in the 11 o'clock

16   hour; right?

17   A.   I don't see a time stamp for President Trump, so I don't

18   know for sure.

19   Q.   So I guess what I'm trying to get at is I think the 4:23

20   time stamp is not in East Coast time.  Is that right?

21   A.   I don't know.

22   Q.   Okay.  But we see that it's responding to President

23   Trump's tweet earlier, and that's five hours earlier; correct?

24   A.   It appears that way, yes.

25   Q.   So at 11 something a.m., President Trump's not tweeting

1   this; correct?

2   A.   I don't know what he was doing at 11 a.m.

3   Q.   Well, this is before any Capitol breach had happened, in

4   the 11 a.m. hour; right?

5   A.   Correct.

6   Q.   I think it's probably safe to assume that he would have

7   tweeted this after the Capitol breach happened or at least was

8   underway; right?

9   A.   I was not with him on January 6.

10  Q.   Okay.  Let me just ask you this:  Are you sure that this

11  would have happened at 4:23 p.m. Eastern time?

12  A.   I'm not sure.

13          MS. CHU:  And we can remove this exhibit.  Thank you

14  so much.

15  BY MS. CHU:

16  Q.   We discussed some video footage that you watched with

17  Ms. MacAndrew approaching the Capitol building on the Capitol

18  lawn.  Do you remember that?

19  A.   Yes.

20  Q.   And that -- some of those videos showed her walking next

21  to Capitol Police officers?

22  A.   Yes.

23  Q.   You testified that Ms. MacAndrew was nearby to the police

24  officers; correct?

25  A.   Correct.

1    Q.   And that you could hear from the videos individuals in the

2    crowd harassing the police officers; right?

3    A.   On one of the videos, yes.

4    Q.   And in those videos there's also individuals in the crowd

5    yelling positive messages to the officers; right?

6    A.   Correct.

7    Q.   They're yelling, "Praying for you"?

8    A.   I don't know exactly, but I know there was positive

9    messages, yes.

10   Q.   Do you recall testifying about the green snow fencing?

11   A.   Yes.

12   Q.   And you testified that it was on the ground near where

13   Ms. MacAndrew was walking; correct?

14   A.   Correct.

15   Q.   And so that snow fencing was pushed aside; correct?

16   A.   I don't know.  I don't have a video of what happened to

17   the snow fencing, but at the time of the video, it appeared to

18   be pushed aside.

19   Q.   It was no longer standing upright?

20   A.   Correct.

21   Q.   And it wasn't in the path where a lot of the crowd was

22   walking?

23   A.   Correct.

24   Q.   And, in fact, most of it was on the ground in those

25   videos?

Ballantyne - Cross (Chu)                                           149

1    A.    Correct.

2    Q.    And talking about the bike racks in those videos that we

3    saw Ms. MacAndrew in as she walked up towards the Capitol,

4    there is bike racks in those videos that you talked about;

5    right?

6    A.    Correct.

7    Q.    And those bike racks were also either lying down on the

8    floor?

9    A.    Correct.

10   Q.    Or they were pushed to the side?

11   A.    Correct.

12   Q.    And none of them were directly in Ms. MacAndrew's path

13   upright?

14   A.    Correct.

15          MS. CHU:   If I could get Exhibit 424 from your law

16   clerk, Your Honor.

17          Thank you so much for your help.

18   BY MS. CHU:

19   Q.    Do you recall Exhibit 424?

20   A.    Yes.

21   Q.    And just to refresh the Court's memory, this is the

22   exhibit where we have CCTV camera on one side and a

23   side-by-side for Ms. MacAndrew's phone on the other; right?

24   A.    I believe so, yes.

25   Q.    Looking at the very beginning of this footage, we're

```
1    looking at approximately 3:07 p.m.; is that correct?  And you

2    can see it on the top of the screen.

3    A.    Correct.

4    Q.    And this is before Ms. MacAndrew entered; correct?

5    A.    Correct.

6    Q.    In fact, this is about two minutes before she entered the

7    Capitol building?

8    A.    Approximately.

9    Q.    I'm going to jump ahead in the video to approximately

10   right here, 3:07:45.  So this would be about a minute and

11   15 seconds or so before Ms. MacAndrew enters; correct?

12   A.    I don't recall the exact time that she entered, but

13   approximately.

14   Q.    And I'm just playing this video for you for a few seconds

15   here.

16         (A portion of Exhibit 424 was played.)

17   BY MS. CHU:

18   Q.    And so we see a crowd has come into the hallway; right?

19   A.    Correct.

20   Q.    And I'm just -- what I'm calling a hallway was previously

21   described by Captain -- I think it was Baboulis as the hallway

22   behind the Senate Wing door.  Does that make sense to you?

23   A.    Yes.

24   Q.    Okay.  And this room isn't very big, is it?

25   A.    Compared to what?
```

1    Q.    Have you ever seen it in person?

2    A.    I have not.

3    Q.    I'm just playing a few more minutes here.

4          (A portion of Exhibit 424 was played.)

5    BY MS. CHU:

6    Q.    And on this video what we see at three -- approximately

7    3:08 p.m., there's people walking in; correct?

8    A.    Correct.

9    Q.    And they're walking in through a wide-open door; right?

10   A.    I see people walking in.  I also see people entering

11   through the window.

12   Q.    But they're walking in through the door as well?

13   A.    Correct.

14   Q.    In fact, more of them are coming in through the door than

15   the window?

16   A.    Correct.

17   Q.    And they're not running in?

18   A.    No.

19   Q.    They're not pushing themselves in?

20   A.    No.

21   Q.    At this point they're walking at a pretty slow pace in

22   through the door; is that correct?

23   A.    Yes.

24   Q.    And as we continue playing this video, are you seeing that

25   there's a lot of individuals just standing in that hallway?

1    A.    Yes.

2    Q.    And some of them are facing each other talking?

3    A.    Yes.

4    Q.    There's not a lot of urgency between these people?

5    A.    Correct.

6    Q.    They are not rushing to move anywhere?

7    A.    Does not appear so.

8    Q.    And I'm going to continue playing.

9          And I'm now at 3:08:25 p.m., and it's continuing to play,

10   and you can see more individuals are coming in?

11   A.    Correct.

12   Q.    And at this point in time, there's no pushing with police?

13   A.    Correct.

14   Q.    No one is throwing anything at the police at this time?

15   A.    Correct.

16   Q.    And there are police that you can see in the video;

17   correct?

18   A.    Correct.

19   Q.    They're in this little hallway here; right?

20   A.    Correct.

21   Q.    And there's actually several officers that you can see

22   lining the portion of the hallway directly facing the Senate

23   Wing door?

24   A.    Yes.  I see them on the bottom of the screen.

25   Q.    Yes.  And so I guess, to make sure that we are all on the

1    same page, I'll circle right here.  We're talking about the

2    police officers along the wall facing the Senate Wing door;

3    correct?

4    A.   Correct.

5    Q.   And then we also see that there is police officers here

6    (indicating) on the bottom right of the screen; right?

7    A.   Correct.

8    Q.   And these would be police officers that somebody would see

9    if they entered through the door.  They would see these

10   officers on their left; correct?

11   A.   They would be on the left-hand side facing through the

12   door, yes.

13   Q.   And these officers, they're not yelling at the crowd at

14   this point?

15   A.   There's no audio.

16   Q.   Do you see them making any gestures that would indicate to

17   you that they are engaging with the crowd just at this point?

18   We're at 3:08:40 p.m.

19   A.   I do see an officer interacting.

20   Q.   You're right.  I see this as well, so I'm circling that.

21   This is at 3:08:45, and you can see an officer and an

22   individual in the crowd talking; right?

23   A.   Correct.

24   Q.   The officer isn't gesticulating at him in any way?

25             MS. BESSLER:  Your Honor --

1    A.    I don't know.

2              MS. BESSLER:  -- I would object.

3              THE COURT:  I can't hear you with your objection.

4    You need to speak in the microphone.

5              MS. BESSLER:  Your Honor, I would object to

6    speculation.

7              THE COURT:  In terms of -- that, I think, is

8    speculation as to what's happening.  We can't -- there's no

9    audio.  There's nothing else.  You can just see the two of them

10   together and whatever their hand movements are.

11             MS. CHU:  Understood, Your Honor.

12   BY MS. CHU:

13   Q.    And we're just going for the visual observation here,

14   Agent Ballantyne.  So looking at the officer that when we were

15   just -- let me go back a few minute -- or a few seconds here.

16   We're looking at this.  You pointed out that there was, like, a

17   conversation going on right here, right, and so we see a

18   conversation between an officer and an individual with the

19   crowd, and right now we're at 3:08:36 p.m.; correct?

20   A.    Correct.

21   Q.    And it looks like that individual is actually leaning into

22   that officer and whispering in his ear or trying to talk into

23   his ear?

24   A.    No audio, but he is close to the officer.

25             MS. CHU:  And I'm going to play a few more seconds

1    here.

2          (A portion of Exhibit 424 was played.)

3    BY MS. CHU:

4    Q.    And right now we're at 3:08:58 p.m., so this is shortly

5    before Ms. MacAndrew enters; correct?

6    A.    Yes.

7    Q.    And we still see at the door here, if you look at the

8    door, you see individuals walking in?

9    A.    Correct.

10   Q.    And now at -- so in the video this would be at the

11   2-minute, 16-second mark.  This is when Ms. MacAndrew's

12   entering the Capitol; correct?

13   A.    She appears to not be entered yet but about to be.

14   Q.    And approximately 2 minutes, 26 minutes into the -- or

15   26 seconds into this video this is probably when you would say

16   she crossed the threshold of the door?

17   A.    Approximately, yes.

18   Q.    And Ms. MacAndrew is filming all of this as she's coming

19   in?

20   A.    Correct.

21   Q.    And as she turns her phone to the left of the room, you

22   can see that there are officers here; correct?

23   A.    Correct.

24   Q.    And so in her video we're looking at the bottom left of

25   the screen; correct?

1    A.    Correct.

2    Q.    And then on the CCTV camera we're looking at the bottom

3    right?

4    A.    Correct.

5    Q.    And these are the same officers that we are referencing?

6    A.    Correct.

7    Q.    And so you can see that these officers are standing there;

8    right?

9    A.    Correct.

10          MS. CHU:  And I'm going to continue playing for a few

11   more minutes here.

12          (A portion of Exhibit 424 was played.)

13   BY MS. CHU:

14   Q.    So we're at approximately 2 minutes, 46 seconds into this

15   video, and what are the officers and the individuals in the

16   crowd doing?

17   A.    Standing there.

18   Q.    They're standing there.  And does it look like the

19   officers are engaging with the individuals?

20   A.    No audio.  I can't tell but potentially.

21   Q.    So just looking for visual observations, looking at the

22   screen, this is Ms. MacAndrew's cell phone video.  In the very

23   middle of what would have been in her view, do you see an

24   individual reaching his hand out to fist-bump with officers?

25   A.    Yes.

Ballantyne - Cross (Chu)                                                157

1    Q.   And do you see officers fist-bumping him?

2    A.   Yes.

3    Q.   And so when we look at the CCTV footage -- going back a

4    little bit so I can make sure to catch it.  I'm circling the

5    bottom right of the CCTV footage screen at approximately 2

6    minutes and 45 seconds in, and you see -- in that screen do you

7    see multiple individuals holding their fists out?

8    A.   Yes.

9    Q.   Do you see at least three people?

10   A.   Yes.

11   Q.   And if we continue playing this clip, do we see officers

12   responding?

13   A.   Yes.

14   Q.   And it's multiple officers giving fist bumps; correct?

15   A.   I see two, yeah.

16   Q.   Let's just go back a little bit.  So we're just looking at

17   the fist bumps.  So there's more than one officer giving fist

18   bumps; correct?

19   A.   Correct.

20   Q.   In this video you see Ms. MacAndrew enter, and she's

21   holding her phone up; correct?

22   A.   Correct.  Correct, yeah.

23   Q.   And we're looking right now at the CCTV footage at

24   approximately 2 minutes and 50 seconds in, and Ms. MacAndrew is

25   looking through her phone screen; correct?

Ballantyne - Cross (Chu)                                              158

1    A.    I can't tell where she's looking.

2    Q.    We watched just a few more seconds of that video, and you

3    see Ms. MacAndrew moving her phone as she's panning across the

4    room?

5    A.    Correct.

6    Q.    And looking at the video, is her head moving with her

7    phone?

8    A.    Yes.

9    Q.    Do you have any reason to think she is not looking through

10   her phone?

11   A.    She could be.

12   Q.    And her head is angled up towards her phone screen?

13   A.    It could be.

14   Q.    She's holding her phone up above her head; right?

15   A.    Yes.

16   Q.    And she's looking up at the screen; correct?

17         MS. BESSLER:  Your Honor --

18   A.    She could be.

19         MS. BESSLER:  -- this has been asked and answered.

20         THE COURT:  Well, I think more importantly he's --

21   "it could be" is not very helpful, I mean, in terms of what he

22   can answer.  You're asking a question, and I'm -- frankly, I

23   think he's speculating at this point.  I mean, certainly the

24   Court can look at it and may come to my own conclusion about

25   it.  "Could be" doesn't answer it one way or the other.  I

1    think you got as far as you can.

2             MS. CHU:  Fair enough, Your Honor.  Thank you.

3    BY MS. CHU:

4    Q.    Looking at Ms. MacAndrew's position in the room in

5    comparison with the officers -- and I'm referring to the

6    officers that were doing the fist bumps here at the bottom of

7    the right in the CCTV footage -- we're looking at about 5 feet,

8    would you say?

9    A.    About, yes.

10   Q.    There is portions of this video that contain cell phone

11   footage from Ms. MacAndrew's phone; correct?

12   A.    Correct, on the right-hand side.

13   Q.    And we all heard it.  Some of that is actually quite loud?

14   A.    Correct.

15   Q.    You can hear a lot of voices?

16   A.    Correct.

17   Q.    And it's -- you -- it's like can you tell -- you can tell

18   it's echoing in there; right?

19   A.    I don't know.

20   Q.    But it's loud?

21   A.    Yes.

22   Q.    You mentioned when you testified that you heard in this

23   video somebody yell, "The SWAT team is on the way."  Do you

24   remember that?

25   A.    Yes.

1    Q.    You don't know if Ms. MacAndrew heard that?

2    A.    I don't know.

3    Q.    You don't know if Ms. MacAndrew heard anything that was

4    specifically said in this room?

5    A.    Correct.

6            MS. CHU:  I'm going to jump in this video to

7    approximately 3:14 p.m.

8        (A portion of Exhibit 424 was played.)

9    BY MS. CHU:

10   Q.    At this point Ms. MacAndrew is in the maybe center --

11   center of the room but closer to the -- I think that would be

12   the south side of the room?

13   A.    Correct.

14   Q.    And she's facing towards the door; right?

15   A.    Honestly, I can't really see where she's facing.

16           MS. CHU:  Let me play a few more seconds.

17       (A portion of Exhibit 424 was played.)

18   BY MS. CHU:

19   Q.    So when you look at her cell phone footage, it's aimed

20   towards the door; right?

21   A.    I mean, I see the hallway in her cell phone footage right

22   here.

23   Q.    Okay.  And on the left of her cell phone footage, that's

24   the doorway out?

25   A.    Yes.

1    Q.    And that's the door she's going to exit from; right?

2    A.    Yes.

3    Q.    That's also the door that she entered from?

4    A.    Yes.

5    Q.    So she never goes far in this hallway, does she?

6    A.    Correct.

7    Q.    In fact, the farthest she goes is a even smaller hallway

8    to the left of that CCTV footage in that smaller screen?

9    A.    Correct.

10   Q.    And she walks a few steps in there, and then she turns

11   around and comes back out; right?

12   A.    Correct.

13   Q.    In total she was in there under ten minutes; correct?

14   A.    As in --

15              THE COURT:  In where?

16              MS. CHU:  Inside the Capitol building.

17              THE COURT:  Okay.

18   A.    I don't know the exact time but approximately under ten

19   minutes.

20        (A portion of Exhibit 424 was played.)

21              MS. CHU:  And I'm just jumping in the video to

22   approximately 3:16 p.m.

23              THE COURT:  Can we get rid of the blue.

24              MS. CHU:  Oh, yes.  Thank you, Your Honor.  Sorry

25   about that.

```
 1              THE COURT:  Great.  Thanks.
 2   BY MS. CHU:
 3   Q.   Okay.  And do you recall when you testified that around
 4   3:16 p.m. you see an officer come up and point towards the
 5   door?
 6   A.   Yes.
 7   Q.   And there he is; right?
 8        We're looking now at 3:16:17 seconds.  We see that there
 9   is an officer with his hand raised in front of Ms. MacAndrew;
10   right?
11   A.   Correct.
12   Q.   And that officer is pointing towards the door?
13   A.   Correct.
14   Q.   And you assume that he's telling her to exit at this
15   point; correct?
16   A.   There's no audio.
17   Q.   Well, you testified that the officer was pointing towards
18   the door.  Would your assumption be that he's suggesting that
19   she exit?
20   A.   I don't want to assume, but yes, he was pointing towards
21   the door.
22   Q.   And that's the first time you see an officer in front of
23   Ms. MacAndrew giving her any directions; right?
24   A.   Correct.
25   Q.   And Ms. MacAndrew leaves at 3:17 p.m.?
```

Ballantyne - Cross (Chu)                                              163

1    A.    Approximately, yeah.

2    Q.    So under a minute after this; correct?

3    A.    Correct.

4    Q.    While Ms. MacAndrew is in the Capitol building, she has

5    her flag rolled up under her arm; correct?

6    A.    You know, I didn't see it on the CCTV.

7    Q.    Okay.  Let me pull it back up.

8          (A portion of Exhibit 424 was played.)

9    A.    Yes.

10   BY MS. CHU:

11   Q.    Okay.  And we're looking at about 3:16 p.m., and you can

12   see Ms. MacAndrew holding her flag?

13   A.    Yes.

14   Q.    And it's rolled up under her arm.

15   A.    It looks like it's in her left hand.

16   Q.    Fair enough.  But it's not out?

17   A.    Correct.

18   Q.    Okay.  And it's no longer on the long flagpole that she

19   had it on earlier?

20   A.    Correct.

21          MS. CHU:  Just got to close this so it's not in the

22   way.

23   BY MS. CHU:

24   Q.    Okay.  Agent Ballantyne, remember the videos that you

25   discussed that were around 3:45 p.m. to 3:50 p.m.?  And we're

1    talking about the officer body cam.

2    A.    Yes.

3    Q.    And that depicted Ms. MacAndrew in the northwest courtyard

4    outside of the Capitol building?

5    A.    Yes.

6              THE COURT:    Let me -- we need to give the laptop

7    back.

8              MS. CHU:    Thank you so much.

9    BY MS. CHU:

10   Q.    You reviewed all of that footage; right?

11   A.    Yes.

12   Q.    And you saw Ms. MacAndrew was standing there in the

13   courtyard?

14   A.    Yes.

15   Q.    And there were people yelling near her?

16   A.    Repeat that.

17   Q.    There were people yelling near her?

18   A.    Yes.

19   Q.    And we heard various people yelling at police officers?

20   A.    Correct.

21   Q.    She never yelled at police officers?

22   A.    Correct.

23   Q.    She never -- she never chanted?

24   A.    Correct.

25   Q.    In fact, she just mostly stood or walked around?

1    A.   Correct.

2    Q.   She took photos?

3    A.   Correct.

4    Q.   She didn't talk to anybody in the crowd there?

5    A.   Correct.

6    Q.   Based on your review of all of the videos in this case,

7    Ms. MacAndrew doesn't appear to have come with anybody, did

8    she?

9    A.   Correct.

10   Q.   She didn't talk to anybody for any prolonged time in that

11   crowd?

12   A.   Correct.

13   Q.   She appears to have come alone.

14   A.   Correct.

15          MS. CHU:  May I have a moment, Your Honor?

16          THE COURT:  Certainly.

17   BY MS. CHU:

18   Q.   And Agent Ballantyne, following up on all of the videos

19   you've reviewed in this case with Ms. MacAndrew, you never

20   heard her chanting?

21   A.   Correct.

22   Q.   You never heard her yelling at police officers?

23   A.   Correct.

24   Q.   And you never saw her pushing anything out of her way?

25   A.   Correct.

Ballantyne - Cross (Chu)                                                    166

1    Q.   You never saw her throwing anything at anybody?

2    A.   Correct.

3    Q.   You never saw her cursing at anybody?

4    A.   Correct.

5    Q.   Mostly she was calm?

6    A.   Correct.

7    Q.   She stuck to herself?

8    A.   Correct.

9              MS. CHU:  No further questions.

10             THE COURT:  All right.  Redirect.

11             MS. BESSLER:  Your Honor, there is no redirect from

12   the government.

13             THE COURT:  All right.  Then you can step down.

14        I don't know where you are with -- are you finished in

15   terms of your case, or are you resting?

16             MR. PHILLIPS:  Yes, Your Honor.

17             THE COURT:  Let me take a short break.  I want to

18   look at my notes really fast to make sure I've asked whatever I

19   need to in terms -- before you actually rest, and then what I

20   would do is -- which I do in every case is I make an inquiry of

21   the defendant setting out her rights so that we -- you know,

22   she understands it's strictly her decision about what she wants

23   to do next.

24             MS. CHU:  Understood, Your Honor.

25             THE COURT:  So give me about ten minutes.  Well, give

1 me 15.  Let's see.  At 20 to four I'll come back out.  Okay?

2 Let me just, as I said, look through -- since the witness is

3 right here, I just want to make sure that I've covered

4 everything -- I had done little notes myself -- before they

5 rest.

6    (Recess taken at 3:23 p.m.)

7    (At 3:44 p.m. on January 10, 2023; with counsel and the

8 defendant present:)

9      THE COURT:  I don't have any additional questions.  I

10 just wanted to go back and look and make absolutely certain

11 there was nothing else that I wanted to follow up.  So at this

12 point you had admitted the exhibits.  There are some that are

13 not published but have been admitted, but presumably they're

14 all part of the record.  I think it was part of the

15 stipulations.

16      MR. PHILLIPS:  That is correct, Your Honor.

17      THE COURT:  Okay.  We just wanted to clarify that.

18 So if you're finished at this point, you can go ahead and rest.

19      MR. PHILLIPS:  We rest, Your Honor.  The government

20 would rest.

21      THE COURT:  Okay.

22      MS. CHU:  Your Honor, the defendant makes a motion

23 under Rule 29.

24      THE COURT:  Okay.  Let me indicate to you that I take

25 them under advisement in terms of -- certainly there's no

1    reason for you not to give me your key points, and I'll hear

2    from you, but it should be quick, and I will do it at a later

3    point either as part of my findings or, if necessary, you know,

4    something separately where you would have an opportunity to do

5    additional briefing.

6              MS. CHU:  Understood, Your Honor.

7         Ms. MacAndrew never denies -- she has never denied that

8    she went to the Capitol, and the videos show that she was on

9    the Capitol grounds and that she did go into the Capitol

10   building, but the government has not met its burden to

11   establish that Ms. MacAndrew knowingly entered and remained on

12   restricted grounds.  She was on the Capitol grounds, but the

13   time that she entered Capitol grounds the snow fencing had

14   already been pushed to the side, and we heard that testimony.

15   The bike racks were already moved to the side or on the ground.

16   The signs would not have been readily available to her to

17   review.  They wouldn't have been in her path.

18        The government also has not met its burden to prove that

19   she engaged in disruptive or disorderly conduct.  We heard

20   testimony that she was calm, she was quiet, she was peaceful,

21   she was not engaging with police officers, she was not throwing

22   things.  She was not in any way disruptive.

23        Additionally, the government can't establish and they have

24   not established that she had the intent to go to the Capitol to

25   disrupt any of the official proceedings going on that day.

1    When she was in the Capitol, Ms. MacAndrew had bundled up or

2    rolled up her flag.  She was taking photos and videos, and

3    that's what we see: Ms. MacAndrew walking around, taking photos

4    and videos, not chanting, not holding up her flag.  She wasn't

5    parading, picketing or demonstrating in the Capitol.

6        And with that I submit.

7        THE COURT:  Okay.  Counsel.

8        MR. PHILLIPS:  Your Honor, just briefly.

9    The evidence has shown that, in fact, Ms. MacAndrew went

10    through lots of areas and lots of places where it would have

11    become very apparent to her that she was not allowed where she

12    was at.  She crossed areas where, although the fencing was not

13    straight up in front of her, it was laying on the ground, had

14    been destroyed, but the signs were still connected to it.

15    She marched next to police officers going there to protect

16    the Capitol.  She flew her flag as she paraded up towards the

17    Capitol, and as she got to the Capitol, she herself took

18    pictures of people that had been tear-gassed, people that had

19    been in battle with Capitol officers as they tried to protect

20    the Capitol.  And as she entered into the building, she heard

21    the blaring sound of the siren inside, the universal sign of

22    get out.  The Capitol was damaged, the windows was knocked out,

23    the door was knocked off of its hinges.  Things were in

24    complete disarray.  All of that knowledge was knowledge to her

25    that she should not be in the Capitol.

1    And once she got into the Capitol, most telling is she got

2    into the Capitol and for the first time on a cold day, she

3    starts covering her face.  That's when she tucks her flag away

4    and covers her face with a scarf, knowing that she was there to

5    disrupt Congress, that she was there unlawfully and willfully

6    and illegally.

7         THE COURT:  And in terms of the disorderly arguments

8    they made or that she's not -- that there's nothing there to

9    indicate on the evidence that she was there to disrupt the

10   certification of the electoral count, what do you rely on?

11        MR. PHILLIPS:  Your Honor, her mere presence as part

12   of this giant riot is disorderly.  Although she may not be

13   chanting, the fact that she is another person in this giant

14   riot that the Capitol Police are having to deal with in order

15   to try to clear the building, in order to clear the grounds,

16   her mere presence is part of -- disruptive and is stopping

17   their action and is disorderly.

18        THE COURT:  Okay.  And the other -- the argument --

19   the other argument she made that she was not -- there's nothing

20   to show that she was there to disrupt the certification of the

21   vote, the Electoral College vote.

22        MR. PHILLIPS:  Well, we know from her tweet that she

23   was there because of another rigged election or something of

24   that nature to give us the idea of why she's in the Capitol.

25   And it further goes to when she's in the Capitol, she'd come

1    from the steal -- steal the vote or whatever it was called

2    rally to the courthouse -- or to the Capitol building in order

3    to stop the electors from doing their constitutional duties.

4                    THE COURT:  All right.  I'll take it under

5    advisement.

6         What I'd like to do for Ms. MacAndrew is I want to make

7    sure she understands her rights before you make a -- she makes

8    a decision or you announce it.

9         So Ms. MacAndrew, I want to make sure you understand your

10   constitutional rights both to testify and not to testify, and

11   the fact that you are -- there's no inference of guilt, no

12   negative impact if you decide that you don't want to testify.

13   You could put the government to the proof.  They're required to

14   do so.

15        On the other hand, you certainly can decide to testify and

16   present evidence.  I want to make sure that you understand the

17   distinction in some of these things.  Your lawyer does the

18   legal strategy, obviously, speaking with you to gather the

19   facts and your views, but that's what her job is, and you

20   certainly, in making this decision, should get advice as to

21   what your testimony would be if you wanted to testify, what

22   likely the cross-examination would be, but it's your decision,

23   not the lawyer's decision, nobody else.  You can talk to

24   everybody, but I want you to understand this is your decision

25   and not someone else's, so you can't at a later date decide,

1   well, you know, my lawyer didn't persuade me or whatever.  I

2   mean, I want to make sure that you know what you want to do.

3        So have you had enough time to talk to your lawyer,

4   consider it, and come to a decision?  I mean, we're at ten to

5   four.  If you need more time, I can give it to you; or if

6   you're ready to tell me one way or the other, that's fine as

7   well.  You can wait till tomorrow morning if you want.  We

8   don't have that much time before I have to break.  If you

9   really want to take additional time, I don't want to push you

10  one way or the other.  I can do that.

11            THE DEFENDANT:  Your Honor, yes, I understand.

12            MS. CHU:  Your Honor, Ms. MacAndrew wants to testify.

13            THE COURT:  All right.  That's your decision?

14            THE DEFENDANT:  Yes.

15            THE COURT:  Then I think what we can probably -- we

16  should go ahead and start it in part because we're going to

17  have a short tomorrow because I have that commission meeting.

18        If I could ask my law clerk for -- can you get the green

19  book?  I left it on my desk.  The green book.

20        I'm just getting my notebook.

21        We can probably go till 4:25 as long as we stop promptly

22  at that point.  It's a Zoom meeting, so I just need to get back

23  into chambers in time.

24        All right.  Ms. MacAndrew, why don't you come on up, and

25  we'll swear you in.

```
 1                   COURTROOM DEPUTY:  Would you raise your right hand,

 2    please.

 3             DANEAN K. MacANDREW, DEFENDANT'S WITNESS, SWORN

 4                   COURTROOM DEPUTY:  Please be seated.

 5                   MS. CHU:  With the Court's permission, may

 6    Ms. MacAndrew remove her mask at this time?

 7                   THE COURT:  Yes.

 8         You can take your mask off.  Otherwise it's harder to

 9    hear.

10                   THE WITNESS:  Thank you.

11                   THE COURT:  And I know you've heard me, but I'll say

12    it again.  Allow counsel to finish their question before you

13    start so we really get the question and the answer, even if you

14    know what they're going to -- what they're asking you.  And

15    also, if you see them stand, they're going to object.  Don't go

16    forward with the testimony if you have not.  If you're in the

17    middle, stop so I can hear the objection.  All right?

18                   THE WITNESS:  Yes, Your Honor.

19                   THE COURT:  Proceed.

20                           DIRECT EXAMINATION

21    BY MS. CHU:

22    Q.   Good afternoon, Ms. MacAndrew.

23    A.   Good afternoon.

24    Q.   What is your full legal name?

25    A.   Danean Kimberly MacAndrew.
```

1    Q.    And Ms. MacAndrew, where do you live right now?

2    A.    Mission Viejo, California.

3    Q.    How long have you lived there?

4    A.    Off and on since I was one and a half years old, since

5    1969.

6    Q.    Who do you live with?

7    A.    I live by myself in my family home.

8    Q.    And how long have you lived there by yourself?

9    A.    Since 2016, the end of 2016.

10   Q.    Before January '20 and '21, had you ever been to

11   Washington, D.C.?

12   A.    No.

13   Q.    Had you traveled out of state very much?

14   A.    Not in the last several years.  The last time I had flown

15   out of town was in 2014, because I was taking care of both of

16   my elderly parents until they passed.  My dad had COPD and my

17   mom had dementia, and so I wasn't able to travel.  I was their

18   sole caregiver.

19   Q.    What made you decide to go to Washington, D.C., in

20   January 2021?

21   A.    I wanted to go hear President Trump's last speech as

22   President, and I wanted to be part of the demonstration.

23   Q.    And what do you mean when you say "demonstration"?

24   A.    Demonstration to protest an election that I thought had a

25   lot of abnormalities about it.

1   Q.   And what did you think -- where did you think the

2   demonstration was taking place?

3   A.   I thought it was, like, kind of like for several days all

4   over D.C.  There were different speakers set up at different

5   places.  There was -- there were maps going around online of

6   different speakers at different locations throughout several

7   days.

8   Q.   What was your understanding before you went to Washington,

9   D.C., of what would be happening on January 6th, 2021?

10  A.   So starting in about probably August, I want to say, I

11  started going to pro Trump rallies in Beverly Hills,

12  California, and Huntington Beach, California.

13           THE COURT:  What year?  August of what year?

14           THE WITNESS:  Of 2020, Your Honor.

15  A.   So I was going to pro Trump rallies.  Not where he was, of

16  course.  Just a gathering of Trump supporters most weekends, I

17  would say, until, like, through the election -- after the

18  election until they closed the park in Beverly Hills where we

19  were meeting.

20  BY MS. CHU:

21  Q.   Okay.  And Ms. MacAndrew, what was -- what were these pro

22  Trump rallies like?

23  A.   They were a lot of fun.  They were really supportive.

24  There were speakers and singers and bands, and if it was at the

25  beach, we had, like, bonfires sometimes.  There were barbecues.

1   There was dancing.

2   Q.   And did these pro Trump rallies in any way inform your

3   expectation of what Washington, D.C., would be like?

4   A.   Definitely.

5   Q.   Can you tell us a little more about that.

6   A.   Yes.  So I had never had a bad experience at a pro Trump

7   rally.  I had also been -- I drove out to Bullhead City,

8   Arizona, at the end of October 2020 to a Trump rally, like,

9   where President Trump was speaking, and that was also a very,

10  very, very fun time.  It felt like going somewhere with a bunch

11  of -- like to a giant party with a bunch of friends you hadn't

12  met yet.  It was just really easy to -- easy to talk to people,

13  you know.

14  Q.   And had you ever witnessed -- had you ever personally

15  witnessed anything violent at these rallies?

16  A.   Never.

17  Q.   What had you heard before traveling to Washington, D.C.,

18  about President Trump's rally?

19  A.   I had heard that it was going to be on the morning of the

20  6th, that he had gone on Twitter and asked people to attend.

21  He said, "Will be wild," but I didn't know how to interpret

22  that because it's Trump, you know.  I mean, who knows what he

23  means half the time?

24  Q.   Did you have any understanding before going to Washington,

25  D.C., that there would be events at the Capitol building?

1    A.    No.  I don't think that was one of the -- one of the

2    locations of the speakers or anything.

3    Q.    Did you have any intention before January 6, 2021, of

4    going to the Capitol building?

5    A.    No.

6    Q.    What did you hope to accomplish by going to Washington,

7    D.C., in January 2021?

8    A.    I hoped to -- to be part of a demonstration, to hear Trump

9    speak one last time, to get -- go across the country, you know,

10   to travel a bit.  It had been a long time.

11   Q.    When you say "be part of a demonstration," what

12   specifically was your expectation about the demonstration?

13   A.    That it would be peaceful, like all the other pro Trump

14   events that I had been to.

15   Q.    And did you believe any of it would take part at the

16   Capitol?

17   A.    No.

18   Q.    Did you plan to go to D.C. with anybody?

19   A.    No.

20   Q.    Tell us about your travel out to Washington, D.C.

21   A.    I'm sorry.  My travel, what?

22   Q.    Your travel to Washington, D.C.

23   A.    Oh.  I flew.  I made my reservations, I don't know, I

24   think right before Christmas, and then I flew to D.C.  I think

25   I took, like, maybe a late morning flight.  I remember I got in

1    in the evening, I think, on the 4th, and so I wanted to do some

2    sightseeing while I was here too, 'cause I'm an American and

3    it's an amazing place, so on the 5th, I did sightseeing and had

4    a great time.  I got in late on the 4th, I think.

5    Q.    So let me ask you, then, about the -- January 6th itself.

6    A.    Okay.

7    Q.    On the morning of January 6, 2021, how did your day start?

8    A.    Early, extremely early.  So when I went to Bullhead City

9    to the rally, I had gotten there, I want to say, like, four or

10   five hours before it started, and the line was already

11   thousands of people long, so I knew that I wanted to get to the

12   Ellipse extremely early so that I could get somewhere decent,

13   you know, to view the speech, so I think I got up at 4 o'clock

14   Eastern, which is one in the morning my time, so it started

15   sleep deprived.

16   Q.    When you say "my time," you mean Pacific time?

17   A.    Yes.  California time, Pacific, yes.

18   Q.    And what did you do that morning after you left your

19   hotel?

20   A.    I went out from my hotel.  I was going to take a scooter,

21   but there was a couple outside my hotel who said, "We're

22   Ubering over, why don't you just share an Uber with us?"  So I

23   did that.

24   Q.    And --

25   A.    To the Ellipse.  Excuse me.

```
 1    Q.    I'm sorry.  What did you say?

 2    A.    I said, "To the Ellipse."

 3    Q.    To the Ellipse.  Thank you.

 4          And you were going to the Ellipse for what reason?

 5    A.    To hear the President speak.

 6    Q.    Did you have any plans for what you would be doing after

 7    President Trump's rally?

 8    A.    No.  I assumed I would go home and go to sleep, go back to

 9    my hotel and go to sleep.

10    Q.    When you got to the Ellipse, can you describe what it was

11    like.

12    A.    It was a long line, and it was the coldest I think I've

13    ever been in my life, and I lived in Pittsburgh for a while.

14    It was freezing cold.  It was biting, painfully windy, damp

15    cold.

16    Q.    And how long were you waiting at the Ellipse to hear

17    President Trump speak?

18          Let's break this into two parts.

19    A.    Yes.

20    Q.    How long did it take for you to get into the Ellipse to

21    hear him speak?

22    A.    So I think -- if I remember right, I think I lined up

23    about 5:30, maybe 5 o'clock, and then I think they opened the

24    security to the Ellipse at, I think, nine.

25    Q.    So it sounds like it was approximately four to five hours
```

1    of waiting?

2    A.   Yes, yes, in the cold.

3    Q.   And then, when you got into the Ellipse, how long did you

4    wait to hear President Trump speak?

5    A.   A really, really long time.  I think he was scheduled to

6    speak at 11 and didn't start until after 12, I want to say.  I

7    could be misremembering that, but that's to the best of my

8    recollection.  It was a long time, and there was -- there was

9    nowhere to sit.  There was nowhere to lean.  It was a muddy,

10   grassy field.  There was like no place to -- okay.

11   Q.   Did you get to hear President Trump's speech?

12   A.   Part of it.

13   Q.   Why did you only hear part of it?

14   A.   Because my back was spasming.

15   Q.   Tell us about that.

16   A.   So as I said, there was nowhere to sit.  There was my -- I

17   have a -- I got hit by a car when I was a kid, so my back is

18   my -- my sore spot, and I think it was just from shivering for

19   all those hours and just being, like, really, really tense that

20   it just started spasming in the middle of my back and so I --

21   there was nowhere to stretch.  It was very congested.  There

22   were a lot of people at the speech, so there was nowhere to

23   lean, to stretch, so I left to the back of the Ellipse area,

24   still, like, within the area, and there were some bike racks

25   that I just was, like, stretching out on hoping that would

1   help, but it didn't, so I ended up leaving.  We had to leave

2   our backpacks outside the -- okay.

3   Q.   I'll just help transition --

4   A.   Sorry.

5   Q.   -- you to the next section.  So it sounds like you left

6   the Ellipse, the rally itself?

7   A.   I did.  I left before he stopped speaking.

8   Q.   And so you only heard part of his speech; is that right?

9   A.   Correct.

10  Q.   What happened after you recovered your backpack, the one

11  that you were just mentioning?

12  A.   I took whatever I had in there.  I think it was Tylenol.

13  Q.   Why did you take the Tylenol?

14  A.   Because my back was spasming.

15  Q.   And what happened after that?

16  A.   I felt better.

17  Q.   And at some point did the rally start leaving -- or

18  ending?

19  A.   Yeah.  I had a hard time finding my backpack.  It took

20  quite a bit of time to find, and I think right around the time

21  that I found it, people started funneling out.

22  Q.   And so when you saw people funneling out, what did you do?

23  A.   I don't know.  There was a big flag.  I don't know if I

24  can guess how big.  I would say, like, maybe 100 feet, 50 feet

25  long.  And a whole bunch of people were all around the

1    underside of it holding it up, and it was beautiful, and I love

2    to take pictures.  I've been -- like, I've won awards at a

3    fair, and I've been published in the newspaper and stuff, so I

4    wanted to take pictures of it.

5    Q.   And so what did you do next in terms of this flag?

6    A.   I went where the flag went.

7    Q.   So did you start walking with the flag?

8    A.   I did, yeah.  I was holding it part of the time.

9    Q.   All right.  Tell us a little bit more about walking with

10   the flag.

11   A.   It was -- it was very peaceful.  There were chants.  There

12   was USA chants and --

13   Q.   At some point did you have an understanding of where the

14   flag was going?

15   A.   Yeah.  At some point I did, yes.

16   Q.   Okay.  Tell us about that moment.

17   A.   It didn't really register, like -- like, okay, so this is

18   where we're going, to the Capitol.  Like, it wasn't a -- didn't

19   seem like a thing.

20   Q.   Did you have any understanding of why people were marching

21   to the Capitol at that point in time?

22   A.   No.

23   Q.   Did you have an intention to go to the Capitol at that

24   point in time?

25   A.   No.

1    Q.    How long did you walk with this flag?

2    A.    From the Ellipse to the Capitol.

3    Q.    What happened as you approached the Capitol building?

4    A.    I saw a whole bunch of people on the hillside and on

5    the -- I guess you'd say the terrace of the Capitol.  Just,

6    like, thousands of people were on the grass and everywhere.

7    Q.    And what did you think when you saw all those people

8    around the Capitol?

9    A.    I thought this was where the next, like, event was, like

10   this is -- felt like a continuation of the Ellipse.

11   Q.    And when you say "a continuation of the Ellipse," what was

12   your expectation for what was happening around the Capitol?

13   A.    That it was a demonstration and a protest.

14   Q.    Did you decide to go and approach the Capitol building?

15   A.    Yes.

16   Q.    And why did you do that?

17   A.    That's where everybody seemed to be going.

18   Q.    And what happened as you came up on the lawn of the

19   Capitol?

20   A.    When I came up on the lawn of the Capitol, it was pretty

21   crowded.  You could walk freely.  I noticed there were some

22   officers on the grass having conversations with people.  I

23   didn't sense any animosity between them.  Then I noticed that

24   there was, like, the face of the Capitol.  I was taking a bunch

25   of pictures the whole time.  "The face of the Capitol," I don't

1    know if that's the right terminology, but people were scaling

2    the wall of it, and I thought that's a really weird thing.

3    Like, why are they doing that?  Like, it's obvious that that's

4    not how all these hundreds of people up here got up there.

5    Like, there must -- like, why aren't they walking around?  It

6    just struck me as super strange.

7    Q.   Okay.  And how long do you think you were on the lawn of

8    the Capitol?

9    A.   I don't know for sure.  Maybe 15 minutes, ten minutes.  I

10   can't say.

11   Q.   And at some point you decided to walk up to the Capitol

12   building?

13   A.   Yes.

14   Q.   And why did you decide to walk up to the Capitol building?

15   A.   There were a lot of D.C. Metro officers walking up to the

16   Capitol, and a very lot of people, like, Trump supporters

17   walking up to the Capitol in the same -- you know, like a

18   stream.

19   Q.   And at this point did any of the police say anything to

20   you at all?

21   A.   No.

22   Q.   And what was your -- describe for us what you were

23   observing in terms of the vibe there.

24   A.   There were -- there were some people who were angry about

25   what they consider a stolen election.  There were other people

1  who were -- you know, I heard people singing God Bless the USA

2  and other patriotic songs.  It was not violent at all.

3  Q.   So did you observe anybody being violent?

4  A.   No.

5  Q.   Did you observe any signs or fencing indicating to you

6  that you shouldn't go to the Capitol building?

7  A.   No.

8  Q.   As you approached the Capitol building, as you went up to

9  the Capitol building, did anybody say anything to you that

10 would have made you thought one way or the other whether you

11 could go to the Capitol building?

12 A.   No.  I was walking side by side with a line of D.C. Metro

13 officers, and I would think that if I were breaking the law,

14 they would have told me, but they didn't.

15 Q.   And at some point you got up to the Capitol building

16 terrace; correct?

17 A.   Yes.

18 Q.   And tell us about what you saw there.

19 A.   A sea of people.  There were -- there were a lot of D.C.

20 Metro officers just walking in a line, and then some of them

21 would, like, stand, like, sort of in front of the Capitol, and

22 then there was -- there was, like, so much going on all at

23 once.  There was a whole bunch of different people.  There were

24 flags.  There were chants.  There were just all sorts of

25 people.

MacAndrew - Direct (Chu)                                          186

1    Q.   What was your impression of the officers and their

2    attitude when you're coming -- when you're on the courtyard

3    area of the Capitol?

4    A.   They seemed to be ready for something to go wrong.  Like,

5    they seemed like -- yeah.

6    Q.   And what did you think about that?

7    A.   I thought it was really strange, because I had never been

8    to a Trump event before out of all of them that I had gone to

9    where police needed to -- felt they needed to be ready for

10   anything.

11   Q.   Did you think that something was going down at that time?

12   A.   No.

13   Q.   If something was happening at the Capitol that was bad,

14   what do you think officers -- what was your expectations for

15   what officers would have done?

16   A.   They would tell us to leave.  I would think that there

17   would be, you know, bullhorns announcing that we needed to

18   leave or maybe a helicopter or something telling us to leave.

19   Q.   So when you're in the courtyard at the Capitol, you never

20   got any impression from the officers that you needed to leave?

21   A.   No.  When I was in the courtyard at the Capitol, I was

22   standing right near the D.C. Metro officers who were lined up

23   behind a row of bike racks, and the majority of the time that I

24   was there, I was within maybe 10 to 15 feet of them.

25   Q.   And at that point what was your intent on why were you

```
 1    there?
 2    A.   I was there to film.  I had a lot of people -- so I had a
 3    Twitter account, and I had, I want to say, like, 4,000 or so
 4    followers, and a lot of people really wanted to go to the
 5    Capitol from around the country and they were unable to go, so
 6    I wanted to document it and -- just to document it and because
 7    I love photography.
 8         MS. CHU:  Your Honor, could I just propose pausing
 9    here?  Because we're probably entering a new section.
10         THE COURT:  That's fine.  No problem.
11       All right.  You can go ahead and step down.
12         THE WITNESS:  Thank you, Your Honor.
13         THE COURT:  So I'll see you tomorrow, then, at
14    9 o'clock.  We'll resume at that point.  And as I said, we'll
15    go -- depending on sort of where we are, but somewhere between
16    11 and 11:30 I'm going to need to stop.  So I won't interrupt
17    things if we're in the middle of something.
18       Counsel.
19         MR. PHILLIPS:  I was going to stand up because I
20    thought you were leaving.
21         THE COURT:  I'm sorry.  Okay, all right.  Everybody
22    take care, and I'll see you tomorrow.
23       (Recessed at 4:22 p.m.)
24
25
```

```
 1        I certify that the foregoing is a correct transcript from

 2   the record of proceedings in the above-entitled matter.

 3

 4

 5        /s/Lisa G. Grimminger          February 21, 2023
          Lisa G. Grimminger, RDR, CRR, CRC   Date
 6

 7                        I-N-D-E-X

 8                              Direct  Cross

 9   WITNESSES:

10   FOR THE PLAINTIFF:

11   Lanelle Hawa                   16     31

12   Jessica Baboulis               36     70

13   Braden Ballantyne              82    144

14   FOR THE DEFENDANT:

15   Danean MacAndrew              173    ---

16                                            Ruled
                                               On
17   MOTION:                        Made
     Defendant's Rule 29 Motion             167    171
18
                                             Ruled
19   EXHIBITS:                    Offered     On

20   1. Photograph                  79     79

21   2. Photograph                  79     79

22   3. Photograph                  79     79

23   4. Photograph                  79     79

24   5. Photograph                  79     79

25   6. Photograph                  79     79
```

| | EXHIBITS: (cont'd.) | Offered | Ruled On |
|---|---|---|---|
| 1 | | | |
| | 7. Photograph | 79 | 79 |
| 2 | | | |
| | 8. Photograph | 79 | 79 |
| 3 | | | |
| | 9. Photograph | 79 | 79 |
| 4 | | | |
| | 10. Photograph | 79 | 79 |
| 5 | | | |
| | 11. Photograph | 79 | 79 |
| 6 | | | |
| | 12. Photograph | 79 | 79 |
| 7 | | | |
| | 23. Cell phone video from January 6, 2021 | 79 | 79 |
| 8 | | | |
| | 24. Cell phone video from January 6, 2021 | 79 | 79 |
| 9 | | | |
| | 114. Twitter screenshot | 80,95 | -- |
| 10 | | | |
| | 124. Tweet to President Trump on 1/6/2021 | 80,92 | 93,96 |
| 11 | | | |
| | 200. Photograph | 14,35 | 14,36 |
| 12 | | | |
| | 206. Capitol 3D model picture | 35 | 36 |
| 13 | | | |
| | 208. Photograph | 35 | 36 |
| 14 | | | |
| | 209. Photograph | 35 | 36 |
| 15 | | | |
| | 210. Area Closed sign | 35 | 36 |
| 16 | | | |
| | 211. Area Closed sign | 35 | 36 |
| 17 | | | |
| | 300. Closure of West Front for Inauguration | 35 | 36 |
| 18 | | | |
| | 302. USSS HOS notification re: VP Pence, Mrs. Pence & daughter | 14 | 14 |
| 19 | | | |
| 20 | | | |
| | 303. Worksheet notification re: VP Pence | 14 | 14 |
| 21 | | | |
| | 304. U.S. Constitution, Amendment XII | 14 | 15 |
| 22 | | | |
| | 306. Title 3, United States Code, Section 15 | 14 | 15 |
| 23 | | | |
| | 307. Title 3, United States Code, Section 16 | 14 | 15 |
| 24 | | | |
| | 308. Title 3, United States Code, Section 17 | 14 | 15 |
| 25 | | | |

| | | Offered | Ruled On |
|---|---|---|---|
| EXHIBITS: (cont'd.) | | | |
| 309. Title 3, United States Code, Section 18 | | 14 | 15 |
| 310. S. Con. Res. 1, dated Jan. 3, 2021 | | 14 | 15 |
| 400. Montage of video footage | | 36 | 36 |
| 414. BWC video MPD Officer Caballero | | 81 | 81 |
| 424. CCTV footage alongside cell phone video | | 81 | 81 |
| 425. CCTV and body-worn camera footage | | 81 | 81 |
| 426. CCTV and body-worn camera footage | | 81 | 81 |
| 427. Body-worn camera footage | | 81 | 81 |
| 428. Body-worn camera footage alongside cell phone video | | 81 | 81 |
| 429. Continuation of Exhibit 428 | | 81 | 81 |
| 430. Body-worn camera footage | | 81 | 81 |
| 431. CCTV footage | | 36 | 36 |
| 432. CCTV footage | | 36 | 36 |